**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO; SERVICE EMPLOYEES INTERNATIONAL UNION; and SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 925,<br><br>     Plaintiffs,<br><br> v.<br><br>UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; ADMINISTRATION FOR CHILDREN AND FAMILIES; ROBERT F. KENNEDY, JR., in his official capacity as Secretary of Health and Human Services; ALEX J. ADAMS, in his official capacity as the Assistant Secretary of the Administration for Children and Families,<br><br>     Defendants. | CASE NO.<br><br>**COMPLAINT** |

PLAINTIFFS' COMPLAINT – 1

18 WEST MERCER ST., STE. 400 **BARNARD**

SEATTLE, WASHINGTON 98119 **IGLITZIN &**

TEL 800.238.4231 | FAX 206.378.4132 **LAVITT LLP**

**INTRODUCTION**

1.      Child care in the United States is a "fundamentally broken system due to chronic underinvestment."[1] Families across the country struggle to find care that meets their children's needs. When they can find a spot, low-income parents pay an average of 20–36% of their income for care—three to five times more than higher-income families. The price averages well over $1,200 per month. For many parents, it exceeds the cost of rent, mortgage payments, and even public college tuition, so families must often choose between paying for adequate child care and meeting other basic needs. The burden forces families to settle for care that may be less safe and less reliable, and it often drives parents—especially mothers—to leave the workforce entirely.[2]

2.      Congress created the Child Care and Development Fund ("CCDF") to address these problems. It designed the fund to give low-income families equal access to affordable, high-quality child care. The program entrusts states, territories, and tribes with billions of federal dollars in federal funds each year to fund grants, contracts, and vouchers that parents can use to pay for care of their choice. Almost 1 million families and 1.6 million children access child care using the program each month. And over 200,000 child care providers—mostly small businesses strained

---

[1] *Improving Child Care Access, Affordability, and Stability in the Child Care and Development Fund*, 89 Fed. Reg. 15366, 15366–67 (2024) ("2024 Rule").

[2] *Id.* at 15366–67, 15407; *see* Child Care Aware of America, Price of Care: 2021 Child Care Affordability Analysis (2022), https://perma.cc/6G2Q-BFV8 (finding that the price of child care for two children—an infant and a 4-year old—exceeded the average annualized rent in the District of Columbia and all 49 states with available data in 2021); Liana Christin Landivar, et al, Women's Bureau, U.S. Dep't of Labor, Issue Brief: Childcare prices in local areas: Initial findings from the national database of childcare prices (Jan. 2023), https://perma.cc/AQ3U-MKUA ("A 10% increase in median child care prices was associated with 1 percentage-point lower county-level maternal employment rates. Counties with child care prices that were twice as expensive than the median child care price had maternal employment rates that were 4 percentage points lower.").

PLAINTIFFS' COMPLAINT – 2

18 WEST MERCER ST., STE. 400   **BARNARD**
SEATTLE, WASHINGTON 98119   **IGLITZIN &**
**TEL** 800.238.4231 | **FAX** 206.378.4132   **LAVITT LLP**

by high operating costs, low pay, workforce shortages, and thin margins—rely on the program as a lifeline to keep their doors open to the families they serve.

3.     Despite the program's bedrock importance to American families and to the national economy, families using the program still find it hard to find and afford child care. In 2024, the Administration of Children and Families ("ACF"), a component of the United States Department of Health and Human Services ("HHS"), found that three problems plagued CCDF.

4.     First, due to high copayments, many families who use CCDF vouchers still pay *more* for child care, as a percentage of their income, than the average private-paying family, making child care unaffordable even with the subsidy. ACF found that this frustrated Congress's directions that CCDF participants should have "equal access" to child care and that copayments must not create a "barrier" to child care access. 42 U.S.C. § 9858c(c)(4)(A), (c)(5).

5.     Second, state payment practices regularly diverge from the way the market typically pays providers. Instead of paying based on enrollment (for the spot the child fills) and in advance, as most private payers do, many states pay providers retroactively and based on a child's actual attendance, often delaying payment for weeks after care is delivered. ACF found that these practices contradicted the statute's direction that states use "generally accepted" market payment practices that cover the fixed costs of providing care. 42 U.S.C. § 9858c(c)(2)(S). The practices drove providers away from the CCDF program and shrunk the options available to parents.

6.     Third, parents of infants and toddlers, children with disabilities, and children in underserved geographic areas often cannot find care that meets their child's needs. States could grow that supply, ACF found, by offering grants and contracts to providers who held slots open for those groups. But states underutilized those critical tools.

PLAINTIFFS' COMPLAINT – 3

18 WEST MERCER ST., STE. 400   **BARNARD**

SEATTLE, WASHINGTON 98119   **IGLITZIN &**

TEL 800.238.4231 | FAX 206.378.4132   **LAVITT LLP**

7.    After notice and comment, ACF promulgated a regulation with four provisions designed to address these issues. The 2024 Rule requires states to (1) cap copayments at 7% of a family's income; (2) pay providers prospectively instead of reimbursing them later; (3) pay them based on enrollment, rather than attendance, to the extent practicable; and (4) deliver some direct services through grants or contracts, including some for infants and toddlers, children with disabilities, and in underserved areas. ACF cited studies showing that these changes would lower child care costs and expand parents' options by encouraging providers to participate in the program. The rule gave hope to providers who struggled to stay in business and families who strained to afford child care under the prior rules.

8.    Less than two years later, the Trump-Vance administration reversed course. In late 2025, the new head of ACF promised a "bonfire" of child care regulations. The 2024 Rule was promptly swept into the blaze. In May 2026, over the objections of most parents and providers who commented, ACF repealed the 2024 Rule. *Restoring Flexibility in the Child Care and Development Fund (CCDF)*, 91 Fed. Reg. 25796 (May 12, 2026) ("2026 Rule").

9.    In tossing out the 2024 Rule's four evidence-backed provisions, ACF ignored Congress's directions and the predictable impacts the recission will have on child care providers and the families they serve. The agency claimed that the reversal would save money and give states "flexibility" about how to run the program. But it did not explain whether—or why—ACF now disagreed with its prior conclusions that providers and parents would be harmed without the 2024 Rule: *i.e.*, that high copays created a "barrier" to child care access and undermined "equal access" for families using CCDF; that retroactive and attendance-based payments broke with the market, pushed providers out of the program, and constrained parental choice; and that grants and contracts would reduce gaps in child care supply for underserved populations. In repealing the provisions it

PLAINTIFFS' COMPLAINT – 4

18 WEST MERCER ST., STE. 400    **BARNARD**

SEATTLE, WASHINGTON 98119    **IGLITZIN &**

TEL 800.238.4231 | FAX 206.378.4132    **LAVITT LLP**

previously found would help fix those problems, ACF did not cite a single study. And it did not grapple with any of the objections raised by the providers, families, and experts who commented.

10. The rule will cost providers and families millions of dollars and shrink the already strained market for affordable child care. ACF acknowledged that rescinding the enrollment-based payment provision alone would cost providers $16.5 million, and the delayed reimbursements and higher copays that flow from the 2026 Rule will push the rule's total costs to providers and families even higher. Without enrollment-based payments, small child care providers on shoestring budgets will lose critical income when children are absent. Without prospective payments, providers must rely on savings or credit (if they can access it) to pay rent, utilities, salaries, and other fixed costs while they await payment for weeks or months for services already provided. Without the copay cap, many families will be unable to afford child care even with CCDF assistance. And absent the grants and contracts requirement, the parents of underserved children will lack access to child care.

11. The 2026 Rule is unlawful, arbitrary and capricious, and the Court should set it aside.

## JURISDICTION AND VENUE

12. The Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because the claims arise under the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.*

13. This Court has the authority to grant relief under the APA, 5 U.S.C. § 701 *et seq.*

14. Venue is proper under 28 U.S.C. § 1391(e)(1) because a substantial part of the events or omissions giving rise to the claims occurred in this district, and Plaintiff SEIU Local 925 resides in this district.

