**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO, *et al.*,

*Plaintiffs*,

v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*,

*Defendants*.

Case No. 2:26-cv-02282-TL

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

NOTE ON MOTION CALENDAR:
December 4, 2026

ORAL ARGUMENT REQUESTED



18 WEST MERCER ST., STE. 400
SEATTLE, WASHINGTON 98119
TEL 800.238.4231 | FAX 206.378.4132
BARNARD IGLITZIN & LAVITT LLP

## TABLE OF CONTENTS

**INTRODUCTION** .......... 1
**BACKGROUND** .......... 4
I. The Child Care and Development Fund .......... 4
II. The 2024 Rule .......... 7
A. Family Copayment Cap .......... 8
B. Payment Practice Requirements .......... 10
C. Grants and Contracts Requirement .......... 12
III. The 2026 Rule .......... 14
**ARGUMENT** .......... 15
I. The plaintiffs have standing. .......... 15
A. The unions' members have suffered injuries-in-fact. .......... 16
B. The injuries are traceable to the rule and redressable. .......... 18
C. The unions may sue on behalf of their members. .......... 19
II. The 2026 Rule violates the APA. .......... 20
A. The 2026 Rule is arbitrary and capricious. .......... 20
1. Family Copayment Cap .......... 21
2. Payment Practice Requirements .......... 25
3. Grants and Contracts Requirement .......... 30
B. The 2026 Rule is contrary to the CCDF statute. .......... 33
III. The Court should vacate the 2026 Rule. .......... 35
**CONCLUSION** .......... 35



18 WEST MERCER ST., STE. 400
SEATTLE, WASHINGTON 98119
TEL 800.238.4231 | FAX 206.378.4132
BARNARD IGLITZIN & LAVITT LLP

# TABLE OF AUTHORITIES

**Cases**

*Beno v. Shalala*,
30 F.3d 1057 (9th Cir. 1994) .......... 19

*Biden v. Nebraska*,
600 U.S. 477 (2023) .......... 16, 17

*Bullfrog Films, Inc. v. Wick*,
847 F.2d 502 (9th Cir. 1988) .......... 18

*Cal. Rural Legal Assistance, Inc. v. Legal Servs. Corp.*,
917 F.2d 1171 (9th Cir. 1990) .......... 19

*CC Distribs., Inc. v. United States*,
883 F.2d 146 (D.C. Cir. 1989) .......... 18

*City & Cnty. of San Francisco v. USCIS*,
944 F.3d 773 (9th Cir. 2019) .......... 18

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) .......... 21

*L.A. Press Club v. Noem*,
171 F.4th 1179 (9th Cir. 2026) .......... 15, 19

*Michigan v. EPA*,
576 U.S. 743 (2015) .......... 20

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .......... 20, 21, 24, 25, 26, 29

*Natural Grocers v. Rollins*,
157 F.4th 1143 (9th Cir. 2025) .......... 35

*Ohio v. EPA*,
603 U.S. 279 (2024) .......... 20, 32, 33

*Orangeburg, S.C. v. FERC*,
862 F.3d 1071 (D.C. Cir. 2017) .......... 18, 19

*Organized Vill. of Kake v. USDA*,
795 F.3d 956 (9th Cir. 2015) .......... 21, 24, 26

*Protect Our Communities Found. v. LaCounte*,
939 F.3d 1029 (9th Cir. 2019) .......... 34



18 WEST MERCER ST., STE. 400
SEATTLE, WASHINGTON 98119
TEL 800.238.4231 | FAX 206.378.4132
BARNARD IGLITZIN & LAVITT LLP

*SEC v. Barry*,
146 F.4th 1242 (9th Cir. 2025) ........ 17

*United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*,
517 U.S. 544 (1996) ........ 20

*Van v. LLR, Inc.*,
61 F.4th 1053 (9th Cir. 2023) ........ 16, 17

*Wilbur v. Locke*,
423 F.3d 1101 (9th Cir. 2005) ........ 18

**Statutes**

5 U.S.C. § 706 ........ 20, 34, 35

42 U.S.C. § 9857(b) ........ 5

42 U.S.C. § 9858c(a) ........ 5

42 U.S.C. § 9858c(c) ........ 2, 3, 5, 6, 7, 10, 12, 13, 22, 24, 25, 26, 27, 29, 31, 33, 34

42 U.S.C. § 9858n(13) ........ 6

**Rules**

*Child Care and Development Block Grant*,
57 Fed. Reg. 34352 (Aug. 4, 1992) ........ 7

*Improving Child Care Access, Affordability, and Stability in the Child Care and Development Fund (CCDF)*,
89 Fed. Reg. 15366 (Mar. 1, 2024) ........ *passim*

*Restoring Flexibility in the Child Care and Development Fund (CCDF)*,
91 Fed. Reg. 207 (proposed Jan. 5, 2026) ........ 14

*Restoring Flexibility in the Child Care and Development Fund (CCDF)*,
91 Fed. Reg. 25796 (May 12, 2026) ........ 3, 5, 15, 22, 25, 27, 29, 31, 32, 34

**Regulations**

45 C.F.R. § 98.30(b)(1) (2024) ........ 12

45 C.F.R. § 98.45(l)(3) (2024) ........ 8

45 C.F.R. § 98.45(m) (2024) ........ 10

**Other Authorities**

Exec. Order No. 14192, 90 Fed. Reg. 9065 (Jan. 31, 2025) ........ 14

S. Rep. No. 113-138 (2014) ........ 7, 31



18 WEST MERCER ST., STE. 400
SEATTLE, WASHINGTON 98119
TEL 800.238.4231 | FAX 206.378.4132
BARNARD IGLITZIN & LAVITT LLP

## INTRODUCTION

For decades, families across the United States have struggled to find and afford childcare. Congress created the Child Care and Development Fund ("CCDF") to help fix that problem. The CCDF program entrusts states, territories, and tribes with billions in federal funds each year to give low-income families equal access to affordable childcare. Almost one million families rely on the program, and over 200,000 childcare providers—mostly small businesses strained by high costs and razor-thin margins—use it as a lifeline to keep their doors open to the families they serve.

Despite the program's importance to American families and to the national economy, families using CCDF still find childcare scarce and unaffordable, even with subsidies. In 2024, the Administration for Children and Families ("ACF"), the component of the Department of Health and Human Services ("HHS") that runs the CCDF program, identified three problems with the program and issued a regulation to address them. *Improving Child Care Access, Affordability, and Stability in the Child Care and Development Fund (CCDF)*, 89 Fed. Reg. 15366 (Mar. 1, 2024) ("2024 Rule").

**1. *The Copay Cap.*** First, due to high copayments, many families who use CCDF subsidies still pay a higher share of their paycheck for childcare than the average family, which pays 7% of its income. As a result, many families cannot afford to access childcare through the CCDF system. ACF



18 WEST MERCER ST., STE. 400
SEATTLE, WASHINGTON 98119
TEL 800.238.4231 | FAX 206.378.4132
BARNARD IGLITZIN & LAVITT LLP

found that these high copays created an impermissible "barrier" for families, in violation of the CCDF statute, 42 U.S.C. § 9858c(c)(5), and undermined the "equal access" to care the statute was designed to achieve, *id.* § 9858c(c)(4)(A). To lower that barrier, ACF capped copays at 7% of a family's income.