PLAINTIFFS' COMPLAINT – 5

**THE PARTIES**

15.    **Plaintiff American Federation of State, County and Municipal Employees, AFL-CIO ("AFSCME")** is a labor organization and unincorporated association headquartered in Washington, D.C. AFSCME is the largest trade union of public employees in the United States, with 1.4 million members organized into approximately 3,400 local unions, 58 councils and affiliates in 46 states, the District of Columbia, and Puerto Rico. AFSCME members include nurses, corrections officers, child care providers, emergency medical technicians, sanitation workers, school bus drivers, civil engineers, policy analysts, and more, all with one thing in common: a dedication to making our communities stronger, healthier, and safer. AFSCME represents more than 35,000 independent child care providers whose caregiving work is directly funded by the CCDF program, along with employees of public and private day care and early childhood education centers. AFSCME's membership also includes parents and other caregivers who rely on CCDF subsidies to access child care for their own families. Some of the collective bargaining agreements (CBAs) AFSCME negotiates with employers of AFSCME members include terms designed to make child care more accessible and affordable for AFSCME members. AFSCME and its affiliates represent more than 65,000 employees in Washington State.

16.    **Plaintiff Service Employees International Union AFL-CIO ("SEIU")** is a labor organization of approximately two million working people united by the belief in the dignity and worth of workers and the services they provide. SEIU strives for a just society in which all workers, families, and communities can thrive. Every day, SEIU members educate and care for children, provide patient care, help seniors and people with disabilities live independently, and keep our communities clean, safe, and healthy. SEIU members work in child care centers, preschools, in-home child care settings, schools and universities, government offices, hospitals and nursing

PLAINTIFFS' COMPLAINT – 6

18 WEST MERCER ST., STE. 400   **BARNARD**

SEATTLE, WASHINGTON 98119   **IGLITZIN &**

**TEL** 800.238.4231 | **FAX** 206.378.4132   **LAVITT LLP**

homes, airports, libraries, and commercial office buildings, among many other settings. SEIU represents approximately 81,000 family child care providers who rely on CCDF funding to provide care, nearly 9,500 child care workers at public and private day care centers and preschools (a significant percentage of which receive some federal CCDF funding), and many parents and/or caregivers who access child care using the CCDF program. In Washington, specifically, SEIU and its local union affiliates represent more than 125,000 workers.

17.     **Plaintiff Service Employees International Union Local 925 ("SEIU 925")** is a local union affiliate of SEIU. SEIU 925 represents approximately 19,000 people in Washington who work in education from early learning through higher education, as well as members who work in local government and nonprofits. SEIU 925 members work together to provide quality education for children and students, to ensure that education remains a state priority, and to provide quality public services to communities across the state of Washington. SEIU 925 represents approximately 5,550 family child care providers who receive CCDF funding and approximately 200 early learning educators, some of whom work for employers that receive CCDF funding. SEIU 925 is headquartered in this district at 1914 N. 34th Street, Seattle, Washington. SEIU 925 also has in-state offices in Vancouver, Longview, Bellingham, and Bremerton.

18.     **Defendant Department of Health and Human Services**, or HHS, is the department of the United States government that administers the CCDF program. *See* 42 U.S.C. §§ 9858a, 9858c(a), 9858n(12) (vesting authority in the Secretary of HHS).

19.     **Defendant Administration of Children and Families**, or ACF, is the division of HHS that administers the CCDF program and that promulgated the 2024 and 2026 Rules.

20.     **Defendant Robert F. Kennedy, Jr.** is the Secretary of Health and Human Services and is sued in his official capacity.

PLAINTIFFS' COMPLAINT – 7

21.    **Defendant Alex J. Adams** is the Assistant Secretary and head of ACF and is sued in his official capacity.

**BACKGROUND**

**I.    The Child Care Development Fund**

22.    The Child Care Development Block Grant Act of 1990, as amended ("CCBDG Act," or the "Act"), establishes a cooperative federal-state program that channels federal subsidies to state and local agencies to fund child care for eligible low-income families. *See* Child Care Development Block Grant Act of 1990, Pub. L. 101-508, 1388 Stat. 236 (Nov. 5, 1990); Child Care Development Block Grant Act of 2014, Pub. L. 113-186, 128 Stat. 1971 (Nov. 19, 2014) (reauthorizing and amending the program). Each year, Congress appropriates over $11 billion through the program to fund child care in 50 states, the District of Columbia, five territories, and 264 tribal organizations. 2024 Rule, 89 Fed. Reg. at 15400; *accord* 2026 Rule, 89 Fed. Reg. at 25797.[3] Under the program, state agencies may use the federal funds to assist eligible children through two mechanisms: (1) direct grants and contracts with providers and (2) "child care certificates," or vouchers, that parents may use to purchase child care services from a qualifying provider of their choice. 42 U.S.C. § 9858c(c)(2)(A).

23.    The Act's primary goal is to expand access to high-quality affordable child care options for working parents with low incomes. 2026 Rule, 91 Fed. Reg. at 25798. By reauthorizing the program in 2014, Congress sought "to promote parental choice," improve the quality of child

---

[3] The federal funds derive from two sources: Child Care and Development Block Grants appropriated pursuant to the Act and mandatory funds under the Child Care Entitlement to States, or "CCES." The CCES is permanently authorized under Section 418 of the Social Security Act. CCES funds generally must be spent according to CCDBG Act rules. 42 U.S.C. 618(c). To be eligible, a child must (1) be younger than age 13, (2) live with a parent or parents who are working or in a job training or education program, (3) have a family income at or below 85% of state median income, and (4) have family assets that do not exceed $1 million. 42 USC § 9858n(4).

PLAINTIFFS' COMPLAINT – 8

18 WEST MERCER ST., STE. 400    **BARNARD**

SEATTLE, WASHINGTON 98119    **IGLITZIN &**

**TEL** 800.238.4231 | **FAX** 206.378.4132    **LAVITT LLP**

care services, and "increase the number and percentage of low-income children in high-quality child care settings." 42 U.S.C. § 9857(b)(2), (b)(7).

24.    Although Congress sought to provide states "maximum flexibility in developing child care programs and policies," 42 U.S.C. § 9857(b)(1), states must comply with defined federal parameters to receive federal funds. The Act establishes detailed requirements and empowers HHS to promulgate regulations to ensure that local agencies use those funds to effectively serve the Act's primary objective: to ensure families have access to affordable high-quality child care.

25.    To participate in the program, states, territories, and tribal organizations (all deemed "States" under the regulations)[4] must designate a "Lead Agency" to administer the program. Every three years, the Lead Agency must submit an application "at such time, in such manner, and containing such information as the Secretary [of HHS] shall by rule require." 42 U.S.C. § 9858c(a). The application must include a "State plan" that meets the following detailed statutory requirements, among others. *Id.* § 9858c(a)(2).

26.    First, the Act recognizes that providers will be less likely to serve families who receive CCDF assistance if the program pays providers on less favorable terms than the private market. To that end, states must certify that the rates used to pay providers through the program "are sufficient to ensure equal access for eligible children to child care services that are comparable" to the services provided to other children. *Id.* § 9858c(c)(4)(A). The rates must match the market. Before setting those rates, States must conduct "a statistically valid and reliable survey of the market rates for child care services in the State," or suitable alternative methodology, and set payment rates "in accordance with" that market assessment. *Id.* § 9858c(c)(4)(B).

---

[4] *See* 45 U.S.C. § 98.2 (defining "State" to mean "[a]ny of the States and the District of Columbia" and to "include[] Territories and Tribes unless otherwise specified").

PLAINTIFFS' COMPLAINT – 9

18 WEST MERCER ST., STE. 400   BARNARD

SEATTLE, WASHINGTON 98119   IGLITZIN &

TEL 800.238.4231 | FAX 206.378.4132   LAVITT LLP

27.    Like payment rates, CCDF payment *practices* must also align with the private market. To "provide stability of funding and encourage more child care providers to serve children" who receive CCDF assistance, the Act also requires States to certify the "payment practices of child care providers in the State" that participate in the CCDF program "reflect generally accepted payment practices of child care providers in the State that serve children who do not receive assistance" under the CCDF program. *Id.* § 9858c(c)(2)(S)(i). It also requires "assurance that the State will, to the extent practicable, implement enrollment and eligibility policies that support the fixed costs of providing child care services by delinking provider reimbursement rates from an eligible child's occasional absences due to holidays or unforeseen circumstances such as illness." *Id.* § 9858c(c)(2)(S)(ii). And States must "provide for timely payment for child care services provided under [CCDF]." *Id.* § 9858c(c)(4)(B)(iv).