**2. *Payment Practice Requirements.*** Second, state payment practices regularly diverge from the way the market typically pays providers. In the private market, parents pay providers like they pay schools: in advance and based on enrollment—for the spot the child fills. But in the CCDF program, many states pay providers retroactively, delaying payment for weeks, and based on a child's actual attendance, reducing pay when a child is absent. ACF found that both these practices violated the statutory requirement that states use payment practices that are "generally accepted" in the market. 42 U.S.C. § 9858c(c)(2)(S)(i). In doing so, those practices undermined childcare providers' financial stability, drove them away from the CCDF program, and shrunk the options available to parents. To help fix those problems, the 2024 Rule required states to pay providers (a) prospectively and (b) based on enrollment.

**3. *Grants and Contracts Requirement.*** Third, parents of infants and toddlers, children with disabilities, and children in underserved geographic areas often cannot find care that meets their child's needs. When it reauthorized CCDF in 2014, Congress recognized that states could grow childcare supply for underserved populations by offering grants and contracts



18 WEST MERCER ST., STE. 400
SEATTLE, WASHINGTON 98119
TEL 800.238.4231 | FAX 206.378.4132
BARNARD IGLITZIN & LAVITT LLP

to providers who serve them. To that end, the statute requires states to give parents the opportunity to enroll their child in a program with a grant or contract. 42 U.S.C. § 9858c(c)(2)(A)(i). But many states still do not use CCDF funds to offer any grants or contracts. In the 2024 Rule, therefore, ACF required states to deliver some services through grants or contracts, including for infants and toddlers, children with disabilities, and in underserved areas.

Years of research and data showed that each of these changes would lower childcare costs, encourage providers to serve families who use CCDF subsidies, and expand childcare supply for low-income parents.

Only two years later, though, the Trump-Vance administration reversed course. The new head of ACF promised a "bonfire" of childcare regulations. The 2024 Rule's key provisions were promptly swept into the blaze. *See Restoring Flexibility in the Child Care and Development Fund (CCDF)*, 91 Fed. Reg. 25796 (May 12, 2026) ("2026 Rule"). In repealing the 2024 Rule's evidence-backed requirements, ACF did not address the reasons behind them. It did not cite a single study. And it did not grapple with the objections raised by the providers, families, and experts who commented.

The repeal will cost providers and families millions of dollars and shrink the already strained market for affordable childcare. Without the copay cap, many families will be unable to afford childcare even with CCDF assistance. Without enrollment-based payments, small childcare providers on shoestring



18 WEST MERCER ST., STE. 400 BARNARD
SEATTLE, WASHINGTON 98119 IGLITZIN &
TEL 800.238.4231 | FAX 206.378.4132 LAVITT LLP

budgets will lose critical income when children are absent. Without prospective payments, these providers will have to rely on savings or credit (if they can access it) to pay rent, utilities, salaries, and the other fixed costs of providing childcare while they await payment for weeks. And absent the grants and contracts requirement, the parents of underserved children will find it harder to access care. The members of the three labor union plaintiffs—including tens of thousands of childcare providers—are among the many harmed.

The 2026 Rule is as harmful as it is unlawful. Because it ignored multiple statutory requirements and failed to analyze the problems the 2024 Rule aimed to address, the 2026 Rule is arbitrary, capricious, and contrary to the CCDF statute, and the Court should vacate it.

## BACKGROUND

### I. The Child Care and Development Fund

As ACF recognized in 2024, childcare in America is a "fundamentally broken system." 2024 Rule, 89 Fed. Reg. at 15367. In almost every state, the average cost of daycare exceeds the average cost of rent, mortgage payments, and public college tuition. Child Care Aware of America, *Child Care in America: 2024 Price & Supply* (May 2025), https://perma.cc/MQM6-D667, cited in Ex. 1, AFSCME Comment at 5 (ACF_004960). Even as the costs of housing, food, and healthcare rise, childcare eats up 20–36% of the average low-income family's pay. 2024 Rule, 89 Fed. Reg. at 15366. The financial burden puts


18 WEST MERCER ST., STE. 400 BARNARD
SEATTLE, WASHINGTON 98119 IGLITZIN &
TEL 800.238.4231 | FAX 206.378.4132 LAVITT LLP

parents in a catch-22: They need childcare to work, but they do not make enough to cover the cost of care and other necessities like food and rent. *Id.* This drives parents—especially mothers—to leave the workforce entirely. *Id.*

Congress passed the Child Care and Development Block Grant Act, as amended (the "Act"), to "help working families with low incomes access child care that best meets their needs." 2026 Rule, 91 Fed. Reg. at 25797; 42 U.S.C. § 9857(b). It establishes a cooperative federal-state program that channels subsidies to states, territories, and tribal agencies to fund childcare for low-income families. State agencies use the funds to assist eligible children through two mechanisms: (1) grants and contracts with childcare providers and (2) "child care certificates," or vouchers, that families use to purchase childcare from a qualifying provider of their choice. 42 U.S.C. § 9858c(c)(2)(A).

Although Congress aimed to ensure states retained "maximum flexibility in developing child care programs and policies," the Act requires state agencies to follow detailed parameters to ensure that states use the funds to accomplish the program's primary goals, including "to promote parental choice" by "maximiz[ing] parents' options" and to "increase the number and percentage of low-income children in high-quality child care settings." 42 U.S.C. § 9857(b).

To participate, states and territories (deemed "States" under the Act) must submit a plan that meets detailed requirements set forth in the Act and HHS regulations. *Id.* § 9858c(a). Three sets of requirements are relevant here.



18 WEST MERCER ST., STE. 400 BARNARD
SEATTLE, WASHINGTON 98119 IGLITZIN &
TEL 800.238.4231 | FAX 206.378.4132 LAVITT LLP

***Copayments must not be a "barrier" to access.*** First, although States may require parents to pay a share of the cost of childcare as a copayment (called "cost sharing"), they must establish and "periodically revise" a "sliding fee scale" that sets copays based on income and family size. 42 U.S.C. § 9858c(c)(5); *see also id.* § 9858n(13). States may not set copays so high that they erect a "barrier" to childcare access. *Id.* § 9858c(c)(5).

***Payment practices must align with the market.*** Second, to "provide stability of funding and encourage more child care providers to serve children" who receive CCDF assistance, States must pay providers using payment practices that "reflect generally accepted payment practices" for children who do not receive subsidies. *Id.* § 9858c(c)(2)(S)(i). States must also "provide for timely payment," *id.* § 9858c(c)(4)(B)(iv), and, "to the extent practicable," "support the fixed costs of providing child care services by delinking provider reimbursement rates" from "occasional absences due to holidays or unforeseen circumstances such as illness," *id.* § 9858c(c)(2)(S)(ii).

***States must offer grants or contracts to providers.*** Third, States must assure that parents are "given the option" to "either" (1) enroll their child with a childcare provider that "has a grant or contract" with the State or (2) receive a voucher. 42 U.S.C. § 9858c(c)(2)(A)(i). Grants and contracts are agreements by which providers agree to hold slots for certain CCDF-eligible children in exchange for funds. 2024 Rule, 89 Fed. Reg. at 15370. Congress



18 WEST MERCER ST., STE. 400
SEATTLE, WASHINGTON 98119
TEL 800.238.4231 | FAX 206.378.4132
BARNARD IGLITZIN & LAVITT LLP

recognized that they "are particularly helpful in meeting the needs of specific populations of children and are well-suited to provide services in specific geographical areas." S. Rep. No. 113-138, at 12 (2014). The Act specifically directs States to "develop and implement strategies," "which may include … the provision of direct contracts or grants to community-based organizations," "to increase the supply and improve the quality of child care services" for "children in underserved areas," "infants and toddlers," and "children with disabilities." 42 U.S.C. § 9858c(c)(2)(M).