28.    Finally, although States may require parents to pay a share of the cost of child care as a copayment, Congress directed them to ensure those copayments are not a "barrier" for families receiving CCDF assistance. *See id.* § 9858c(c)(5) ("The State plan shall provide that the State will establish and periodically revise, by rule, a sliding fee scale that provides for cost sharing (that is not a barrier to families receiving assistance under this subchapter) by the families that receive child care services for which assistance is provided under this subchapter.").

29.    Through these provisions, "Congress intended for the [CCDF] to give parents the widest possible variety of child care options." *Child Care and Development Block Grant*, 57 Fed. Reg. 34352, 34370 (Aug. 4, 1992). Thus, "although Grantees enjoy great flexibility in program administration," ACF regulations since 1992 have "require[d] that such discretion may not be exercised at the expense of parental choice." *Id.* In other words, states must follow the Act's requirements to maximize affordable, high-quality child care options for participating families.

PLAINTIFFS' COMPLAINT – 10

18 WEST MERCER ST., STE. 400  **BARNARD**

SEATTLE, WASHINGTON 98119  **IGLITZIN &**

TEL 800.238.4231 | FAX 206.378.4132  **LAVITT LLP**

## II.    The 2024 Rule

30.    In 2024, ACF found that despite states' efforts to expand access, child care in the United States remained "a fundamentally broken system" due to "chronic underinvestment," scarcity, and ballooning costs. 2024 Rule, 89 Fed. Reg. 15367. "There are not enough child care programs to serve families who need care," and over half of U.S. families live in places "where potential demand for child care outstrips supply by at least three to one." *Id.* As a result, "most families . . . struggle to find or afford high-quality child care that meets their needs." *Id.* The COVID-19 pandemic worsened these problems, forcing many providers to close their doors. *Id.*

31.    Amid these challenges, the agency identified three specific issues that plagued the CCDF program. First, many participating families were paying high copayments that were a "significant and destabilizing financial strain on family budgets" and posed "a barrier to participating in the CCDF program and maintaining employment." *Id.* Second, many Lead Agencies pay providers less, and later, than private-paying clients, discouraging providers from participating in CCDF and shrinking parent options. *Id.* at 15367. Third, specific populations—families with infants and toddlers, children in underserved geographic areas, and children with disabilities—found it especially hard to access care. *Id.* at 15769–70.

32.    ACF found that these issues warranted four main changes to CCDF regulations.

### A.    Family Copayment Cap

33.    First, the 2024 Rule capped the maximum copayment that families with CCDF vouchers could be required to pay out-of-pocket. *See* 45 C.F.R. § 98.45(l)(3)(2024) (requiring Lead Agencies to "establish, and periodically revise, by rule, a sliding fee scale(s) for families that receive CCDF child care services that . . . [p]rovides for affordable family co-payments that are not a barrier to families receiving assistance under this part, not to exceed 7% of income for all

PLAINTIFFS' COMPLAINT – 11

18 WEST MERCER ST., STE. 400    BARNARD

SEATTLE, WASHINGTON 98119    IGLITZIN &

TEL 800.238.4231 | FAX 206.378.4132    LAVITT LLP

families, regardless of the number of children in care who may be receiving CCDF assistance").

34.     Since 2016, HHS regulations had set a copay equal to 7% of a family's income as the "benchmark" for affordable co-payments. 89 Fed. Reg. at 15368. Despite the federal benchmark, average CCDF copays in 11 States exceeded the benchmark, 20 states allowed copayments over the benchmark, and 16 lacked clear restrictions on copayments. *Id.* at 15368. In States that did not cap copayments, copays rose as high as 27% of family income. *Id.* at 15388.

35.     In the 2024 rulemaking, ACF found that copays over 7% of a family's income create a "barrier to child care access in the CCDF program." *Id.* at 15368. Studies show that "even very low co-payments[] remain a barrier for some families to make ends meet, especially families struggling to afford housing costs." *Id.*; *see also id.* at 15388 (citing research showing that "the cost of child care is a barrier to access at any co-payment level").[5] Commenters reinforced that many families could not afford even a 7% copay. *Id.* at 15388.

36.     ACF also concluded that the 7% cap would help ensure equal access to child care for low-income families, one of the goals of the Act. According to the U.S. census data, the average family "spent 7 percent of income on child care"—but low-income families spent "four times the share of their income on child care compared to higher income families." *Id.* (citing Lynda Laughlin, *Who's Minding the Kids? Child Care Arrangements: Spring 2011*, U.S. Census Bureau (Apr. 2013), https://perma.cc/XV3Z-KAFZ). Other studies showed that families with low incomes (below $25,000 per year) pay from 9–31% of their income for child care, while those with high incomes (above $150,000) paid around 7% (*i.e.*, 6–8%) of their income for child care. *Id.* Because

---

[5] *See*, *e.g.*, Ellen K. Scott et al., Assessing the Impacts of Oregon's 2007 Changes to Child-Care Subsidy Policy, Univ. of Oregon 8 (2011) https://perma.cc/2YDF-V7HT (finding, in a study of Oregon's child care subsidy program, that "parents experienced substantial financial burden in meeting their portion of the child-care costs, even when paying very low copays").

PLAINTIFFS' COMPLAINT – 12

18 WEST MERCER ST., STE. 400   **BARNARD**

SEATTLE, WASHINGTON 98119   **IGLITZIN &**

TEL 800.238.4231 | FAX 206.378.4132   **LAVITT LLP**

CCDF assistance is supposed to "offset the disproportionate share of income that families with low incomes pay for child care," ACF reasoned that "families participating in CCDF should not be required to pay a greater share of their income than higher income families." *Id.*

**B. Prospective and Enrollment-based Payment**

37.　Second, the 2024 Rule required States to align their payment practices "with generally accepted payment practices in the private sector," by paying providers prospectively and based on enrollment, rather than attendance. 2024 Rule, 89 Fed. Reg. at 15769.

38.　Specifically, the rule amended the regulations to provide that Lead Agencies must: "(1) Ensure timeliness of payment to child care providers by paying in advance of or at the beginning of the delivery of child care services to children receiving [CCDF] assistance" and "(2) Support the fixed costs of providing child care services by delinking provider payments from a child's occasional absences by: (i) Basing payment on a child's authorized enrollment; or (ii) An alternative approach for which the Lead Agency provides a justification [that enrollment-based payments] are not practicable, including evidence that the alternative approach will not undermine the stability of child care programs." 45 C.F.R. § 98.45(m) (2024).

39.　The Act requires States to use practices that "reflect generally accepted payment practices" in the private market, 42 U.S.C. 9858c(c)(2)(S), because market-based payment practices "make[] it easier for child care providers to serve children receiving assistance from CCDF," which keeps more providers in the program, and thus "foster[s] equal access to child care for participating parents," a "central" goal of CCDF. 2024 Rule, 89 Fed. Reg. at 15369.

40.　In the private market, most providers charge a "set fee" based on "a child's enrollment" and "are paid in advance of when services are provided." *Id.* That is because child care providers operate with high monthly expenses and low profit margins, usually "less than 1

PLAINTIFFS' COMPLAINT – 13

percent." *Id*. Providers need to charge private customers based on enrollment, rather than attendance, to support "the fixed costs of providing child care, including staff wages, rent, and utilities," which "do not decrease when a child is absent." *Id*. They charge private-paying families prospectively (e.g., payment on February 1 for February child care) "because providers need to receive payment before services are delivered to meet payroll and pay rent." *Id.* at 15391. Many of these bills must be paid at the beginning of the month. *Id.* at 15392.

41.   As one provider described it, "During cold and flu season, if child care providers were only paid based on attendance rather than enrollment, many of us simply would not survive the winter. . . . Most of our families have multiple children, and when one child gets sick, it often spreads through the entire household. Enrollment-based pay is the only model that reflects the real cost of maintaining stable staffing, ratios, and operations."[6]

42.   Many State CCDF plans do not follow these market practices, however. In 2024, only 8 States paid providers prospectively, and only 36 paid based on enrollment. *Id.* at 15369.