Since 1992, HHS has promulgated regulations that interpret these requirements and impose additional ones. The regulations have consistently sought to advance the program's primary goal: to provide parents affordable access to the "widest possible variety of child care options." *Child Care and Development Block Grant*, 57 Fed. Reg. 34352, 34370 (Aug. 4, 1992). "[A]lthough [States] enjoy great flexibility in program administration," "such discretion may not be exercised at the expense of parental choice." *Id.*

## II. The 2024 Rule

In 2024, ACF concluded that most American families still "struggle to find or afford high-quality child care that meets their needs," even when they receive CCDF subsidies. 2024 Rule, 89 Fed. Reg. at 15367. ACF identified three problems that make childcare scarce and unaffordable. First, many parents pay high copayments that put "significant and destabilizing financial strain on



18 WEST MERCER ST., STE. 400 SEATTLE, WASHINGTON 98119 TEL 800.238.4231 | FAX 206.378.4132
BARNARD IGLITZIN & LAVITT LLP

family budgets." *Id.* Second, many States pay providers less, and later, than private-paying clients, discouraging participation in CCDF and shrinking childcare options for participating parents. *Id.* Third, States underuse key tools—grants and contracts—that would expand access to childcare for underserved populations. *Id.* at 15369–70.

These three issues warranted four main changes to CCDF regulations.

**A. Family Copayment Cap**

First, to make childcare more affordable, the 2024 Rule capped copayments at 7% of the family's income. 45 C.F.R. § 98.45(l)(3) (2024).

Since 2016, HHS regulations had set a copay equal to 7% of a family's income as the "benchmark" for affordable copayments. 89 Fed. Reg. at 15368. Yet, 20 States allowed copayments over the benchmark, 16 lacked clear restrictions on copayments, and average copays in 11 States exceeded the benchmark. *Id.* In States that did not cap copayments, copays rose as high as 27% of family income. *Id.* at 15388.

In the 2024 rulemaking, ACF found that copays over 7% of a family's income create an impermissible "barrier to child care access in the CCDF program." *Id.* at 15368. Studies showed that "even very low co-payments[] remain a barrier for some families to make ends meet, especially families struggling to afford housing costs." *Id.* at 15368, 15388. Commenters reinforced that many low-income families could not afford to pay 7% of their income on


18 WEST MERCER ST., STE. 400 BARNARD
SEATTLE, WASHINGTON 98119 IGLITZIN &
TEL 800.238.4231 | FAX 206.378.4132 LAVITT LLP

childcare. *Id.* at 15388. And if families cannot afford their copay, they are more likely to "patch together informal, unregulated care" that may be "less expensive" but is also "less reliable" and "less likely to meet [their] children's developmental needs." *Id.* at 15368; *see id.* at 15407 ("[R]esearch shows that higher out-of-pocket child care expenses (which may include co-payments) reduce families' child care use and parental (particularly maternal) employment."). A copay cap would ensure that the subsidies serve their purpose—to make quality care affordable.

ACF also concluded that the copay cap would help ensure "equal" access to childcare for low-income families, one of the goals of the Act. 89 Fed. Reg. at 15387–88. According to U.S. Census data, the average family spends 7% of income on childcare, but low-income families spend four times the share of income that wealthier families do. *Id.* at 15368. Families with low incomes (below $25,000 per year) pay from 9–31% of their income, while those with high incomes (above $150,000) pay around 7% (*i.e.*, 6–8%). *Id.* at 15387–88. Because CCDF assistance is supposed to "offset the disproportionate share of income that families with low incomes pay for child care," ACF reasoned that "families participating in CCDF should not be required to pay a greater share of their income than higher income families." *Id.* The copay cap would ensure that low-income families who use CCDF subsidies would not pay a higher share than the average family. *See id.*



18 WEST MERCER ST., STE. 400 BARNARD
SEATTLE, WASHINGTON 98119 IGLITZIN &
TEL 800.238.4231 | FAX 206.378.4132 LAVITT LLP

### B. Payment Practice Requirements

Second, the 2024 Rule required States to align their payment practices "with generally accepted payment practices in the private sector," 89 Fed. Reg. at 15369, by paying providers (1) prospectively ("in advance of or at the beginning of the delivery of child care services") and (2) based on "a child's authorized enrollment," rather than attendance, 45 C.F.R. § 98.45(m) (2024).[1]

ACF found these two changes were needed to comply with the Act's requirement that CCDF payment practices "reflect generally accepted payment practices" in the private market. 42 U.S.C. § 9858c(c)(2)(S). Just like schools charge tuition upfront, most childcare providers charge private clients a "set fee" based on "a child's enrollment" that is "paid in advance of when services are provided." 2024 Rule, 89 Fed. Reg. at 15369. Childcare providers charge based on enrollment because they operate on thin profit margins (usually less than 1%) with high "fixed costs," "including staff wages, rent, and utilities," that "do not decrease when a child is absent." *Id.* And they "need to

---

[1] The rule allowed two exceptions to these payment practice requirements. A State could exempt a particular "type of child care setting" from prospective or enrollment-based payments if it "demonstrate[d] that such practices are not generally-accepted" for that setting. 2024 Rule, 89 Fed. Reg. at 15415. And a State could adopt an "alternative approach" to enrollment-based payment if it showed that enrollment-based payments were "not practicable" and the alternative would "not undermine the stability" of childcare programs. *Id.*



18 WEST MERCER ST., STE. 400 SEATTLE, WASHINGTON 98119 TEL 800.238.4231 | FAX 206.378.4132
BARNARD IGLITZIN & LAVITT LLP

receive payment before services are delivered to meet payroll and pay rent," which "must be paid at the beginning of the month." *Id.* at 15391–92.

Many states do not follow these market practices in the CCDF program. 89 Fed. Reg. at 15369. And studies showed that retroactive and attendance-based payments discouraged providers from serving children who pay with subsidies, which "limits parent choices." *Id.* In one survey, many providers cited "delayed payments and their destabilizing effect on child care operations as a key reason why they do not participate in the CCDF program." *Id.* In another, 80% responded that they would "be more likely to serve families using subsidies if the State paid based on enrollment rather than attendance, and 73 percent said they would be more likely if the State paid prospectively." *Id.* Commenters confirmed that retroactive and attendance-based payments "have led some child care providers to choose not to participate in the subsidy program or to limit the number of children receiving subsidies that they will serve at any given time." *Id.* at 15392.

Based on this evidence, ACF concluded that a requirement that states pay providers prospectively and based on enrollment would "increase parents' options, make it easier for providers to accept subsidies, improve stability among child care providers serving children participating in CCDF, and align[] with generally accepted payment practices for private pay families." *Id.*



18 WEST MERCER ST., STE. 400
SEATTLE, WASHINGTON 98119
TEL 800.238.4231 | FAX 206.378.4132
BARNARD IGLITZIN & LAVITT LLP

**C. Grants and Contracts Requirement**

Finally, to "increase parent choice," the 2024 Rule required States to "provid[e] some portion of the delivery of direct services via grants or contracts," 45 C.F.R. § 98.30(b)(1) (2024). This requirement tracks a provision of the Act, which requires States to give parents the option to enroll their child with a provider that has a grant or contract for childcare services. 42 U.S.C. § 9858c(c)(2)(A). The 2024 Rule specifically required States to use grants or contracts "at a minimum" for three underserved populations: "children in underserved geographic areas, infants and toddlers, and children with disabilities." 45 C.F.R. § 98.30(b)(1) (2024).