43.   ACF found that such retroactive and attendance-based payment practices pushed providers away from the program. Providers paid based on attendance "either absorb the lost revenue associated with a child's occasional absences or choose not to participate" in CCDF, which "limits parent choices" for participating families. *Id*. In one survey, many providers cited "delayed payments and their destabilizing effect on child care operations as a key reason why they do not participate in the CCDF program." *Id.* In another, "80 percent" responded that they would "be more likely to serve families using subsidies if the State paid based on enrollment rather than attendance, and 73% said they would be more likely if the State paid prospectively." *Id.*; *see also*

---

[6] Emily Tate Sullivan, Federal Child Care Changes May Leave Providers, Families in the Lurch, The 74 (May 12, 2026), https://perma.cc/PC8T-VJW7.

PLAINTIFFS' COMPLAINT – 14

18 WEST MERCER ST., STE. 400   **BARNARD**

SEATTLE, WASHINGTON 98119   **IGLITZIN &**

TEL 800.238.4231 | FAX 206.378.4132   **LAVITT LLP**

*id.* at 15407 (finding that prospective and enrollment-based payment practices are linked "to higher-quality care and increases in the supply of child care").

44.    Commenters reinforced that retroactive and attendance-based payment practices "have led some child care providers to choose not to participate in the subsidy program or to limit the number of children receiving subsidies that they will serve at any given time." *Id.* at 15392.

45.    ACF therefore concluded that prospective and enrollment-based payments would "increase parents' options, make it easier for providers to accept subsidies, improve stability among child care providers serving children participating in CCDF, and align[] with generally accepted payment practices for private pay families." *Id.* In doing so, ACF considered and rejected the alternatives that would have allowed States to reduce payments if a child attended less than 85% of the service period, or more than five days in a month. *Id.* at 15392.

46.    The 2024 Rule's payment practice requirements were not inflexible, however. The rule allowed Lead Agencies to adopt alternative payment methods so long as the state agency demonstrated that prospective and enrollment-based payments were not "practicable," "reflect[ed] private pay practices for most child care providers in the State or Territory, and [did] not undermine the stability of child care providers participating the CCDF program." *Id.* at 15392.

47.    ACF also noted that States could "continue to require child care providers submit attendance records to ensure children participating in CCDF are utilizing their subsidy." *Id.* at 15392.  And they could require providers to certify their expected enrollment before receiving their payment and to "submit documentation" regarding "newly enrolled or disenrolled" students at certain intervals. *Id.* at 15393. "Because Lead Agencies [would] not have to closely align attendance records with payments," however, ACF predicted that the 2024 Rule would "decrease in administrative burden for Lead Agencies and child care providers." *Id.*

PLAINTIFFS' COMPLAINT – 15

18 WEST MERCER ST., STE. 400  **BARNARD**

SEATTLE, WASHINGTON 98119  **IGLITZIN &**

TEL 800.238.4231 | FAX 206.378.4132  **LAVITT LLP**

48.    "Most commenters strongly supported the proposed changes to move to paying prospectively and based on enrollment, noting that the changes were long overdue and [would] have a significant impact on child care providers." *Id.* at 15392.

**C. Grants and Contracts**

49.    Finally, the 2024 Rule required States to use grants and contracts to expand child care supply. 89 Fed. Reg. at 15370. It also required States to use some of those grants and contracts for three populations for whom child care is especially hard to come by: infants and toddlers, children with disabilities, and children in underserved geographic areas. *Id.*; *see* 45 C.F.R. § 98.30(b)(1) (2024) ("Lead Agencies shall increase parent choice by providing some portion of the delivery of direct services via grants or contracts, including at a minimum for children in underserved geographic areas, infants and toddlers, and children with disabilities."). Grants and contracts are agreements between state agencies and child care providers to designate slots for CCDF-eligible children in exchange for funds. 89 Fed. Reg. at 15370.

50.    As ACF determined in 2024, "Finding care for infants and toddlers and children with disabilities is particularly difficult for parents." *Id.* Caring for those populations requires "[h]igher operational costs per child," "specialized training," and more "physical space," which all demand "additional funding and planning" and shrinks supply. *Id.* "Children in underserved geographic areas especially have less access to high-quality child care options and parents struggle to find high-quality child care that is reliably available and affordable." *Id*. at 15369. "[I]nsufficient child care supply greatly limits parents' choices in child care arrangements." *Id.* at 15382.

51.    At the same time, these populations make up a large proportion of CCDF participants: About one third are infants and toddlers, and about 17% have developmental disabilities. *Id.* at 15370. An analysis of 19 states and the District of Columbia found that in 80%

PLAINTIFFS' COMPLAINT – 16

18 WEST MERCER ST., STE. 400    **BARNARD**
SEATTLE, WASHINGTON 98119    **IGLITZIN &**
TEL 800.238.4231 | FAX 206.378.4132    **LAVITT LLP**

of counties studied, there were three infants and toddlers for every child care slot for children under three. *Id.* More than a third of parents with children with disabilities reported having difficulty finding child care, compared to a fourth for children without disabilities. *Id.*

52.     The Act requires States to describe "strategies" that the State will use "to increase the supply and improve the quality of child care services" for "(i) children in underserved areas," "(ii) infants and toddlers," "(iii) children with disabilities," such as "the provision of direct contracts or grants to community-based organizations" that serve those children. 42 U.S.C. § 9858c(c)(2)(M). The Act further requires the State to give parents the option to enroll their child with a provider that has a contract or grant for the provision of child care services. *Id.* § 9858c(c)(2)(A). Nonetheless, as of the 2024 Rule's issuance, "approximately twenty states report[ed] serving no children with disabilities." 2024 Rule, 89 Fed. Reg. at 15370.

53.     To address these supply gaps, the 2024 Rule required Lead Agencies to use some grants and contracts to provide direct services to children in underserved geographic areas, infants and toddlers, and children with disabilities. *Id*. By guaranteeing payment for providers who hold open spots for those groups, grants and contracts increase available slots for populations in need, "building child care supply" for underserved populations. *Id.* at 15370, 15381. They also "increase stability for child care providers and encourage them to participate in the subsidy program." *Id.* at 15382. ACF found that "requiring some use of grants or contracts" for underserved populations would "help more parents find the child care they need." *Id.*

54.     Reinforcing that conclusion, ACF cited studies indicating that grants and contracts would increase the supply of child care for these populations. In a survey, 80% of child care providers indicated that they would be interested in applying for grants or contracts to serve the identified populations. *Id.* at 15370. Analyses of programs in two different states—Pennsylvania

PLAINTIFFS' COMPLAINT – 17

18 WEST MERCER ST., STE. 400   **BARNARD**

SEATTLE, WASHINGTON 98119   **IGLITZIN &**

TEL 800.238.4231 | FAX 206.378.4132   **LAVITT LLP**

and Georgia—showed that the use of grants and contacts increased providers' financial stability, improved quality of care, and led to more stable or increased enrollment for infants and toddlers. *Id.* Commenters "strongly supported" the new provision. *Id.* at 15381.

55.　　Together, ACF found, the 2024 Rule's new requirements would "lower families' costs for child care," "encourage more providers to accept subsidies," and "expand available child care options" for low-income parents participating in CCDF. *Id.* at 15367, 15369.

56.　　The 2024 Rule took effect on April 30, 2024. *Id.* at 15366. To give States time to implement the rule, ACF allowed States to "request a temporary waiver for an extension of up to two years if needed to come into compliance" with the new requirements. *Id.*

**III.　　The Challenged Rule**

57.　　When the Trump-Vance Administration took office, the President directed that "for each new regulation issued, at least 10 prior regulations be identified for elimination." *Unleashing Prosperity Through Deregulation*, Exec. Order No. 14192, 90 Fed. Reg. 9065 (Jan. 31, 2025). In late 2025, the head of ACF, Assistant Secretary Alex Adams, promised a "bonfire" of child care regulations. Coral Davenport, *Trump's Top Child Care Official Wants a 'Bonfire of Regulations,'* N.Y. Times (Apr. 28, 2026), https://perma.cc/CG3X-CTNT. "We're going to barbeque a lot of sacred cows," he told an interviewer. *Id.*

58.　　On January 5, 2026, the ACF noticed a proposed rulemaking to repeal the four key provisions of the 2024 Rule. *Restoring Flexibility in the Child Care and Development Fund (CCDF)*, 91 Fed. Reg. 207 (Jan. 5, 2026).