"Finding care for infants and toddlers and children with disabilities is particularly difficult for parents." 89 Fed. Reg. at 15370. Caring for those populations requires "[h]igher operational costs per child," "specialized training," and more "physical space," which all demand "additional funding and planning." *Id.* At the same time, these populations make up a large proportion of CCDF participants. About one third are infants and toddlers, and about 17% have developmental disabilities. *Id.* An analysis of 19 states and the District of Columbia found that in 80% of counties studied, infants and toddlers outnumbered licensed childcare slots for children their age by a factor of three to one. *Id.* More than a third of parents with children with disabilities reported having difficulty finding childcare. *Id.* This lack of supply "greatly limits


18 WEST MERCER ST., STE. 400
SEATTLE, WASHINGTON 98119
TEL 800.238.4231 | FAX 206.378.4132
BARNARD IGLITZIN & LAVITT LLP

parents' choices in child care arrangements." *Id.* at 15382.

Aware of the issues facing these populations, Congress required States to adopt strategies "to increase the supply and improve the quality of child care services" for them. 42 U.S.C. § 9858c(c)(2)(M). It listed "[d]irect contracts or grants" as one such strategy. *Id.* Nonetheless, only 10 States reported "using any grants and contracts for direct services," and "approximately twenty states report[ed] serving no children with disabilities" through the CCDF program. 2024 Rule, 89 Fed. Reg. at 15370.

ACF found that requiring "some use" of grants or contracts for underserved populations would "help more parents find the child care they need." *Id.* at 15382. By guaranteeing payment for providers who hold open spots for those groups, grants and contracts "are an important tool for building child care supply" for these populations. *Id.* at 15370, 15381. Again, ACF cited studies to support that conclusion. In a survey, 80% of childcare providers indicated that they would be interested in applying for grants or contracts to serve the identified populations. *Id.* at 15370. Analyses of programs in two different states—Pennsylvania and Georgia—showed that the use of grants and contracts increased providers' financial stability, improved quality of care, and led to more stable or increased enrollment for infants and toddlers. *Id.* Commenters "strongly supported" the new provision. *Id.* at 15381.

***



18 WEST MERCER ST., STE. 400 BARNARD
SEATTLE, WASHINGTON 98119 IGLITZIN &
TEL 800.238.4231 | FAX 206.378.4132 LAVITT LLP

Together, ACF found, the 2024 Rule's requirements would "lower families' costs for childcare," "encourage more providers to accept subsidies," and "expand available child care options" for low-income parents participating in CCDF. 89 Fed. Reg. at 15367, 15369. The rule took effect on April 30, 2024. *Id.* at 15366. To give States time to implement it, ACF allowed States to "request a temporary waiver for an extension of up to two years if needed to come into compliance" with the new requirements. *Id.*

**III. The 2026 Rule**

When President Trump took office, he directed that "for each new regulation issued, at least 10 prior regulations be identified for elimination." Ex. 2, Exec. Order No. 14192, 90 Fed. Reg. 9065, 9065 (Jan. 31, 2025) (ACF_000075). The new head of ACF promised a "bonfire" of childcare regulations. C. Davenport, *Trump's Top Child Care Official Wants a 'Bonfire of Regulations,'* N.Y. Times (Apr. 28, 2026), https://perma.cc/CG3X-CTNT. "We're going to barbecue a lot of sacred cows," he said. *Id.*

Five days into the new year, on January 5, 2026, ACF noticed a proposed rulemaking to repeal the four key provisions of the 2024 Rule. *Restoring Flexibility in the Child Care and Development Fund (CCDF)*, 91 Fed. Reg. 207 (Jan. 5, 2026). Comments poured in, including from plaintiffs AFSCME and SEIU. Of the nearly 1,000 comments, most opposed the rescission. 2026 Rule, 91 Fed. Reg. at 25799. Childcare providers, families, and experts explained



18 WEST MERCER ST., STE. 400 SEATTLE, WASHINGTON 98119 TEL 800.238.4231 | FAX 206.378.4132
BARNARD IGLITZIN & LAVITT LLP

that the proposal would push providers out of the CCDF program and make care costlier and harder to find, especially for underserved populations.

ACF went ahead with its bonfire anyway, rescinding the 2024 Rule's core requirements. 2026 Rule, 91 Fed. Reg. at 25797. In the 2026 Rule's preamble, ACF generally opined that the rescission would save money and give States more "flexibility" over how to implement the CCDF program. *Id.* at 25797–98. But it did not address the reasons that ACF adopted the 2024 Rule in the first place. It did not discuss the Act's relevant requirements—that copayments may not be a barrier to access, that payment practices must align with the market, or that States must offer grants and contracts. And it did not analyze the data that supported the 2024 Rule.

The 2026 Rule took effect on July 13, 2026. 91 Fed. Reg. at 25796.

## ARGUMENT

### I. The plaintiffs have standing.

A union has standing to sue on behalf of its members when "(1) at least one member would have standing to sue individually, (2) the interests it seeks to protect are germane to its purpose, and (3) neither the claim nor relief requires the participation of individual members in the lawsuit." *L.A. Press Club v. Noem*, 171 F.4th 1179, 1188 (9th Cir. 2026) (quotation marks omitted). To meet the first requirement, at least one of the union's members must have


18 WEST MERCER ST., STE. 400 SEATTLE, WASHINGTON 98119 TEL 800.238.4231 | FAX 206.378.4132
BARNARD IGLITZIN & LAVITT LLP

"an injury in fact" that is "fairly traceable to the challenged [rule] and likely to be redressed by the lawsuit." *Biden v. Nebraska*, 600 U.S. 477, 489 (2023).

The plaintiff unions—the American Federation of State, County and Municipal Employees ("AFSCME"), the Service Employees International Union ("SEIU"), and SEIU Local 925—meet each requirement here.

**A. The unions' members have suffered injuries-in-fact.**

The 2026 Rule causes the unions' members economic harm, a classic injury-in-fact. *See Van v. LLR, Inc.*, 61 F.4th 1053, 1064 (9th Cir. 2023) ("Any monetary loss," even "a fraction of a cent, is sufficient to support standing.").

***Copay Cap***. First, the rescission of the copay cap harms the unions' provider members. As an SEIU member explained, when parents cannot afford their copays, the providers must either "allow them not to pay or ask them to find another provider." Ex. 3, SEIU Healthcare Illinois Indiana Missouri Kansas' Child Care and Early Learning Division Comment at 3 (ACF_005509). The providers "lose money either way it goes." *Id.*; *accord* Ex. 4, Vasquez Decl. ¶ 14; Ex. 5, Horton Decl. ¶ 27; Ex. 6, Godbolt Decl. ¶ 9. In Ohio, which charges copays up to 27% of family income (Ex. 7, ACF State Compliance Summary at 2 (ACF_001127)), an AFSCME provider member has lost clients because they cannot afford the copay. Ex. 8, Thompson Decl. ¶ 21. "If the 2024 rule capping family copays at 7% of income had gone into effect, more families would be able to enroll in [her] program," and she would earn more money. *Id.*



18 WEST MERCER ST., STE. 400 SEATTLE, WASHINGTON 98119 TEL 800.238.4231 | FAX 206.378.4132
BARNARD IGLITZIN & LAVITT LLP

***Payment Practices***. The unions also have thousands of members who provide childcare in states that use the payment practices barred by the 2024 Rule and authorized by the challenged rule. Ex. 9, Sforza Decl. ¶ 8; Ex. 10, Peterson Decl. ¶¶ 19, 23; Ex. 5, Horton Decl. ¶¶ 4, 18–20. Because their states pay based on attendance, rather than enrollment, the providers lose money when children are absent for more than a few days. Ex. 8, Thompson Decl. ¶¶ 12–15; Ex. 11, Rodriguez Decl. ¶¶ 14–16; Ex. 6, Godbolt Decl. ¶ 14; Ex. 12, Good Decl. ¶ 11. And because their states reimburse providers retroactively, they receive payment weeks after they must front costs to deliver services, forcing them to keep more money in reserve and use savings or personal funds to pay the bills due at the start of each month. Ex. 11, Rodriguez Decl. ¶¶ 9–13; Ex. 12, Good Decl. ¶ 10; Ex. 4, Vasquez Decl. ¶ 10; Ex. 8, Thompson Decl. ¶¶ 10–11; Ex. 13, Guadalupe Suárez Decl. ¶¶ 22–23. Being paid less, and later, inflicts economic harm. *Biden*, 600 U.S. at 490; *see SEC v. Barry*, 146 F.4th 1242, 1263 (9th Cir. 2025) (because "money is worth more today than the same nominal amount in the future," even a brief delay in payment does "pecuniary harm"); *accord Van*, 61 F.4th at 1063.