59.　　Comments poured in, including from Plaintiffs AFSCME and SEIU. Of the nearly 1,000 unique comments, the majority opposed the rescission. Child care providers, families, and

PLAINTIFFS' COMPLAINT – 18

experts explained that the proposed rule would push providers out of the CCDF program and make care more costly and harder to find, especially for underserved populations.

60. ACF rescinded the relevant provisions anyway. The agency published the final rule on May 12, 2026. *Restoring Flexibility in the Child Care and Development Fund (CCDF)*, 91 Fed. Reg. 25796 (May 12, 2026). In the preamble, ACF generally opined that the rule would save money and give States more flexibility to decide how to implement the CCDF program. *See id.* at 25797–98. But it did not meaningfully engage with the rationale behind the 2024 Rule or the factual findings that underpinned that rule. And it did not describe any data concerning the likely impacts of the 2026 rule on child care providers or families. In short, while the rule touted state choice, parent choice and family budgets fell by the wayside.

## A. Family Copayment Cap

61. To justify repealing the 7% copay cap, ACF said the rule would give States "flexibility to decide how best to balance the trade-offs between reducing child care costs for families participating in CCDF and serving additional families with higher co-payments." *Id.* at 25798, 25801. But as explained above, Congress limited the extent to which States may require families to pay higher copays: The Act directs that States may not set copays so high that they pose a "barrier" to access for the low-income families who participate in the CCDF program. 42 U.S.C. § 9858c(5). If families cannot afford the copay, the increased cost per family could reduce participation in the program. *See* 2024 Rule, 89 Fed. Reg. at 15407 ("[R]esearch shows that higher out-of-pocket child care expenses (which may include co-payments) reduce families' child care use and parental (particularly maternal) employment."). And if families using CCDF must pay more than average, CCDF subsidies do not achieve their goal to equalize access to child care. *See*

PLAINTIFFS' COMPLAINT – 19

18 WEST MERCER ST., STE. 400   **BARNARD**

SEATTLE, WASHINGTON 98119   **IGLITZIN &**

TEL 800.238.4231 | FAX 206.378.4132   **LAVITT LLP**

*id.* at 15388. Though the 2024 Rule flagged and addressed these issues, the 2026 Rule ignored them.

62.    First, in rescinding the copay cap, ACF did not address its prior conclusion, reached just two years earlier, that copays of 7% or higher create a barrier to child care access for the low-income families that CCDF serves. Commenters submitted overwhelming evidence showing that families could not afford copays of over 7%, forcing impossible tradeoffs between paying for child care and paying for other necessities, and that higher copays reduced participation in CCDF.[7] But ACF did not discuss that data. And it cited no evidence that families in *any* state can afford copays over 7%. Nor did it find that the evidence was uncertain on whether copays over 7% of a family's income pose a barrier to child care access.

63.    Second, ACF said nothing to address the other rationale for the copayment cap: that copays over 7% place a disproportionate burden on low-income families and undermine the *equality* of access to child care that CCDF is designed to ensure. *See* 2024 Rule, 89 Fed. Reg. at

---

[7] *See*, *e.g.*, Catholic Charities, *Comment Letter on CCDF Rule* 2 (Feb. 4, 2026) (noting that nonpartisan reviews of subsidy programs show that lower out-of-pocket costs are associated with increased use of child care and higher rates of parental employment; "even modest increases in co-payments can determine whether child care is financially viable"); SEIU Healthcare Illinois Indiana Missouri Kansas' Child Care and Early Learning Division, *Comment Letter on CCDF Rule* 1–3 (Feb. 3, 2026) (providing anecdotes from providers that explain that the 7% copay protects parents and providers and that providers lose money when parents cannot afford their copays); Family Resource Center, *Comment Letter on CCDF Rule* 3 (Jan. 30, 2026) ("The 7 percent cap provides an important safeguard against cost increases that would otherwise make child care unaffordable for families who are already balancing rising housing, transportation, and food costs."); Child Care Law Center, *Comment Letter on CCDF Rule* 3–4 (Feb. 4, 2026) ("Hundreds of California families have shared their experiences and legislative testimony highlighting how copayments were a major barrier to finding and maintaining child care before California significantly reduced these fees," after which "[f]amilies reported that, for the first time, they could pay their rent on time, save for their children's education, pay off debt, improve their credit scores, and even save enough money for a down payment on a home."); Center for American Progress, *Comment on CCDF Rule* 2 (Feb. 4, 2026) ("The families that most need subsidies often cannot afford to participate in the subsidy system specifically because of this cost burden [of rising copays].").

PLAINTIFFS' COMPLAINT – 20

18 WEST MERCER ST., STE. 400   **BARNARD**

SEATTLE, WASHINGTON 98119   **IGLITZIN &**

TEL 800.238.4231 | FAX 206.378.4132   **LAVITT LLP**

15388 ("As CCDF assistance is intended to offset the disproportionate share of income that families with low incomes pay for child care, families participating in CCDF should not be required to pay a greater share of their income than higher income families.").

64. Worse, the 2026 Rule not only rescinded the copay cap, it also declined to set *any* benchmark to guide states in setting copays. In doing so, it departed from a practice the agency has followed for 28 years. ACF regulations have set a copayment benchmark since 1998. *See Child Care and Development Fund (CCDF) Program*, 81 Fed Reg. 67438, 67440 (Sept. 30, 2016) (setting benchmark at 7% of family income); *Child Care and Development Fund*, 63 Fed. Reg. 39936, 39960 (July 24, 1998) (10%). The 2026 Rule rescinded the 7% benchmark established in the 2016 rule. Although ACF claimed that the 7% benchmark was based on "outdated" data (from the 2011 census), 2026 Rule, 91 Fed. Reg. at 25801, commenters had submitted ample data supporting a 7% cap. ACF did not explain why it could not rely on that data to set a federal benchmark. *Id.* Nor did it explain why it could not rely on data from the 2021 census. *Id.*

65. Instead, ACF rescinded the copay cap without any reasoned analysis.

**B. Prospective Payments**

66. ACF also repealed the prospective payment requirement. In doing so, it allowed Lead Agencies to delay payment for up to 21 days after services are provided. 2026 Rule, 91 Fed. Reg. at 25802. Instead of being paid by January 1 for care delivered in January (as required by the 2024 Rule), for example, child care providers may now need to wait until February 21 to be reimbursed. To justify that change, ACF also gestured to State choice, claiming that the rule "restores Lead Agency flexibility regarding the timing of payments to CCDF providers and provides Lead Agencies with the option to pay providers prospectively or on a reimbursement basis." *Id.* Here too, ACF ignored the key factor Congress identified as relevant to its decision—

PLAINTIFFS' COMPLAINT – 21

general market practices—and the predicable impacts that payment delays would have on providers and families.

67.    First, ACF failed to consider whether retrospective payment "reflect[ed] generally accepted payment practices of child care providers" in the private market, 42 U.S.C. 9858c(c)(2)(S), or even whether any State could reasonably reach that conclusion.  ACF did not engage with its prior conclusion that most private-paying customers pay providers "in advance of when services are provided," 2024 Rule, 89 Fed. Reg. 15369, or the ample evidence in the administrative record that reinforced that conclusion. *See*, *e.g.*, Georgia Child Care Association, *Comment Letter on CCDF Rule* 1–2 (Jan. 30, 2026) (Georgia Child Care Association's 2025-2026 Child Care Pulse Survey results show that paying providers prospectively reflects generally accepted private practices and improves cash flow predictability, reduces administrative strain, and supports staff retention); The National Association for the Education of Young Children, *Comment Letter on CCDF Rule* 3–4 (Feb. 4, 2026) (survey shows that 77% of program directors require prospective payments and nearly 70% of providers indicate they would be more likely to accept subsidies if they receive prospective payments based on enrollment).