Attendance-based reimbursements also impose higher administrative burdens on the plaintiffs' members, who must spend time keeping the detailed attendance records required to receive payment. *See* 2024 Rule, 89 Fed. Reg. at 15393 ("Because Lead Agencies will not have to closely align attendance



18 WEST MERCER ST., STE. 400 SEATTLE, WASHINGTON 98119 TEL 800.238.4231 | FAX 206.378.4132
BARNARD IGLITZIN & LAVITT LLP

records with payments, we expect a decrease in administrative burden for … child care providers."); Ex. 13, Guadalupe Suárez Decl. ¶¶ 19–20. These "increased operational costs" are also cognizable harms. *City & Cnty. of San Francisco v. USCIS*, 944 F.3d 773, 785, 787 (9th Cir. 2019); *see Wilbur v. Locke*, 423 F.3d 1101, 1107 (9th Cir. 2005) (compliance costs are cognizable injuries).

***Grants and Contracts***. The 2026 Rule also harms the unions' provider members by repealing the 2024 Rule's grants-and-contracts requirement. Many members' states do not offer grants or contracts covering children with disabilities, infants and toddlers, or kids in underserved areas, as the 2024 Rule required. Ex. 7, ACF State Compliance Summary at 5–7 (ACF_001130–32). Many members would have applied for those grants or contracts if they were available, but under the 2026 Rule, they will not have the chance. Ex. 8, Thompson Decl. ¶¶ 19–20; Ex. 12, Good Decl. ¶ 18; Ex. 6, Godbolt Decl. ¶ 19. The lost "opportunity to compete" for these benefits is a cognizable injury. *Bullfrog Films, Inc. v. Wick*, 847 F.2d 502, 514 (9th Cir. 1988); *CC Distribs., Inc. v. United States,* 883 F.2d 146, 148 (D.C. Cir. 1989).

**B. The injuries are traceable to the rule and redressable.**

Those economic injuries are traceable to the challenged rule and redressable by the Court. When a federal rule "authorizes" previously unlawful state action that causes harm, the harm is traceable to the rule and redressable by its vacatur. *Orangeburg, S.C. v. FERC*, 862 F.3d 1071, 1080 (D.C. Cir. 2017).



18 WEST MERCER ST., STE. 400 SEATTLE, WASHINGTON 98119 TEL 800.238.4231 | FAX 206.378.4132
BARNARD IGLITZIN & LAVITT LLP

In *Beno v. Shalala*, for example, when a federal agency allowed a state agency to cut benefits under a federally funded program, the beneficiaries had standing to challenge the federal rule. 30 F.3d 1057, 1064 (9th Cir. 1994).

So too here. The 2026 Rule allows States to adopt the payment practices and copays that harm the plaintiffs—practices that "would … be illegal" under the 2024 Rule. *Orangeburg*, 862 F.3d at 1083 (citation omitted). It also permits States not to offer the grants or contracts that the 2024 Rule required. By vacating the 2026 Rule, the Court would restore the 2024 Rule's requirements, avoiding the financial harms that flow from their repeal.

Thus, the unions' members meet all three elements of standing.

**C. The unions may sue on behalf of their members.**

To sue on behalf of their members, the unions must satisfy two remaining requirements: The lawsuit must be "germane" to their purposes, and the claims for relief must not require the individual participation of their members. *L.A. Press Club*, 171 F.4th at 1188. The unions' claims are certainly germane to their purposes, which include achieving better pay for their provider members and expanding members' access to childcare so that they can remain in the workforce. Ex. 9, Sforza Decl. ¶¶ 4–5; Ex. 10, Peterson Decl. ¶¶ 8–11; Ex. 5, Horton Decl. ¶¶ 9–11; *see Cal. Rural Legal Assistance, Inc. v. Legal Servs. Corp.*, 917 F.2d 1171, 1174 (9th Cir. 1990). And there is no need for individual members to participate in this facial challenge to a generally


18 WEST MERCER ST., STE. 400 BARNARD
SEATTLE, WASHINGTON 98119 IGLITZIN &
TEL 800.238.4231 | FAX 206.378.4132 LAVITT LLP

applicable rule. *See United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 553–54 (1996).

The unions thus have standing to challenge the 2026 Rule.

## II. The 2026 Rule violates the APA.

The Administrative Procedure Act ("APA") directs a court to "hold unlawful and set aside" agency actions that are (A) "arbitrary" or "capricious" or (B) contrary to law. 5 U.S.C. § 706(2)(A). The 2026 Rule fails on both counts.

### A. The 2026 Rule is arbitrary and capricious.

An agency action qualifies as "arbitrary" or "capricious" if it is not "reasonable and reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (citation omitted). To meet that standard, the agency "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation modified). Its decision must rest "on a consideration of the relevant factors," *id.* (citation omitted), including both "the advantages *and* the disadvantages" of its decision. *Michigan v. EPA*, 576 U.S. 743, 753 (2015) (emphasis in original). A decision fails APA review if the agency "failed to consider an important aspect of the problem," did not "examine the relevant data," or "offered an explanation for its decision that runs counter to the evidence before" it. *State Farm*, 463 U.S. at 43.



18 WEST MERCER ST., STE. 400 SEATTLE, WASHINGTON 98119 TEL 800.238.4231 | FAX 206.378.4132
BARNARD IGLITZIN & LAVITT LLP

When an agency repeals an existing policy, it must also provide "a reasoned explanation … for disregarding facts and circumstances that underlay or were engendered by the prior policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009). A policy change violates the APA "if the agency ignores or countermands its earlier factual findings without reasoned explanation for doing so." *Organized Vill. of Kake v. USDA*, 795 F.3d 956, 966 (9th Cir. 2015) (en banc) (quoting *Fox*, 556 U.S. at 537 (Kennedy, J., concurring)). An "[u]nexplained inconsistency between agency actions" makes the change "arbitrary and capricious." *Id.* (citation omitted).

The 2026 Rule flunks that test several times over. For each of the 2024 Rule's requirements, ACF argued that the rescission would give States more discretion to adopt their own policies. But ACF failed to engage with the reasons the 2024 Rule imposed those requirements in the first place: because without them, many States would continue to use practices that the 2024 Rule found violated the Act and frustrated the goals of the program. And at every turn, ACF failed to address the Act's pertinent requirements and ignored the "relevant data" that supported the 2024 Rule. *State Farm*, 463 U.S. at 43.