68.    Second, ACF did not consider the extent to which retrospective payment practices create financial instability for providers, deter providers from participating in the CCDF program, and thereby limit parental choice for eligible families.  It did not consider that many providers need to receive prospective payments "to meet payroll and pay rent," and that retrospective payments have caused providers "to choose not to participate in the subsidy program or to limit the number of children receiving subsidies that they will serve at any given time." 2024 Rule, 89 Fed. Reg. at 15391–92; *see also* Society for Research in Child Development, *Comment Letter on CCDF Rule* 5 (Feb. 4, 2026) (citing studies that support that "[p]ayments to child care centers only

PLAINTIFFS' COMPLAINT – 22

after services are delivered creates revenue instability, contributes to high staff turnover, and undermines program quality, ultimately disrupting continuity of care and productive learning environments for children").

69.    Third, ACF also failed to explain why it rejected alternative proposals that would have required Lead Agencies to pay providers within shorter timeframes. "All commenters who responded voiced support for a timeframe shorter than 21 days." 2026 Rule, 91 Fed. Reg. at 25802. Commenters urged that if ACF eliminated the prospective payment requirement, it should require payment within three to fourteen days. *See id.* But aside from reiterating that the new rule would provide "flexibility," ACF did not explain why it rejected those alternatives. *Id.*

**C. Enrollment-based Payments**.

70.    ACF explained the decision to rescind the enrollment-based payment requirement with the same refrain—that it provided States more flexibility. *Id*. Here, too, the agency failed to consider market practices or the rule's effects on providers and families.

71.    First, ACF failed to consider its previous finding that providers typically charge private clients "based on a child's enrollment." 2024 Rule, 89 Fed. Reg. 15369. Indeed, ACF did not assess whether attendance-based payment practices reflected the "generally accepted payment practices of child care providers" in the private market anywhere in the country. 42 U.S.C. 9858c(c)(2)(S). And it ignored evidence, cited in the 2024 Rule and the comments, that the private market pays based on enrollment. *See*, *e.g*., The National Association for the Education of Young Children, *Comment Letter on CCDF Rule* 3–4 (Feb. 4, 2026) (2026 survey shows that 80% of program directors charge private pay families based on enrollment and nearly 70% of providers indicate they would be more likely to subsidize if they receive prospective payments based on enrollment).

PLAINTIFFS' COMPLAINT – 23

72.    Second, ACF failed to consider whether attendance-based payments sufficiently "delink" payments from absences to "support the fixed costs of providing child care," as the Act requires. *Id.* at § 9858c(c)(2)(S)(ii). In 2024, ACF concluded that providers need to charge private clients based on enrollment to support "the fixed costs of providing child care, including staff wages, rent, and utilities," which "do not decrease when a child is absent." 2024 Rule, 89 Fed. Reg. 15369. But the 2026 Rule did not grapple with that finding or the evidence behind it. *See* Georgia Child Care Association, *Comment Letter on CCDF Rule* 1–2 (Jan. 30, 2026) (Georgia Child Care Association's 2025-2026 Child Care Pulse Survey results show that attendance-based pay exposed providers to financial volatility and instability); Liminality Consulting, *Comment Letter on CCDF Rule* 1–2 (Jan. 31, 2026) (explaining that the fixed costs of running a child care program, such as rent, wages, and utilities, are inconsistent with attendance-based payment scheme); Catholic Charities, *Comment Letter on CCDF Rule* 3–4 (Feb. 4, 2026) (citing reports that show that predictable and timely payments paid prospectively and based on enrollment increase stability and reduce volatility in the child care system).

73.    Although ACF noted that States could "provide full payment to providers as long as a child is absent for five or fewer days in a four[-]week period or attends for 85 percent of the authorized time," 2026 Rule, 91 Fed. Reg. at 25803, the 2026 Rule does not actually require States to adopt any of these options. *See id.* at 25802 (noting that States could establish any "alternative approach justified in the CCDF Plan"). And studies cited in the 2024 Rule suggest that a significant percentage of children tend to be absent more than 15% of the time, often due to unforeseen issues such as illness. *See, e.g.*, 2024 Rule, 89 Fed. Reg. at 15402–03 (discussing studies showing that, in Washington D.C.'s Head Start program, "seven percent of children missed 20 percent or more

PLAINTIFFS' COMPLAINT – 24

18 WEST MERCER ST., STE. 400   **BARNARD**

SEATTLE, WASHINGTON 98119   **IGLITZIN &**

TEL 800.238.4231 | FAX 206.378.4132   **LAVITT LLP**

of enrolled days," and in a nationally representative sample, "12 percent of children were chronically absent," *i.e.*, "for more than ten percent of days").

74.     Third, the agency failed to consider evidence that attendance-based payments depress provider participation in the CCDF program and shrink the range of options available to eligible families. *See* 2024 Rule, 89 Fed. Reg. at 15369 (discussing survey indicating that 80% of providers would "be more likely to serve families using subsidies if the State paid based on enrollment rather than attendance"); *see also id.* at 15392 (finding that attendance-based payments "have led some child care providers to choose not to participate in the subsidy program or to limit the number of children receiving subsidies that they will serve at any given time").

75.     ACF asserted that the enrollment-based payment requirement "was estimated to cost $16.5 million per year." 2026 Rule, 91 Fed. Reg. at 25798. In reality, though, that number describes how much the rescission will harm child care *providers*. In the 2024 Rule, ACF estimated that the enrollment-based payment requirement would cause Lead Agencies to pay child care providers $16.5 million more per year. 89 Fed. Reg. at 15410 (categorizing this as a "transfer" rather than a "cost" in the rule's summary of economic impacts). This means that the 2026 Rule will cost child care providers at least $16.5 million per year, even before accounting for the costs of rescinding the prospective payment requirement. As explained above, ACF ignored the predictable impacts of those costs on providers' operations and on their willingness to serve CCDF participants over other potential clients who pay based on enrollment.

**D.  Grants and Contracts**

76.     Finally, the 2026 Rule rescinded the general requirement that States use some grants or contracts to provide direct services, as well as the specific requirement that States use grants and contracts to provide services for underserved populations—infants and toddlers,

PLAINTIFFS' COMPLAINT – 25

18 WEST MERCER ST., STE. 400  **BARNARD**

SEATTLE, WASHINGTON 98119  **IGLITZIN &**

TEL 800.238.4231 | FAX 206.378.4132  **LAVITT LLP**

children with disabilities, and children in underserved geographic areas. ACF opined that "child care vouchers or certificates" allow for more "parental choice" because they "allow[] families to choose from a wider range of child care providers than just those with which the Lead Agency may have direct service grants or contracts." 2026 Rule, 91 Fed. Reg. at 25800.

77.     This ignores the reason ACF promulgated the grants and contracts requirement in the first place: to create options for parents—especially parents of infants and toddlers, children with disabilities, and in underserved geographic areas—who cannot find child care spots for their children even if they have vouchers. *See* 2024 Rule, 89 Fed. Reg. at 15382. As the 2024 Rule recognized, a choice without options is no choice at all. Commenters echoed this point.[8] Direct grants and contracts address those supply issues—and help give parents options—by holding child care slots open for underserved groups, "increas[ing] stability for child care providers," and thereby "encourag[ing] them to participate in the subsidy program" and serve those populations.