**1. Family Copayment Cap**

To justify rescinding the copay cap, ACF said the rescission would give States "flexibility" to balance the "trade-offs between reducing child care costs for families participating in CCDF and serving additional families with higher



18 WEST MERCER ST., STE. 400
SEATTLE, WASHINGTON 98119
TEL 800.238.4231 | FAX 206.378.4132
BARNARD IGLITZIN & LAVITT LLP

co-payments." 2026 Rule, 91 Fed. Reg. at 25798, 25801. But as explained above, Congress limited the extent to which States may require families to pay higher copayments: States may not set copays so high that they raise a "barrier [for] families receiving assistance." 42 U.S.C. § 9858c(c)(5). The 2024 Rule found that copays over 7% of a family's income raised such an "impermissible barrier" and deprived participants of the "equal access" to childcare that Congress aimed to achieve. 89 Fed. Reg. at 15387–88. The 2026 Rule repealed the cap without considering either of these core rationales for it.

***First***, ACF did not address its prior conclusion that copays over 7% create a barrier to childcare access for the low-income families that CCDF serves. The 2024 Rule based that conclusion on studies showing that "even very low co-payments[] remain a barrier for some families to make ends meet." 89 Fed. Reg. at 15368, 15388.[2] The comments to the 2026 proposed rule supported that conclusion. One organization relayed reports from "[h]undreds of California families" that before California implemented the 7% cap,

[2] *See*, *e.g.*, Ellen Scott et al., *Assessing the Impacts of Oregon's 2007 Changes to Child-Care Subsidy Policy*, Univ. of Oregon 8 (2011), https://perma.cc/2YDF-V7HT (Oregon "parents experienced substantial financial burden in meeting their portion of the child-care costs, even when paying very low copays"); Gina Adams et al., *Assessing Child Care Subsidies through an Equity Lens: A Review of Policies and Practices in the Child Care and Development Fund* 40–41 (2021), https://perma.cc/UTG2-HM2E (high copays can make parents "unable to afford to participate in the subsidy system and force them to opt out for cheaper care that they can afford but that may not meet their other needs").



18 WEST MERCER ST., STE. 400 BARNARD
SEATTLE, WASHINGTON 98119 IGLITZIN &
TEL 800.238.4231 | FAX 206.378.4132 LAVITT LLP

"copayments were a major barrier to finding and maintaining child care." Ex. 14, Child Care Law Center Comment at 3 (ACF_006226). "[F]amilies were often forced to choose between child care or basic necessities such as rent, gas, and food," and some "disenrolled from publicly funded child care because they simply could not afford the co-payments." *Id.*; *accord* Ex. 15, Cal. Family Child Care Network Comment at 2 (ACF_005972) (before California implemented the cap, many families "could not take advantage of subsidized child care" because "they could not afford to pay more than 7 percent of their annual income"). Other comments presented both qualitative and quantitative data showing that copays over 7% of income "present a 'barrier for families receiving' CCDF assistance" and can make it unaffordable to participate in the program. Ex. 16, Urban Institute Comment at 7 (ACF_006048).[3]

[3] *See also*, *e.g.*, Ex. 1, AFSCME Comment at 5 & n.15 (ACF_004960) (citing evidence "not only that higher co-payments are a barrier for more families the higher they are, but also that state policy actions to reduce co-payments increase CCDF accessibility"), citing U.S. Gov't Accountability Off., GAO-23-106073, *Subsidy Eligibility and Use in Fiscal Year 2019 and State Program Changes during the Pandemic* 8 (2023), https://perma.cc/KV7J-HN9V ("[S]ome families limited the amount of care they used for their children or did not accept a subsidy at all due to an inability to pay their family co-payment."); Ex. 17, Center for American Progress Comment at 2 (ACF_006033) ("The families that most need subsidies often cannot afford to participate in the subsidy system specifically because of this cost burden [of rising copays]."); Deana Grobe et al., *Struggling to Pay the Bills: Using Mixed-Methods to Understand Families' Financial Stress and Child Care Cost* at 22–26, 39, published in 6 Contemporary Perspectives in Family Research 93–121 (2012), https://perma.cc/XA3A-SUE9 (outlining hardships imposed by high copays).



18 WEST MERCER ST., STE. 400 SEATTLE, WASHINGTON 98119 TEL 800.238.4231 | FAX 206.378.4132
BARNARD IGLITZIN & LAVITT LLP

The 2026 Rule did not discuss that data. And it cited no evidence that families in *any* state can afford copays over 7%. Indeed, the 2026 Rule did not analyze whether copays over 7% created a barrier to access. In failing to do so, ACF ignored an "important aspect of the problem," "the relevant data," *State Farm*, 463 U.S. at 43, and the "earlier factual findings" that underlay the copay cap. *Organized Vill. of Kake*, 795 F.3d at 966 (citation omitted).

***Second***, ACF said nothing to address the other rationale for the copayment cap: that copays over 7% place a *disproportionate* burden on low-income families and undermine the *equality* of access to childcare that the Act seeks to ensure. As explained above, the Act requires States to set payment rates to ensure that children in the CCDF program have "equal access" to childcare relative to children whose families pay privately. 42 U.S.C. § 9858c(c)(4)(A). As ACF found in 2024, the average family spends 7% of its income on childcare, with low-income families paying a far higher share than high-income families. 89 Fed. Reg. at 15368. Therefore, parents who pay more than 7% of their paycheck as a copay pay a higher share than families who do not receive assistance. *See id.* ACF concluded that this disparity undermined the goal of the program to ensure equal access to childcare for the low-income families who receive CCDF assistance. *See id.* at 15388.



18 WEST MERCER ST., STE. 400 SEATTLE, WASHINGTON 98119 TEL 800.238.4231 | FAX 206.378.4132
BARNARD IGLITZIN & LAVITT LLP

In ignoring both rationales for the 7% copay cap, the 2026 Rule overlooked two "important aspect[s] of the problem." *State Farm*, 463 U.S. at 43. The decision to rescind the cap was therefore arbitrary and capricious.

**2. Payment Practice Requirements**

ACF explained the decision to rescind the prospective and enrollment-based payment requirements with the same refrain—that their repeal would give States more "flexibility." 2026 Rule, 91 Fed. Reg. at 25802. But again, ACF ignored the reasons it imposed those requirements: because without them, many States would continue to use different payment practices (retroactive and attendance-based payments) that are not "generally accepted" in the private market, 42 U.S.C. § 9858c(c)(2)(S), do not support the "fixed costs" of childcare, and discourage providers from serving children in the CCDF program. 2024 Rule, 89 Fed. Reg. at 15369, 15391–92.

***First***, ACF failed to consider market practices. The 2024 Rule rested on ACF's finding that "[g]enerally accepted payment practices for parents who do not receive subsidies (which are most parents) require a set fee, are based on a child's enrollment, and are paid in advance of when services are provided." 2024 Rule, 89 Fed. Reg. at 15369. Both the 2024 Rule and the 2026 comments cited studies that confirmed that attendance-based reimbursements are not



18 WEST MERCER ST., STE. 400 BARNARD
SEATTLE, WASHINGTON 98119 IGLITZIN &
TEL 800.238.4231 | FAX 206.378.4132 LAVITT LLP

"the norm" in the private market. *Id.* at 15391–92.[4] The Act itself makes the market a key aspect of the problem: It directs that State payment practices must be "generally accepted" in the private market in order "to provide stability of funding and encourage more child care providers to serve children" in the CCDF program. 42 U.S.C. § 9858c(c)(2)(S).

In authorizing retroactive and attendance-based payments, though, ACF did not analyze the private market at all. And it ignored its prior findings that those practices deviated from the market, in violation of the statute. Like the rescission of the copay cap, the decision to repeal the payment practice requirements thus unlawfully "failed to consider an important aspect of the problem," failed to "examine the relevant data," *State Farm*, 463 U.S. at 43, and failed to "address its prior factual findings" that underlay the repealed requirements. *Organized Vill. of Kake*, 795 F.3d at 966–67 (citation omitted).