---

[8] *See*, *e.g*., Family Resource Center, *Comment Letter on CCDF Rule* 5 (Jan. 30, 2026) ("34 percent of parents with children with disabilities experience at least some difficult finding child care, compared to 25 percent for parents with nondisabled children."); Liminality Consulting, *Comment Letter on CCDF Rule* 2 (Jan. 31, 2026) (citing research from the Bipartisan Policy Center which estimates that 32% of children in rural areas cannot attend child care because of lack of supply and noting that "[r]emoving the requirement to provide contracts and grants will remove a reliable source of funding for these providers, thus impact the supply of child care that families in rural economies rely on so they can go to work."); Center for American Progress, *Comment Letter on CCDF Rule* 6 (Feb. 4, 2026) (citing research that shows that the child care gap is significantly more pronounced in rural communities, where residents face a 32% gap); Urban Institute, *Comment Letter on CCDF Rule* 6 (Feb. 4, 2026) (citing 20 years of research that shows that contracts and grants are a source of stability for providers which leads them to more supply for children with disabilities "as providers may not be willing to establish such services without assurance of a reliable funding source."); The National Association for the Education of Young Children, *Comment Letter on CCDF Rule* 5 (Feb. 4, 2026) (soon-to-be-published survey revealed that 73% of providers indicate they would be more willing to accept families with subsidies if they could receive grants and contracts to serve infants and toddlers and children with disabilities); Save the Children, *Comment Letter on CCDF Rule* 2–3 (Feb. 4, 2026) (explaining the substantial need for contracts and grants to support child care for children in rural communities who have a more pronounced child care gap and are 25% more likely to live with a disability).

PLAINTIFFS' COMPLAINT – 26

18 WEST MERCER ST., STE. 400   **BARNARD**

SEATTLE, WASHINGTON 98119   **IGLITZIN &**

**TEL** 800.238.4231 | **FAX** 206.378.4132   **LAVITT LLP**

2024 Rule, 89 Fed. Reg. at 15370, 15382. Since "insufficient child care supply greatly limits parents' choices in child care arrangements, requiring some use of grants or contracts" expands parental choice by "help[ing] more parents find the child care they need." *Id.* at 15382.

78. ACF acknowledged that "[i]t is important for parents, especially parents of children of the identified populations who may need specialized care, to have maximum flexibility to choose a provider that matches their unique needs and values." 2026 Rule, 91 Fed. Reg. at 25800. But the agency failed to address the evidence that grants and contracts expand the choices available for parents and thereby make it more likely they will find suitable care, especially for infants and toddlers, children with disabilities, and children in child care deserts.

## IV.    Harms to Plaintiffs, Providers, and Families

79. The 2026 Rule will profoundly impact child care providers and families who rely on CCDF. Before the Trump-Vance Administration rescinded the 2024 Rule, most States were required to implement its requirements by the end of 2026.[9] Now, states no longer need to adopt the 2024 Rule's requirements. By ACF's own count, as of March 2026, most states and territories have not yet adopted the 2024 Rule's payment practice changes: at least 19 States allow co-payments to exceed 7% of family income, at least 312 out of 321 Lead Agencies do not pay all providers prospectively, and at least 292 out of 321 Lead Agencies do not pay based on authorized child enrollment. 2026 Rule, 91 Fed. Reg. at 25800–02. Only 7 States and 1 Territory have implemented grants or contracts for children with disabilities, 11 States and 1 Territory for infants and toddlers, and 10 States for children in underserved geographic regions. *Id.* at 25800. These States and Territories need not change their policies under the 2026 Rule, and many will not.

---

[9] Because States applied for and received state-specific two-year transitional waivers, the deadline for compliance varied by State. 2026 Rule, 91 Fed. Reg. at 25797.

PLAINTIFFS' COMPLAINT – 27

18 WEST MERCER ST., STE. 400   **BARNARD**
SEATTLE, WASHINGTON 98119   **IGLITZIN &**
TEL 800.238.4231 | FAX 206.378.4132   **LAVITT LLP**

80.    Indeed, several States that had taken action to comply with the 2024 Rule reversed course after ACF proposed to rescind it. Ohio delayed enrollment-based payments until July 2028. *See* Sub. H.B. 184, 136 Gen. Assemb. (Ohio 2025) (eff. Mar. 20, 2026), https://perma.cc/X3A9-P35U, amending Ohio Rev. Code 5104.32(C). Missouri announced in December 2025 that it would postpone the statewide rollout of the payment practice changes. *See* Mo. Dep't of Elementary and Secondary Educ., OOC Announcement, https://perma.cc/2DZ9-LZ6Q (accessed Jun. 5, 2026). Washington repealed its prospective payment requirement and directed the agency to pay providers based on children's attendance. *See* Chapter 264, 2026 Laws, §§ 3, 6 (Wash. 2025); https://perma.cc/9EGN-SRLA.  Other states will likely follow suit.

81.    The 2026 Rule will harm Plaintiffs and their members. All Plaintiffs represent child care providers whose work is funded by CCDF subsidies, as well as parents and/or caregivers who use CCDF to access child care. Plaintiff AFSCME represents over 35,000 independent child care providers nationwide who provide care to families who pay with CCDF subsidies. In New York and Pennsylvania specifically, neither of which has made changes required by the 2024 Rule, AFSCME has thousands of members who provide their child care services to families who receive CCDF subsidies and who will be affected by the 2026 Rule.  AFSCME also has child care provider members in Oregon and Ohio, which have not implemented the 2024 Rule's payment practice requirements. And it represents employees of day care and early childhood centers in states that have not made changes required by the 2024 Rule. Finally, AFSCME has members who rely on CCDF benefits to pay for child care for their own families.

82.    Similarly, Plaintiff SEIU represents approximately 81,000 family child care providers who receive CCDF funding across seven states. SEIU also represents nearly 9,500 child care workers at public and private day care centers and preschools in 16 states and the District of

PLAINTIFFS' COMPLAINT – 28

Columbia, a significant percentage of whom receive some federal CCDF funding. Like AFSCME, Plaintiff SEIU has many members who rely on CCDF to pay for care for their own children or children in their care.

83. Plaintiff SEIU 925 represents approximately 5,550 family child care providers, all of whom rely on CCDF subsidies, and roughly 200 early learning educators, some of whom work for employers that rely on CCDF funding.

84. AFSCME has members in every state that has not implemented the 7% co-pay cap: Alaska, Colorado, Florida, Hawaii, Idaho, Indiana, Maine, Massachusetts, Montana, North Carolina, Ohio, Vermont, and Wisconsin. SEIU likewise has members in Colorado, Florida, Hawaii, Indiana, Maine, Massachusetts, Montana, North Carolina, Ohio, Vermont, and Wisconsin, none of which have implemented the cap.

85. Without the 7% cap, families will continue to see their out-of-pocket costs for child care rise. The rule especially burdens families who need care for multiple children: while the 2024 Rule would have capped their copayment at 7% of their income, the 2026 Rule allows their copayments to far exceed that amount. Such high out-of-pocket costs force families to choose between sending their children to safe and reliable child care providers, buying necessities like food, soap, and water; paying rent; and securing healthcare; among other costs.

86. The removal of the copay cap harms providers as well. Many of Plaintiffs' provider members receive a substantial portion of their tuition (i.e., revenue) from copays paid by families who receive subsidies. Many of these providers derive a much higher percentage of their income from these copayments. When parents can no longer afford the increased out-of-pocket costs due to increased copays, providers lose revenue. Because child care providers operate on notoriously thin margins, delays in even one family's tuition payment could undermine the stability of a

PLAINTIFFS' COMPLAINT – 29

provider's business. And when parents are priced out of care when copays become unaffordable, they must remove their children from the program, which harms both the family and the provider alike.

87.    The 2026 Rule's rescission of the payment practice requirements also harm families and providers, including Plaintiffs' members. For example, Plaintiff AFSCME has independent child care provider members in Pennsylvania, New York, Ohio, and Oregon, which do not pay providers prospectively or based on enrollment. SEIU and SEIU 925 have members in Washington who will be paid retroactively and based on attendance when Washington's new law takes effect. *See* Chapter 264, 2026 Laws, §§ 3, 6 (Wash. 2025); https://perma.cc/9EGN-SRLA.

88.    Plaintiffs' independent provider members' expenses are fixed, and their payments are their livelihoods and directly impact the level of care they can provide to children in need. Rescinding the prospective and enrollment-based payment requirements causes financial instability and uncertainty and jeopardizes their business.

89.    Like many service providers, Plaintiffs' independent provider members must pay all their expenses—including rent, liability insurance, food for the children, and staff's wages—up front. Being paid after services have been provided causes financial uncertainty and requires providers to rely on cash reserves that many do not have. The retrospective payments are often inconsistent and unpredictable, leading to delays of up to 3 months before receiving the funds that providers desperately need to continue their business. A minimal delay undermines the stability of a provider's business and puts them at risk of closure.