***Second***, ACF ignored its prior conclusion that retroactive, attendance-based payments are insufficient to cover "the fixed costs of child care" and create financial instability for providers. 2024 Rule, 89 Fed. Reg. at 15369.

The 2024 Rule found that enrollment-based payments were necessary to meet the requirement that States "support the fixed costs of providing child

[4] *See, e.g.*, Ex. 18, Nat'l Ass'n for Educ. of Young Children Comment at 3–4 (ACF_006553–54) (survey: 77% of program directors require prospective payments and 80% charge private pay families based on enrollment).



18 WEST MERCER ST., STE. 400 BARNARD
SEATTLE, WASHINGTON 98119 IGLITZIN &
TEL 800.238.4231 | FAX 206.378.4132 LAVITT LLP

care services by delinking provider reimbursement rates from an eligible child's occasional absences" "to the extent practicable." 42 U.S.C. § 9858c(c)(2)(S)(ii); 2024 Rule, 89 Fed. Reg. at 15391. In the 2026 Rule, ACF suggested that States could meet that requirement with attendance-based alternatives: they could "provide full payment to providers as long as a child is absent for five or fewer days in a four week period or attends for 85 percent of the authorized time." 2026 Rule, 91 Fed. Reg. at 25803. But the rule does not require States to adopt either of those alternatives. *See id.* at 25802 (States may establish any "alternative approach justified in the CCDF Plan"). And in 2024, ACF specifically rejected both of those alternatives because "[n]either" of them "reflect the norm for families paying privately" or "supported a provider's fixed operational costs." 2024 Rule, 89 Fed. Reg. at 15392. The 2026 Rule did not address those prior conclusions or explain why they no longer justified an enrollment-based payment requirement.

In doing so, ACF ignored data showing that attendance-based payment models do not support providers' fixed costs. The 2024 Rule itself cited studies showing that the 85% attendance rule did not support those fixed costs because a significant percentage of children tend to be absent more than 15% of the time. *See*, *e.g.*, 2024 Rule, 89 Fed. Reg. at 15402–03 (in Washington, D.C.'s Head Start program, 7% of children missed at least 20% of enrolled days).



18 WEST MERCER ST., STE. 400 SEATTLE, WASHINGTON 98119 TEL 800.238.4231 | FAX 206.378.4132
BARNARD IGLITZIN & LAVITT LLP

The comments to the 2026 proposed rule reinforced the same conclusion. One cited medical studies finding that the average child under three years old is sick from 50 to 84 days per year—"far greater than what most states currently cover" in the CCDF program. Ex. 19, Early Care and Educ. Consortium Comment at 7 (ACF_006129). In an illustrative case study, when a provider's state changed to attendance-based payments, "the program experienced immediate revenue instability":

> Routine child absences due to illness resulted in income losses of approximately 20–30 percent in some weeks, while operating costs remained unchanged. After several consecutive months of operating at a deficit despite stable enrollment and full compliance, this provider made the economically rational decision to discontinue serving CCDF subsidized infants and toddlers.

Ex. 20, Dr. Victoria Long-Coleman Comment at 3 (ACF_005494). As another provider attested, "During cold and flu season, if childcare providers were only paid based on attendance rather than enrollment, many of us simply would not survive the winter." Ex. 18, Nat'l Ass'n for Educ. of Young Children Comment at 6 (ACF_006556) (collecting similar statements from providers). Other comments provided nationwide data showing that attendance-based payments



18 WEST MERCER ST., STE. 400
SEATTLE, WASHINGTON 98119
TEL 800.238.4231 | FAX 206.378.4132
BARNARD IGLITZIN & LAVITT LLP

created financial instability for childcare providers.[5] The 2026 Rule entirely failed to "examine" that "relevant data." *State Farm*, 463 U.S. at 43.

Similarly, the 2024 Rule found that "providers need to receive payment before services are delivered to meet payroll and pay rent." 89 Fed. Reg. at 15391. The 2026 comments reinforced that finding, too, citing studies showing that making "[p]ayments to child care centers only after services are delivered creates revenue instability, contributes to high staff turnover, and undermines program quality, ultimately disrupting continuity of care and productive learning environments for children." Ex. 21, Society for Research in Child Development Comment at 5 (ACF_006448). But the 2026 Rule did not grapple with it or the evidence behind it. *See* 91 Fed. Reg. at 25802–03.

***Third***, ACF failed to consider its prior conclusions that attendance-based reimbursements depress provider participation in the CCDF program and shrink the range of options available to eligible families. As explained above, the goal of the Act's payment practice provisions is to "encourage more child care providers to serve children who receive [CCDF] assistance." 42 U.S.C. § 9858c(c)(2)(S). But in 2024, ACF found that retroactive and attendance-based payments cause providers to "choose not to participate in the

[5] *See*, *e.g.*, Ex. 22, Ga. Child Care Ass'n Comment at 1–2 (ACF_005136–37); Ex. 23, Liminality Consulting Comment at 1–2 (ACF_005224–25); Ex. 24, Catholic Charities Comment at 3–4 (ACF_005582–83).



18 WEST MERCER ST., STE. 400 SEATTLE, WASHINGTON 98119 TEL 800.238.4231 | FAX 206.378.4132
BARNARD IGLITZIN & LAVITT LLP

subsidy program or to limit the number of children receiving subsidies that they will serve at any given time," 2024 Rule, 89 Fed. Reg. at 15392, which "limits parent choices," *id.* at 15369. Conversely, the 2024 Rule cited evidence that enrollment-based prospective payments would "encourage more providers to accept subsidies" and "expand available child care options to parents participating in CCDF so they can find child care that meets their families' needs." *Id.* (describing August 2023 survey showing that 73–80% of providers would "be more likely to serve families using subsidies" if states paid by enrollment or in advance). The 2026 comments bolstered that conclusion.[6]

In the 2026 Rule, however, ACF did not discuss its previous factual findings or the data behind them. Indeed, ACF did not assess the 2026 Rule's likely impact on provider participation in the CCDF program at all.

**3. Grants and Contracts Requirement**

In repealing the grants and contracts requirement, ACF opined that vouchers allow for more "parental choice" because they "allow[] families to choose from a wider range of child care providers than just those with which

[6] *See*, *e.g.*, Ex. 24, Catholic Charities Comment at 2 (ACF_005581) (prospective and enrollment-based payments "are associated with greater participation in subsidy programs and improved access for families," and "[p]roviders frequently cite unpredictable payments and attendance-based reimbursement as reasons for limiting or declining participation in subsidy systems"); *accord* Ex. 25, Advance Illinois Comment at 5 & n.12 (ACF_006461); Ex. 1, AFSCME Comment at 2 (ACF_004957).



18 WEST MERCER ST., STE. 400 SEATTLE, WASHINGTON 98119 TEL 800.238.4231 | FAX 206.378.4132
BARNARD IGLITZIN & LAVITT LLP

the [State] may have direct service grants or contracts." 2026 Rule, 91 Fed. Reg. at 25800. But the 2024 Rule already allowed families to use vouchers; it just required States to offer direct-service grants and contracts *in addition* to vouchers. Once again, the 2026 Rule ignored the reasons ACF imposed this requirement: grants and contracts "are required by the Act and can be one of the most effective tools to build supply in underserved geographic areas and for underserved populations." 2024 Rule, 89 Fed. Reg. at 15381.