90.    Providers' operating costs do not change when children are absent. They must prepare as if all children will be present on any given day. But given how often babies and toddlers get sick, children are often unpredictably absent for long periods of time.

PLAINTIFFS' COMPLAINT – 30

18 WEST MERCER ST., STE. 400  **BARNARD**

SEATTLE, WASHINGTON 98119  **IGLITZIN &**

TEL 800.238.4231 | FAX 206.378.4132  **LAVITT LLP**

91.    Moreover, when payments are tied to attendance, providers must meticulously trace attendance and report it to the state when they could be caring for children or doing other necessary business tasks. It also introduces room for human error: When providers make a mistake or do not submit the correct information in the correct form at the correct time, payments are delayed or withheld altogether, leaving providers uncompensated even when the child attended. *See* 2024 Rule, 89 Fed. Reg. at 15393 (explaining that the rule would have decreased burdens on providers because they would not need to closely align attendance records with payments). Most providers who serve only private-paying clients do not face these risks.

92.    Removing the requirements to pay providers prospectively and based on enrollment thus strains providers' budgets and injects even more financial insecurity into their lives and businesses.

93.    Finally, the 2026 Rule's rescission of the grants and contracts requirement significantly decreases parental choice because it decreases the number of child care slots available for all children, especially infants and toddlers, children with disabilities, and children in underserved areas. Providing child care to these underserved populations imposes additional administrative burdens and costs that providers cannot shoulder without the grants and contracts. Providers who serve children with disabilities, including many of Plaintiffs' members, must often hire additional staff to provide one-to-one care. Grants and contracts would help them shoulder those burdens and serve more children.

94.    At least one of AFSMCE's provider members who provides services to toddlers, infants, and children with disabilities in New York would apply for a grant or contract to serve these groups if one were made available, but now, after the repeal of that provision, does not have the opportunity to do so.

PLAINTIFFS' COMPLAINT – 31

18 WEST MERCER ST., STE. 400   **BARNARD**

SEATTLE, WASHINGTON 98119   **IGLITZIN &**

TEL 800.238.4231 | FAX 206.378.4132   **LAVITT LLP**

**CLAIMS FOR RELIEF**

**COUNT I**
**Violation of the APA, 5 U.S.C. § 706(2)(A)**
**Contrary to Law**

95.     The paragraphs above are incorporated and reasserted as if fully set forth herein.

96.     The 2026 Rule is a final agency action under the APA. *See* 5 U.S.C. § 704.

97.     Under the APA, a court "shall . . . hold unlawful and set aside agency action" that is "not in accordance with law." 5 U.S.C. § 706(2)(A).

98.     The 2026 Rule is contrary to several provisions of the CCDBG Act.

99.     First, the Act requires States to set copayments (i.e., "cost sharing") at a rate "that is not a barrier to families receiving assistance" under CCDF. 42 U.S.C. § 9858c(c)(5).

100.     By rescinding the requirement that States limit copayments to 7% of a family's income, the 2026 Rule permits States to set copayments that create a barrier to families receiving CCDF assistance, substantially impeding their ability to afford child care through the program.

101.     Second, the Act requires States to certify that their payment practices "reflect generally accepted payment practices of child care providers in the State that serve children who do not receive assistance" and to provide "an assurance" that the State "support the fixed costs of providing child care services by delinking provider reimbursement rates" from "occasional absences" to the extent practicable. 42 U.S.C. § 9858c(c)(2)(S).

102.     By rescinding the requirement to pay providers prospectively and based on enrollment, both of which are the generally accepted payment practice, the 2026 Rule disregards this statutory mandate and allows States to certify something else entirely.

PLAINTIFFS' COMPLAINT – 32

18 WEST MERCER ST., STE. 400  **BARNARD**
SEATTLE, WASHINGTON 98119  **IGLITZIN &**
TEL 800.238.4231 | FAX 206.378.4132  **LAVITT LLP**

103. Third, the Act requires States to "provide assurances" that the parent of "each eligible child" is given the option to enroll their child with a provider that has a "grant or contract for the provision of such services," or receive a child care certificate. 42 U.S.C. § 9858c(c)(2)(A).

104. But the 2026 Rule completely removes the requirement for States to offer grants and contracts at all. 2026 Rule, 91 Fed. Reg. at 25800 ("The final rule rescinds the requirement at § 98.30(b)(1) for States and Territories to provide some portion of the delivery of direct services via grants or contracts, including at a minimum for children in underserved geographic areas, infants and toddlers, and children with disabilities."). By rescinding the requirement to offer grants or contracts, the 2026 Rule once again disregards the statute and permits States to do so as well.

105. The Challenged Rule is therefore contrary to law and must be set aside.

## COUNT II
### Violation of the APA, 5 U.S.C. § 706(2)(A)
### Arbitrary and Capricious

106. The paragraphs above are incorporated and reasserted as if fully set forth herein.

107. The 2026 Rule is a final agency action under the APA. *See* 5 U.S.C. § 704.

108. Under the APA, a court "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious," or an "abuse of discretion." 5 U.S.C. § 706(2)(A).

109. When an agency promulgates a new rule, it "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation modified). When an agency repeals a policy, it must provide "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009). An agency decision is arbitrary and capricious if it "failed to consider an important aspect of the

PLAINTIFFS' COMPLAINT – 33

18 WEST MERCER ST., STE. 400    BARNARD

SEATTLE, WASHINGTON 98119    IGLITZIN &

TEL 800.238.4231 | FAX 206.378.4132    LAVITT LLP

problem," failed to "examine the relevant data," or "offered an explanation for its decision that runs counter to the evidence before the agency." *State Farm*, 463 U.S. at 43.

110.    The 2026 Rule is arbitrary and capricious. As explained above, ACF failed to articulate a reasoned explanation for its decision to repeal the copay cap, prospective and enrollment-based payment requirements, and grants and contracts requirements of the 2024 Rule. It ignored important aspects of the problem; failed to examine relevant data; and failed to explain whether (and why) the agency disagreed with the factual findings that underlay the 2024 Rule. Its conclusions run counter to the evidence in the administrative record, and its explanation for the rule fails to articulate "a rational connection between the facts found and the choice made." *Id.*

111.    The Court should declare the 2026 Rule unlawful and set it aside.

**PRAYER FOR RELIEF**

For those reasons, Plaintiffs respectfully request that this Court:

1.    Declare that the 2026 Rule is contrary to law and arbitrary and capricious under the APA;

2.    Vacate and set aside the 2026 Rule pursuant to 5 U.S.C. § 706;

3.    Award Plaintiffs' their costs, reasonable attorney's fees, and other disbursements as appropriate; and

4.    Grant such other and further relief that the Court deems just and proper.

PLAINTIFFS' COMPLAINT – 34

Date: June 30, 2026                              Respectfully submitted,


                                                 */s/Robert H. Lavitt*
                                                 Robert H. Lavitt, WSBA No. 27758
                                                 **BARNARD IGLITZIN & LAVITT LLP**
                                                 18 W Mercer St, Suite 400
                                                 Seattle, WA 98119
                                                 (206) 257-6004
                                                 lavitt@workerlaw.com

                                                 Sean Ouellette* (DC Bar No.1741535)
                                                 Briana M. Clark* (DC Bar No. 1735505)
                                                 Joel McElvain* (DC Bar No. 448431)
                                                 Robin F. Thurston* (DC Bar No. 1531399)
                                                 **DEMOCRACY FORWARD FOUNDATION**
                                                 P.O. Box 34553
                                                 Washington, DC 20043
                                                 Phone: (202) 448-9090
                                                 Fax: (202) 796-4426
                                                 souellette@democracyforward.org
                                                 bclark@democracyforward.org
                                                 jmcelvain@democracyforward.org
                                                 rthurston@democracyforward.org

                                                 **Motion for admission pro hac vice pending*

                                                 *Attorneys for Plaintiffs*

PLAINTIFFS' COMPLAINT – 35

18 WEST MERCER ST., STE. 400  **BARNARD**

SEATTLE, WASHINGTON 98119  **IGLITZIN &**

**TEL** 800.238.4231 | **FAX** 206.378.4132  **LAVITT LLP**