As explained above, the Act requires States to assure that parents have the "option" to enroll their children with a provider that has a "grant or contract" for childcare services. 42 U.S.C. § 9858c(c)(2)(A)(i). As ACF explained in 2024, many parents could not find suitable care even if they had vouchers. 2024 Rule, 89 Fed. Reg. at 15370, 15382. By guaranteeing providers a stable funding source and requiring them to allocate slots for underserved populations, grants and contracts increase supply. *Id.* In doing so, they "increase parent choice" by giving parents options. *Id.* at 15413; *see id.* at 15381 (the Act "identifies the use of grants or contracts as a key element of parental choice of child care providers"). The Act's legislative history recognizes that grants and contracts are "particularly helpful in meeting the needs of specific populations of children and are well-suited to provide services in specific geographical areas." S. Rep. No. 113-138, at 12 (2014). The 2026 comments also


18 WEST MERCER ST., STE. 400 SEATTLE, WASHINGTON 98119 TEL 800.238.4231 | FAX 206.378.4132
BARNARD IGLITZIN & LAVITT LLP

reinforced that grants and contracts grow childcare supply for underserved populations.[7]

Nonetheless, ACF failed to consider this rationale for the 2024 Rule's grants and contracts requirement or any of the evidence that supports it. Indeed, it did not assess the 2026 Rule's impact on the supply of childcare.

***

ACF acknowledged that commenters raised some of these issues. 2026 Rule, 91 Fed. Reg. at 25802–03. When commenters raise a reasonable concern, though, the agency must do more than simply acknowledge the concern; it must offer a "reasoned response." *Ohio*, 603 U.S. at 293–95. Here, ACF responded to the above issues with the refrain that States could still adopt copay caps, prospective and enrollment-based payments, or grants and contracts if they wanted to. 2026 Rule, 91 Fed. Reg. at 25802–03. But that ignores the reason for the nationwide requirements: many States did not and

[7] *See*, *e.g.*, Ex. 16, Urban Institute Comment at 6 (ACF_006047) (citing research showing that grants and contracts increase investment in suitable care for children with disabilities and other underserved populations and encourage providers to serve those populations); Ex. 23, Liminality Consulting Comment at 2 (ACF_005225) (explaining that 32% of children in rural areas do not have childcare because of lack of supply, and removing the grants and contracts requirement would "remove a reliable source of funding for these providers" and thereby depress supply); Ex. 18, Nat'l Ass'n for Educ. of Young Children Comment at 5 (ACF_006555) (73% of providers would be more willing to accept families with subsidies if they could receive grants and contracts to serve infants and toddlers and children with disabilities).



18 WEST MERCER ST., STE. 400
SEATTLE, WASHINGTON 98119
TEL 800.238.4231 | FAX 206.378.4132
BARNARD IGLITZIN & LAVITT LLP

would not adopt those practices voluntarily. *See* 2024 Rule, 89 Fed. Reg. at 15368–70 (at least 20 States charged copays over 7%, only 8 States paid providers prospectively, only 36 paid providers based on enrollment, and only 10 used any grants and contracts for direct services). ACF did not explain why it should authorize those States to charge copays that create barriers to access, use payment practices that do not align with the market, or refuse to offer grants and contracts to providers, in conflict with the text and goals of the statute and the rationales behind the 2024 Rule.

In sum, ACF "did not address" the concerns raised in the 2024 Rule and the 2026 comments "so much as sidestep" them. *Ohio*, 603 U.S. at 295. Its lack of analysis makes the rule arbitrary and capricious. *See id.*

**B. The 2026 Rule is contrary to the CCDF statute.**

The 2026 Rule is also contrary to the Act. As explained above, the statute provides that copays may not be "a barrier to families receiving assistance" under CCDF, 42 U.S.C. § 9858c(c)(5), and that payment practices must be "generally accepted" in the private market, *id.* § 9858c(c)(2)(S). In the 2024 Rule, ACF found that copays over 7% of family income raised an impermissible "barrier" to childcare access and that retroactive and attendance-based payment practices were not "generally accepted" in the private market. 2024 Rule, 89 Fed. Reg. at 15369, 15387–88, 15391–92. Without disputing those



18 WEST MERCER ST., STE. 400 SEATTLE, WASHINGTON 98119 TEL 800.238.4231 | FAX 206.378.4132
BARNARD IGLITZIN & LAVITT LLP

conclusions, the 2026 Rule authorized the very practices that ACF previously found to violate the statute.

The Act also requires States to assure that the parent of "each eligible child" is "given the option" to enroll their child with a provider that has a "grant or contract for the provision of [childcare] services" or to receive a voucher. 42 U.S.C. § 9858c(c)(2)(A)(i). Since parents must be able to "select[]" one of those choices, both must be available. *Id.* § 9858c(c)(2)(A)(ii), (iii). "[E]ven though [grants and contracts] are required by the Act," the 2024 Rule found that "only 10 States and Territories report using any grants and contracts for direct services …." 89 Fed. Reg. at 15381. Again, the 2026 Rule did not dispute this fact. But it completely removed the requirement for States to offer any grants and contracts at all. 2026 Rule, 91 Fed. Reg. at 25800. In permitting States not to use any grants or contracts to provide direct services, it authorizes them to violate the Act's requirement to provide parents the option to enroll their children with a provider that has such a grant or contract.

Because the 2026 Rule authorizes States to violate the Act, it is "not in accordance with law." *Protect Our Communities Found. v. LaCounte*, 939 F.3d 1029, 1043 (9th Cir. 2019) ("agency action that sanction[s] unlawful conduct by third parties" is contrary to law under 5 U.S.C. § 706(2)).


18 WEST MERCER ST., STE. 400 SEATTLE, WASHINGTON 98119 TEL 800.238.4231 | FAX 206.378.4132
BARNARD IGLITZIN & LAVITT LLP

### III. The Court should vacate the 2026 Rule.

When an agency rule violates the APA, the statute directs the Court to "hold unlawful and set aside" the rule. 5 U.S.C. § 706. Thus, "vacatur and remand is the default remedy under the APA …." *Natural Grocers v. Rollins*, 157 F.4th 1143, 1170 (9th Cir. 2025). Because the 2026 Rule is arbitrary and capricious, contrary to the Act, and leaves heavy financial burdens on small childcare providers and low-income families, the Court should vacate it.

## CONCLUSION

The Court should vacate the 2026 Rule.

Dated: September 24, 2026

Respectfully submitted,

/s/ Sean Ouellette
Sean Ouellette*
Briana M. Clark*
Joel McElvain*
Robin F. Thurston*
**DEMOCRACY FORWARD FOUNDATION**
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
souellette@democracyforward.org
bclark@democracyforward.org
jmcelvain@democracyforward.org
rthurston@democracyforward.org

Robert H. Lavitt, WSBA No. 27758
Sarah E. Derry, WSBA No. 47189
**BARNARD IGLITZIN & LAVITT LLP**
18 W Mercer St, Suite 400
Seattle, WA 98119
(206) 257-6004
lavitt@workerlaw.com
derry@workerlaw.com

*Counsel for Plaintiffs*
**Admitted pro hac vice*

## WORD COUNT CERTIFICATION

Per Local Rule 7(e)(6), I certify that this memorandum contains 8,378 words excluding the caption, table of contents, table of authorities, and signature block, in compliance with the Local Civil Rules.

*/s/ Sean Ouellette*
Sean Ouellette



18 WEST MERCER ST., STE. 400
SEATTLE, WASHINGTON 98119
TEL 800.238.4231 | FAX 206.378.4132
BARNARD IGLITZIN & LAVITT LLP