**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO; SERVICE EMPLOYEES INTERNATIONAL UNION; and SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 925,

*Plaintiffs*,

v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; ADMINISTRATION FOR CHILDREN AND FAMILIES; ROBERT F. KENNEDY, JR., in his official capacity as Secretary of Health and Human Services; ALEX J. ADAMS, in his official capacity as the Assistant Secretary of the Administration for Children and Families,

*Defendants*.

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND CROSS MOTION FOR SUMMARY JUDGMENT**

NOTE ON MOTION CALENDAR:
December 4, 2026

Case No. 2:26-cv-02282-TL



U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, D.C. 20005
(202) 598-0860

## TABLE OF CONTENTS


INTRODUCTION ....... 1
BACKGROUND ....... 3

I. The CCDF Statutory Framework ....... 3
II. The Regulatory Framework Before and Under the 2024 Rule ....... 4
III. The 2026 Rulemaking ....... 6
IV. Procedural History ....... 8

STANDARD OF REVIEW ....... 8
ARGUMENT ....... 8

I. Plaintiffs Have Not Established Standing to Challenge Rescission of the Copayment Ceiling. ....... 8
II. Defendants Are Entitled to Summary Judgment on Count I Because the 2026 Rule Is Consistent with the CCDF Statute. ....... 11

   A. The affordability provisions do not require a seven percent federal copayment ceiling. ....... 12
   B. The payment provisions permit the revised treatment of prospective and enrollment-based payments. ....... 13
   C. The Act permits states to choose among funding mechanisms and does not require the population specific grants or contracts mandate adopted in the 2024 Rule. ....... 14

III. Defendants Are Entitled to Summary Judgment on Count II Because the Agency Adequately Explained the Challenged Policy Changes. ....... 17

   A. HHS acknowledged the changes and explained its revised policy judgments. ....... 17
   B. HHS adequately explained the rescission of the copayment cap. ....... 19
   C. HHS adequately explained the rescission of the payment requirements. ....... 21
   D. HHS adequately explained rescission of the grants or contracts requirement. ....... 23

IV. Any Relief Should Be Limited. ....... 25

CONCLUSION ....... 27

# TABLE OF AUTHORITIES

**Cases**

*Ariz. All. for Retired Ams. v. Mayes*,
186 F.4th 622 (9th Cir. 2026) ..... 11

*Davis v. FEC*,
554 U.S. 724 (2008) ..... 8

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ..... 17

*K Mart Corp. v. Cartier, Inc.*,
486 U.S. 281 (1988) ..... 26

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ..... 8, 16

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ..... 8, 10

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ..... 8, 18

*Nat. Grocers v. Rollins*,
157 F.4th 1143 (9th Cir. 2025) ..... 25

*Occidental Eng'g Co. v. INS*,
753 F.2d 766 (9th Cir. 1985) ..... 8

*Ohio v. EPA*,
603 U.S. 279 (2024) ..... 24-25

*Organized Vill. of Kake v. U.S. Dep't of Agric.*,
795 F.3d 956 (9th Cir. 2015) ..... *passim*

*Protect Our Communities Foundation v. LaCounte*,
939 F.3d 1029 (9th Cir. 2019) ..... 16

*Solar Energy Indus. Ass'n v. FERC*,
80 F.4th 956 (9th Cir. 2023) ..... 25, 26

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) ..... 11

*United States v. Texas*,
599 U.S. 670 (2023) ..... 27

**Statutes**

5 U.S.C. § 702(1) .....27

5 U.S.C. § 706(2)(A).....8

42 U.S.C. § 9857(b)(1) ..... *passim*

42 U.S.C. § 9857(b)(2) .....3, 14, 15, 17

42 U.S.C. § 9857(b)(7) ..... 12, 19

42 U.S.C. § 9858c(c)(2)(A) ..... *passim*

42 U.S.C. § 9858c(c)(2)(M) ..... *passim*

42 U.S.C. § 9858c(c)(2)(S) ..... *passim*

42 U.S.C. § 9858c(c)(5).....3, 11, 12, 19

Child Care and Development Block Grant Act of 1990, Pub. L. No. 101-508, tit. V, § 5082, 104 Stat. 1388-236 .....1

**Regulations**

45 C.F.R. § 98.45(l)(2) (2026) .....3

45 C.F.R. § 98.45(l)(3) (2026) .....7

45 C.F.R. § 98.45(m)(3) (2026).....13

*Child Care and Development Block Grant (CCDBG)*, 57 Fed. Reg. 34,352 (Aug. 4, 1992).....4

*Child Care and Development Fund (CCDF) Program*, 63 Fed. Reg. 39,936 (July 24, 1998) .....5

*Child Care and Development Fund (CCDF) Program*, 81 Fed. Reg. 67,438 (Sep. 30, 2016)..... 5, 6

*Improving Child Care Access, Affordability, and Stability in the Child Care and Development Fund (CCDF)*, 89 Fed. Reg. 15,366 (Mar. 1, 2024) .....1

*Restoring Flexibility in the Child Care and Development Fund (CCDF)*, 91 Fed. Reg. 25796 (May 12, 2026)..... 1, 7



U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, D.C. 20005
(202) 598-0860

## INTRODUCTION

Congress designed the Child Care and Development Block Grant Act of 1990, Pub. L. No. 101-508, tit. V, § 5082, 104 Stat. 1388-236 ("Act"), to combine federal assistance and substantive program requirements with state flexibility. An express purpose of the Act is "to allow each State maximum flexibility in developing child care programs and policies that best suit the needs of children and parents within that State." 42 U.S.C. § 9857(b)(1). In *Restoring Flexibility in the Child Care and Development Fund (CCDF)*, 91 Fed. Reg. 25796 (May 12, 2026) ("2026 Rule"), the U.S. Department of Health and Human Services ("HHS") restored state discretion over four aspects of program administration while preserving the statutory obligations Plaintiffs invoke. AR, ACF 000063-69, 000073 (ECF No. 27-6 at 2-8, 12). Under the 2026 Rule, states may retain all four policies mandated by the 2024 Rule or adopt alternative approaches that satisfy the continuing statutory requirements. AR, ACF 000065-69, 000073 (ECF No. 27-6 at 4-8, 12).

The challenged changes restore approaches permitted before HHS issued *Improving Child Care Access, Affordability, and Stability in the Child Care and Development Fund (CCDF)*, 89 Fed. Reg. 15,366 (Mar. 1, 2024) ("2024 Rule"). Prior to the 2024 Rule, HHS did not impose a regulatory cap on copayments, permitted provider reimbursement within 21 days after receipt of a complete invoice, and allowed states to account for occasional absences through specified attendance or absence thresholds. AR, ACF 000022-23, 000026-27 (ECF No. 27-3 at 22-23, 26-27). From 1992 until the 2024 Rule, the regulations also permitted, but did not require, direct service grants or contracts. AR, ACF 000066 (ECF No. 27-6 at 5). The 2024 Rule, in contrast, imposed a binding seven percent copayment ceiling, prospective provider payments, enrollment-based payments, and direct service grants or contracts for specified underserved populations. AR, ACF 000063-64 (ECF No. 27-6 at 2-3).



U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, D.C. 20005
(202) 598-0860

Implementation of the 2024 Rule's requirements was subject to substantial delays. Fifty-five of 56 states obtained waivers allowing two additional years to implement at least one requirement, and 19 states requested further waivers. States reported implementation costs and difficulties exceeding HHS's estimates. AR, ACF 000063 (ECF No. 27-6 at 2). That experience informed HHS's reconsideration of whether the requirements should remain mandatory nationwide. Following notice and comment, HHS explained why implementation burdens, competing demands on finite funding, and program integrity concerns warranted restoring prior alternative approaches. AR, ACF 000063-69 (ECF No. 27-6 at 2-8).

Plaintiffs have not established standing to challenge rescission of the copayment ceiling. Their statutory and arbitrary and capricious challenges also fail. The 2026 Rule preserves Congress's substantive requirements while allowing states greater flexibility in how they satisfy them. The revised framework thus satisfies the statutory requirements, which do not prescribe the four rescinded mechanisms as the exclusive means of compliance. HHS also acknowledged its change in policy, considered the benefits supporting the 2024 Rule, and explained why implementation burdens, funding tradeoffs, and program integrity concerns justified greater state discretion. AR, ACF 000063-69, 000073 (ECF No. 27-6 at 2-8, 12). The Court should deny Plaintiffs' motion and grant Defendants' cross-motion.



U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, D.C. 20005
(202) 598-0860

## BACKGROUND

### I. The CCDF Statutory Framework

The Child Care and Development Fund ("CCDF") combines federal funding under the Act and section 418 of the Social Security Act to help low-income families access child care and improve the quality of that care. State, territorial, and tribal agencies administer the program subject to federal requirements. AR, ACF 000063 (ECF No. 27-6 at 2).[1] Congress's stated purposes include affording states "maximum flexibility" to develop suitable programs, promoting parental choice, and increasing low-income children's access to high-quality care. 42 U.S.C. § 9857(b)(1)-(2), (7).

The Act establishes requirements governing family contributions and equal access. Each state must establish and periodically update a sliding fee scale that sets families' copayments at levels that are not a barrier to receiving assistance. *Id.* § 9858c(c)(5). Under the Act, a sliding fee scale determines families' copayments based on their income and family size. *Id.* § 9858n(13). The regulations allow states to consider other appropriate factors, but copayments cannot be based on the cost of care or the amount of the subsidy. 45 C.F.R. § 98.45(l)(2) (2026). States must also certify that their payment rates are sufficient to provide eligible children equal access to child care comparable to that available to children whose parents are not eligible for assistance under CCDF or other federal or state programs. 42 U.S.C. § 9858c(c)(4)(A).

Provider payment practices must reflect generally accepted practices among providers serving children who do not receive assistance, with the goal of promoting stable funding and encouraging provider participation. *Id.* § 9858c(c)(2)(S)(i). States must also assure that, "to the extent practicable," their enrollment and eligibility policies support providers' fixed costs by delinking reimbursement rates from children's occasional absences due to holidays or unforeseen circumstances such as illness. *Id.* §

[1] Unless otherwise specified, references to "states" include the District of Columbia and participating territories.

9858c(c)(2)(S)(ii). State plans must describe how providers will receive timely payment. *Id.* § 9858c(c)(4)(B)(iv).

The Act separately addresses parental choice and underserved populations. State plans must assure that parents receiving or offered assistance may choose care from a provider that "has a grant or contract" or receive a child care certificate to select a provider. *Id.* § 9858c(c)(2)(A)(i). When a parent selects a provider holding a grant or contract, the state must enroll the child with that provider to the maximum extent practicable. *Id.* § 9858c(c)(2)(A)(ii). From 1992 until 2024, states could choose whether to fund care through grants or contracts, while parents retained the option to receive child care certificates. AR, ACF 000066 (ECF No. 27-6 at 5). States must also develop and implement strategies to increase the supply and improve the quality of child care for children in underserved areas, infants and toddlers, children with disabilities, and children receiving care during non-traditional hours. 42 U.S.C. § 9858c(c)(2)(M). Those strategies "may include" alternative reimbursement rates to child care providers, direct contracts or grants to community-based organizations, offering child care certificates to parents, or other means determined by the state. *Id.*

## II. The Regulatory Framework Before and Under the 2024 Rule

In 2024, HHS amended the CCDF regulations to impose a mandatory seven percent family copayment ceiling, require prospective and enrollment-based provider payments, and require some direct child care services through grants or contracts for specified underserved populations. AR, ACF 000001, 000003-05 (ECF No. 27-3 at 1, 3-5).

**Family copayments.** Prior to the 2024 Rule, HHS had never required states to cap family copayments at a specified percentage of income under the Act, which Congress enacted in 1990. In its initial implementing regulations, HHS declined to establish a uniform affordability standard, explaining that doing so would undermine state flexibility, complicate monitoring and enforcement, and prevent variation inherent in block grants. 57 Fed. Reg. 34,352, 34,380 (Aug. 4, 1992). The 1998

preamble recommended limiting copayments to 10 percent of family income. 63 Fed. Reg. 39,936, 39,960 (July 24, 1998). The 2016 preamble lowered that nonbinding benchmark to seven percent while preserving states' discretion to determine when copayments would create a barrier to CCDF assistance. 81 Fed. Reg. 67,438, 67,515 (Sep. 30, 2016); *see also* AR, ACF 000022-23 (ECF No. 27-3 at 22-23); AR, ACF 000067 (ECF No. 27-6 at 6). The 2024 Rule required states to limit a family's combined copayments for all children receiving assistance to seven percent of family income. AR, ACF 000021-23 (ECF No. 27-3 at 21-23).

**Prospective payments.** In 2016, HHS adopted regulations through notice and comment rulemaking to implement the Act's 2014 amendments. Those regulations allowed states to reimburse providers within 21 calendar days after receiving a complete invoice. 81 Fed. Reg. 67,438, 67,516-17, 67,587 (Sept. 30, 2016). That option remained available until the 2024 Rule required payment in advance of, or at the beginning of, the service period. The 2024 Rule allowed states to define the service period and listed one week, two weeks, or one month as examples. AR, ACF 000026 (ECF No. 27-3 at 26).

**Enrollment based payments.** The prior regulations permitted several approaches to accounting for occasional absences such as full payment when a child attended at least 85 percent of authorized time or was absent for five or fewer days in a month. AR, ACF 000027 (ECF No. 27-3 at 27). The 2024 Rule removed those two alternatives and required payment based on authorized enrollment, to the extent practicable. AR, ACF 000027-28 (ECF No. 27-3 at 27-28).

**Grants or contracts.** From 1992 until the 2024 Rule, HHS's regulations permitted, but did not require, direct service grants or contracts. AR, ACF 000066 (ECF No. 27-6 at 5). In 2016, following the Act's 2014 amendments, HHS required state plans to describe strategies to increase the supply and improve the quality of care for children in underserved areas, infants and toddlers, children with disabilities, and children receiving care during nontraditional hours. Plans also had to identify



U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, D.C. 20005
(202) 598-0860

shortages, list supporting data sources, and describe how progress would be tracked. 81 Fed. Reg. 67,438, 67,577 (Sept. 30, 2016). The 2024 Rule required states to use grants or contracts to fund some child care services for each of the following three groups: (1) children in underserved geographic areas; (2) infants and toddlers; and (3) children with disabilities. AR, ACF 000016-17 (ECF No. 27-3 at 16-17).

**Implementation and waivers.** The 2024 Rule became effective on April 30, 2024. AR, ACF 000001 (ECF No. 27-3 at 1). Commenters raised concerns that implementation would require legislative and administrative changes and additional time. HHS authorized transitional or legislative waivers lasting up to two years and stated that it would assess compliance through plan review and federal monitoring. AR, ACF 000006, 000010 (ECF No. 27-3 at 6, 10). HHS later reported that 55 of 56 states obtained waivers for at least one requirement and that 19 states requested another two years because compliance required substantial spending and systems changes. AR, ACF 000063 (ECF No. 27-6 at 2).

## III. The 2026 Rulemaking

**Proposal and comments.** States reported that certain requirements adopted in the 2024 Rule were more costly and difficult to implement than HHS had anticipated. They provided feedback through plan appendices, administrator meetings, and technical assistance inquiries. AR, ACF 000064 (ECF No. 27-6 at 3). On January 5, 2026, HHS proposed eliminating the four requirements and provided the public 30 days to comment on the proposal. AR, ACF 000063-64 (ECF No. 27-6 at 2-3). Most commenting states and organizations representing state and local human services agencies supported the proposed rescissions. Most unique public comments opposed them by raising concerns about family affordability, provider participation, and investments already made to implement the 2024 requirements. HHS reviewed and considered all comments before adopting the four rescissions. AR, ACF 000065 (ECF No. 27-6 at 4).



U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, D.C. 20005
(202) 598-0860

**Final rule.** HHS published the 2026 Rule on May 12, 2026, rescinding the four mandates effective July 13, 2026. 91 Fed. Reg. 25,796 (May 12, 2026); AR, ACF 000062 (ECF No. 27-6 at 1). The 2026 Rule reported that, as of March 2026, nine lead agencies had implemented prospective payments for all providers, 29 paid based on authorized enrollment, and 37 limited copayments to seven percent of family income or less. AR, ACF 000067-68 (ECF No. 27-6 at 6-7). Seven states and one territory had implemented grants or contracts for children with disabilities, 11 states and one territory for infants and toddlers, and 10 states for children in underserved geographic areas. AR, ACF 000066 (ECF No. 27-6 at 5).

**Copayments.** The 2026 Rule removes the seven percent ceiling while requiring states to demonstrate, with supporting data and facts, that copayments do not create a barrier to assistance. 45 C.F.R. § 98.45(l)(3) (2026); AR, ACF 000067, 000073 (ECF No. 27-6 at 6, 12).

**Provider payments.** The 2026 Rule again allows states to reimburse providers within 21 calendar days after receiving a complete invoice instead of paying prospectively. It also restores the attendance and absence thresholds described above as alternatives to enrollment-based payment. Further, the 2026 Rule retains requirements concerning generally accepted payment practices, timely payment, and support for providers' fixed costs during occasional absences to the extent practicable. AR, ACF 000068-69, 000073 (ECF No. 27-6 at 7-8, 12).

**Grants or contracts.** The 2026 Rule restores states' discretion to use grants or contracts. State plans must still identify shortages and supporting data, explain how selected strategies will address those shortages, and describe how progress will be tracked. States using grants or contracts must preserve parents' option to receive child care certificates. AR, ACF 000066, 000073 (ECF No. 27-6 at 5, 12).

### IV. Procedural History

Plaintiffs filed this Administrative Procedure Act ("APA") challenge to the 2026 Rule on June 30, 2026. Compl., ECF No. 1. Defendants filed the certified administrative record, and Plaintiffs moved for summary judgment. ECF Nos. 27-31. Defendants now oppose Plaintiffs' motion and cross move for summary judgment. Order, ECF No. 26.

## STANDARD OF REVIEW

Summary judgment permits the Court to determine, based on the administrative record, whether the agency's action is lawful. *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769-70 (9th Cir. 1985). The Court must set aside agency action that is arbitrary, capricious, an abuse of discretion, or otherwise contrary to law. 5 U.S.C. § 706(2)(A). Review is narrow in that the agency must examine the relevant information and satisfactorily explain its decision, but the Court may not substitute its judgment for the agency's. *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). On Plaintiffs' statutory claim, the Court independently interprets the Act and determines the scope of any discretion Congress delegated to HHS. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395–96, 412-13 (2024).

## ARGUMENT

### I. Plaintiffs Have Not Established Standing to Challenge Rescission of the Copayment Ceiling.

Plaintiffs must establish standing for each claim and each form of relief sought. *Davis v. FEC*, 554 U.S. 724, 734 (2008).[2] At summary judgment, they must provide specific facts establishing a concrete injury, fairly traceable to the challenged action, that a favorable decision would likely redress.

[2] The other rescissions likewise leave states free to retain prospective payments, enrollment-based payments, and grants or contracts. AR, ACF 000066, 000068-69, 000073 (ECF No. 27-6 at 5, 7-8, 12). Plaintiffs must show how states' actual or anticipated responses to those rescissions would injure a member and how the requested relief would likely remedy that injury. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992).



U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, D.C. 20005
(202) 598-0860

*Lujan*, 504 U.S. at 560-61. Plaintiffs must provide facts showing how the regulated states' decisions connect the challenged 2026 Rule to their injuries and how the requested relief would remedy those injuries. *Id.* at 562. Plaintiffs' copayment theories concern both providers' alleged enrollment losses and the copayments paid by members receiving subsidized child care. Each theory requires evidence connecting an affected member's injury to the 2026 Rule's rescission of the seven percent copayment ceiling.

Plaintiffs rely on declarations from providers in Washington, Pennsylvania, and Ohio. HHS's February 25, 2026 summary identifies Washington's and Pennsylvania's CCDF plans as complying with the 2024 Rule's seven percent copayment ceiling. AR, ACF 001126-28 (ECF No. 28 at 183-85). The 2026 Rule permits states to set copayment levels in light of local costs and conditions. AR, ACF 000067 (ECF No. 27-6 at 6). Plaintiffs must therefore demonstrate how removing the federal ceiling would cause higher copayments and a resulting loss of enrollment or revenue for an identified provider.

The Washington declarations identify no actual or imminent change to the state's copayment cap. Vasquez Hernandez describes current copayments and two past instances of families struggling to afford care but identifies no increase attributable to the 2026 Rule. Vasquez Hernandez Decl. ¶¶ 13–14 (ECF No. 31-4 at 6-7). Horton describes existing affordability concerns and possible future increases without identifying a planned change in Washington's copayment policy. Horton Decl. ¶ 27 (ECF No. 31-5 at 10). Neither declaration establishes that the 2026 Rule's removal of the seven percent copayment ceiling will increase copayments and cause providers to lose enrollment or revenue.

The Pennsylvania declarations likewise do not establish that reinstating the seven percent ceiling would remedy a provider's injury. Godbolt and Good state generally that Pennsylvania did not implement the 2024 Rule's changes. Godbolt Decl. ¶¶ 22-23 (ECF No. 31-6 at 7-8); Good Decl. ¶¶ 6-7 (ECF No. 31-12 at 3-4). HHS's summary, however, states that Pennsylvania amended its CCDF

plan to comply with the 2024 Rule's seven percent copayment ceiling. AR, ACF 001127 (ECF No. 28 at 184). Neither declaration addresses that amendment or identifies a subsequent copayment increase. Godbolt describes a gap between tuition and subsidy reimbursement without explaining how reinstating the ceiling would reduce families' payments or increase enrollment. Godbolt Decl. ¶ 9 (ECF No. 31-6 at 4-5). Good describes an $11 weekly copayment without identifying any increase attributable to the 2026 Rule. Good Decl. ¶ 9 (ECF No. 31-12 at 4-5).

Thompson operates a child care program in Ohio and states that Ohio requires families to contribute 12 percent of their income toward care. Thompson Decl. ¶¶ 4, 21 (ECF No. 31-8 at 3, 9). HHS's summary identifies Ohio's plan as exceeding the 2024 Rule's seven percent copayment ceiling. AR, ACF 001127 (ECF No. 28 at 184). Thompson states that some prospective families declined to enroll because they could not afford care and predicts that reinstating the ceiling would increase enrollment. Thompson Decl. ¶ 21 (ECF No. 31-8 at 9). Her declaration does not establish whether those families qualified for CCDF assistance or whether their required CCDF copayments prevented enrollment. The ceiling applies only to copayments for families receiving CCDF assistance. AR, ACF 000021-23 (ECF No. 27-3 at 21-23). Because the asserted enrollment benefit depends on families' independent decisions, Plaintiffs must provide facts supporting the prediction that reinstating the ceiling would lead families to enroll in Thompson's program. *See Lujan*, 504 U.S. at 562. Her declaration does not connect the enrollment losses she describes to CCDF copayments subject to the ceiling. It therefore does not establish that reinstating the ceiling would remedy those losses.

The union declarations also assert injuries to members receiving subsidized child care. Sforza asserts that AFSCME has members in states without seven percent caps and that members using subsidies will be harmed. Sforza Decl. ¶ 9 (ECF No. 31-9 at 13). Petterson reports that members of the Service Employees International Union ("SEIU") rely on subsidies and states that SEIU does "not track precisely how many" members qualify for subsidized child care. Petterson Decl. ¶ 24 (ECF No.

31-10 at 10). Neither declaration establishes that a particular member pays a copayment exceeding seven percent or would pay less if the ceiling were reinstated.

Associational standing requires evidence that at least one member has standing to sue individually. *Summers v. Earth Island Inst.*, 555 U.S. 488, 498-99 (2009); *Ariz. All. for Retired Ams. v. Mayes*, 186 F.4th 622, 631 n.1 (9th Cir. 2026) (en banc) (rejecting representational standing where the organization had not identified a member with an actual or threatened injury from the challenged provisions). The declarations do not demonstrate that any member receiving CCDF assistance would pay less if the seven percent ceiling were reinstated. Plaintiffs therefore have not established associational standing on behalf of their members receiving CCDF assistance. The Court should dismiss Plaintiffs' challenge to the removal of the seven percent copayment ceiling for lack of standing.

## II. Defendants Are Entitled to Summary Judgment on Count I Because the 2026 Rule Is Consistent with the CCDF Statute.

The 2026 Rule preserves the Act's requirements concerning affordability, access, provider payments, parental choice, and underserved populations while giving states more flexibility in how they satisfy those requirements. 42 U.S.C. § 9858c(c)(2)(A), (M), (S), (4), (5); AR, ACF 000073 (ECF No. 27-6 at 12). It restores payment options adopted in 2016 and state discretion over copayment levels and the use of grants or contracts that existed for decades before the 2024 Rule. AR, ACF 000064, 000066-69 (ECF No. 27-6 at 3, 5-8). As the following subsections explain, the Act does not require the four mechanisms mandated by the 2024 Rule, and the alternatives permitted by the 2026 Rule satisfy its requirements.



U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, D.C. 20005
(202) 598-0860

**A. The affordability provisions do not require a seven percent federal copayment ceiling.**

Congress required family contributions not to be a barrier to accessing CCDF subsidies without prescribing a uniform, numerical ceiling. Each state must establish and periodically revise a sliding fee scale providing for cost sharing "that is not a barrier to families receiving assistance." 42 U.S.C. § 9858c(c)(5). A sliding fee scale bases contributions on family income and size. *Id.* § 9858n(13). The 2026 Rule permits states to set copayment levels in light of local costs and conditions, which is consistent with Congress's express purpose of allowing state policies that "best suit the needs of children and parents within that State." 42 U.S.C. § 9857(b)(1); AR, ACF 000067 (ECF No. 27-6 at 6).

The equal access requirement likewise leaves the permissible copayment percentage unspecified. It requires states to set provider payment rates high enough to give eligible children equal access to child care comparable to that available to children whose parents are ineligible for assistance. 42 U.S.C. § 9858c(c)(4)(A). Related provisions require states to conduct a market rate survey or use an alternative method to assess child care costs and explain how they will set provider payment rates. *Id.* § 9858c(c)(4)(B)(i)-(iii). Those obligations complement the affordability requirement without converting it into a particular percentage-of-income limit.

Plaintiffs point to no provision of the Act requiring a seven percent copayment cap. Pls.' Mot. Summ. J. 33-34 (ECF No. 31 at 37-38). The 2024 Rule converted HHS's nonbinding seven percent benchmark into a mandatory ceiling. AR, ACF 000022-23 (ECF No. 27-3 at 22-23). The 2026 Rule gives states flexibility to balance lower copayments against serving additional families, while continuing to require that copayments are not a barrier to assistance. AR, ACF 000067, 000073 (ECF No. 27-6 at 6, 12). That flexibility advances Congress's purpose of increasing the number and percentage of low-income children in high-quality child care settings. 42 U.S.C. § 9857(b)(7). The Act permits HHS

to reconsider the ceiling, subject to its obligation to explain the change through reasoned decision making. Part III explains why HHS's explanation was adequate.

**B. The payment provisions permit the revised treatment of prospective and enrollment-based payments.**

The Act imposes three complementary obligations governing provider payments. States must use payment practices that "reflect generally accepted payment practices" of providers in the state serving children who do not receive assistance, with the goal of providing stable funding and encouraging provider participation in CCDF. 42 U.S.C. § 9858c(c)(2)(S)(i). States must also, "to the extent practicable," support providers' fixed costs by delinking reimbursement rates from children's occasional absences due to holidays or unforeseen circumstances such as illness. *Id.* § 9858c(c)(2)(S)(ii). Finally, state plans must describe how providers will receive timely payment. *Id.* § 9858c(c)(4)(B)(iv). These provisions leave states flexibility to satisfy the statutory requirements through payment methods other than prospective or enrollment-based payment.

The 2026 Rule continues to require payment practices that reflect generally accepted practices among child care providers "in the State" serving children who do not receive assistance; those practices may vary from state to state. 42 U.S.C. § 9858c(c)(2)(S)(i); AR, ACF 000073 (ECF No. 27-6 at 12). States must pay providers on a part-time or full-time basis and cover reasonable mandatory registration fees charged to private paying families. A state may depart from these two practices upon providing evidence that they are not generally accepted in the state or service area. 45 C.F.R. § 98.45(m)(3) (2026); AR, ACF 000069, 000073 (ECF No. 27-6 at 8, 12). With respect to payment timing, the 2026 Rule permits advance payment or reimbursement within 21 calendar days after receipt of a complete invoice. AR, ACF 000073 (ECF No. 27-6 at 12). HHS reinstated the reimbursement option that the 2016 regulations permitted and the 2024 Rule eliminated. AR, ACF 000064 (ECF No. 27-6 at 3); AR, ACF 000026 (ECF No. 27-3 at 26). The 2026 Rule also requires written payment agreements and procedures for resolving payment disputes. AR, ACF 000073 (ECF No. 27-6 at 12).



U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, D.C. 20005
(202) 598-0860

Congress required states, to the extent practicable, to support providers' fixed costs by delinking reimbursement rates from children's occasional absences. 42 U.S.C. § 9858c(c)(2)(S)(ii). The 2026 Rule permits payment based on enrollment; full payment when attendance reaches at least 85 percent of authorized time or absences total five or fewer days in a month; or another approach justified in the state plan. AR, ACF 000073 (ECF No. 27-6 at 12). States must still protect providers' ability to cover fixed costs by paying for children's occasional absences to the extent practicable.

Plaintiffs invoke HHS's earlier findings concerning private market practices and provider stability, but those findings do not establish that Congress prescribed prospective and enrollment-based payments as the exclusive permissible methods. Pls.' Mot. Summ. J. 25-27, 33-34 (ECF No. 31 at 29-31, 37-38). The revised framework retains the private market, timeliness, and occasional absence obligations, and its alternative methods remain subject to those statutory requirements. AR, ACF 000073 (ECF No. 27-6 at 12). The 2026 Rule thus is not contrary to the statute. HHS's explanation for selecting those methods is addressed in Part III.

### C. The Act permits states to choose among funding mechanisms and does not require the population specific grants or contracts mandate adopted in the 2024 Rule.

Congress expressly sought to give states "maximum flexibility" in developing child care programs and to empower parents to choose care that best meets their families' needs. 42 U.S.C. § 9857(b)(1)-(2). Consistent with those purposes, the Act requires states to meet the child care needs of underserved populations while leaving states flexibility to choose how to fund that care. States must develop and implement strategies to increase the supply and improve the quality of care for children in underserved areas, infants and toddlers, children with disabilities, and children needing care during nontraditional hours. Those strategies "may include" alternative reimbursement rates, direct contracts or grants to community based organizations, child care certificates, and other means determined by the state. *Id.* § 9858c(c)(2)(M). Congress thereby required states to address these populations' needs without prescribing a particular funding mechanism.

The 2026 Rule removes the population specific mandate while requiring state plans to address all four statutory populations, identify shortages, explain selected strategies, and track progress. AR, ACF 000066, 000073 (ECF No. 27-6 at 5, 12). The Act's parental choice provision does not impose the funding mandate Plaintiffs assert. Rather, it requires state plans to assure that parents may choose to enroll their children with a provider that "has a grant or contract" or receive a child care certificate. 42 U.S.C. § 9858c(c)(2)(A)(i)(I)-(II). When a parent chooses a provider that has a grant or contract, the state must enroll the child with that provider to the maximum extent practicable. A child care certificate must provide a subsidy comparable in value to the subsidy provided through grants or contracts. *Id.* § 9858c(c)(2)(A)(ii)-(iii). Plaintiffs read these provisions to require every state to make both funding options available. Pls.' Mot. Summ. J. 34 (ECF No. 31 at 38).

The better reading is that these provisions protect parents' choices when a state uses grants or contracts. The statute refers to a provider that "has a grant or contract," governs a parent's selection of that provider, and specifies the value of certificates for parents who choose that option. 42 U.S.C. § 9858c(c)(2)(A)(i)-(iii). It does not direct states to establish grants or contracts where none exist. This interpretation respects states' statutory flexibility to choose strategies for underserved populations and protects parents' choice of the care setting and provider that best meet their children's needs. *Id.* §§ 9857(b)(2), 9858c(c)(2)(M). HHS explained that certificates provide the greatest degree of parental choice because they allow parents to select any provider that accepts them. AR, ACF 000066 (ECF No. 27-6 at 5).

The legislative history reinforces this interpretation. During the 2014 reauthorization, the Senate committee explained that "[g]rants and contracts will continue to remain an option for States to provide direct services to children." S. Rep. No. 113-138, at 12 (2014). Plaintiffs cite the committee's discussion of how grants or contracts can help meet particular populations' needs. Pls.' Mot. Summ. J. 31 (ECF No. 31 at 35). But the same passage describes those arrangements as optional and explains

that certificates give parents a broad choice of providers. S. Rep. No. 113-138, at 12. Recognizing the benefits of grants or contracts does not establish that Congress required states to use them.

Plaintiffs rely on the 2024 Rule's statement that grants or contracts "are required by the Act." Pls.' Mot. Summ. J. 34 (ECF No. 31 at 38) (quoting AR, ACF 000016 (ECF No. 27-3 at 16)). The Court must independently determine whether the Act imposes that requirement. *Loper Bright Enters.*, 603 U.S. at 412. The statutory text, the Senate committee's description of grants or contracts as optional, and HHS's regulations before 2024 support the agency's current reading.

Plaintiffs also emphasize that the parental choice provision applies to "each eligible child." Pls.' Mot. Summ. J. 34 (ECF No. 31 at 38). The provision protects parents' choices for each eligible child while allowing states to choose how to fund care for particular populations. Even if the provision required states to fund some care through grants or contracts, states would retain discretion to use other funding methods for the populations covered by the 2024 Rule. Congress expressly permitted alternative strategies for addressing those populations' needs. 42 U.S.C. § 9858c(c)(2)(M).

Finally, Plaintiffs contend that the 2026 Rule authorizes statutory violations, citing *Protect Our Communities Foundation v. LaCounte*, 939 F.3d 1029, 1043 (9th Cir. 2019). Pls.' Mot. Summ. J. 34 (ECF No. 31 at 38). That argument depends on their premise that the Act requires grants or contracts. For the reasons above, the Act permits other funding methods. The 2026 Rule preserves states' obligations to protect parental choice and address underserved populations while allowing states to select how to satisfy them. AR, ACF 000066, 000073 (ECF No. 27-6 at 5, 12).

### III. Defendants Are Entitled to Summary Judgment on Count II Because the Agency Adequately Explained the Challenged Policy Changes.

#### A. HHS acknowledged the changes and explained its revised policy judgments.

HHS identified the four requirements it was rescinding and explained why states should have more discretion to administer CCDF while continuing to meet federal requirements. AR, ACF 000063-64, 000073 (ECF No. 27-6 at 2-3, 12). The 2026 Rule restores states' discretion to set copayment levels and decide whether to use grants or contracts—discretion they had under HHS's regulations from 1992 until 2024. It also restores payment options HHS adopted through notice and comment rulemaking in 2016. AR, ACF 000064, 000066-69 (ECF No. 27-6 at 3, 5-8). Restoring that discretion advances Congress's express purposes of allowing states "maximum flexibility" in developing child care programs and empowering parents to choose care that best meets their families' needs. 42 U.S.C. § 9857(b)(1)-(2). HHS considered states' reports of implementation costs, difficulties, and administrative burdens, along with competing demands on finite funding and program integrity concerns. AR, ACF 000063-64 (ECF No. 27-6 at 2–3). States remain free to retain the policies required by the 2024 Rule. AR, ACF 000065-69 (ECF No. 27-6 at 4-8).

An agency changing policy must acknowledge the change and give good reasons for its revised approach. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). The revised policy must be permissible under the statute and supported by good reasons, but the agency is not required to establish that its new reasons are better than its earlier ones. *Id.* An agency may reconsider how much weight to give competing policy concerns. *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 968 (9th Cir. 2015) (en banc). When its revised policy rests on factual findings that contradict earlier findings, however, it must explain that departure. *Fox*, 556 U.S. at 515-16. In *Kake*, the agency relied on contrary factual findings without adequately explaining the reversal. 795 F.3d at 968-69. HHS recognized the benefits identified in 2024 but explained why implementation difficulties reported by states, funding tradeoffs, and program integrity concerns favored restoring earlier approaches. AR,

ACF 000063-69 (ECF No. 27-6 at 2-8). HHS also addressed parental choice, explaining that certificates provide the greatest degree of choice and encouraging states to preserve parents' access to providers. AR, ACF 000066-68 (ECF No. 27-6 at 5-7).

States reported greater implementation costs and difficulties than HHS anticipated. Fifty-five of 56 states obtained waivers for at least one requirement, and 19 requested another two years. AR, ACF 000063 (ECF No. 27-6 at 2). As of March 2026, nine lead agencies paid all providers prospectively, and 29 paid based on authorized enrollment. AR, ACF 000068 (ECF No. 27-6 at 7). Those data supported reconsidering nationwide mandates. Part III.D addresses implementation of grants or contracts.

HHS identified program integrity concerns as well. States expressed concern that the 2024 requirements could increase the potential for fraudulent payments. HHS cited increased CCDF funding, a 2020 Government Accountability Office report identifying program integrity risks, and recurring audit findings identifying weaknesses in financial controls. AR, ACF 000063 (ECF No. 27-6 at 2).

HHS also summarized comments warning that rescission could increase family costs, discourage provider participation, and depart from private pay practices. AR, ACF 000065 (ECF No. 27-6 at 4). As the following subsections explain, HHS considered those concerns and the earlier findings Plaintiffs identify and explained why competing considerations supported each rescission. AR, ACF 000066-69 (ECF No. 27-6 at 5-8). Plaintiffs may weigh those considerations differently, but the Court may not substitute its policy judgment for HHS's judgment. *State Farm*, 463 U.S. at 43.

**B. HHS adequately explained the rescission of the copayment cap.**

HHS explained that states must balance lower copayments for participating families against extending assistance to additional families within available funding. It considered comments describing fiscal and operational challenges, changing budgets, and existing child care waiting lists. AR, ACF 000067 (ECF No. 27-6 at 6). Serving additional families advances Congress's express purpose "to increase the number and percentage of low-income children in high-quality child care settings." 42 U.S.C. § 9857(b)(7). States must make those funding decisions while ensuring that family cost sharing is not "a barrier to families receiving assistance." *Id.* § 9858c(c)(5). The 2026 Rule retains that limit and allows states greater flexibility to assess affordability in their circumstances. AR, ACF 000067, 000073 (ECF No. 27-6 at 6, 12).

Colorado's experience illustrates the funding pressures HHS identified. The record reports enrollment freezes or waiting lists in 23 Colorado counties and an estimated annual cost exceeding $9.8 million to reduce copayments. AR, ACF 001644-46 (ECF No. 29-1 at 1–3). The program's division director explained that increased costs without additional funding would require serving fewer families. AR, ACF 001646 (ECF No. 29-1 at 3). This evidence corroborates HHS's explanation that lower copayments compete with assistance to additional families for finite funding. AR, ACF 000067 (ECF No. 27-6 at 6).

Plaintiffs contend that HHS failed to address the 2024 Rule's conclusions concerning copayments above seven percent. Pls.' Mot. Summ. J. 22-25 (ECF No. 31 at 26-29). The 2024 Rule imposed the ceiling because HHS considered copayments above seven percent of family income a barrier to receiving child care assistance. AR, ACF 000022–23 (ECF No. 27-3 at 22–23). In the 2026 Rule, HHS reconsidered whether that ceiling should apply nationwide. HHS weighed the benefits of lower copayments against the opportunity to serve more families and concluded that states should



U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, D.C. 20005
(202) 598-0860

have greater flexibility to allocate funding between those goals. AR, ACF 000067 (ECF No. 27-6 at 6).

The 2026 Rule makes no finding that families can afford copayments above seven percent of income. States must demonstrate, with supporting data and facts, that their copayment policies do not create a barrier to receiving assistance. AR, ACF 000067, 000073 (ECF No. 27-6 at 6, 12). HHS explained that states could use local or regional economic data to determine when copayments become a barrier, allowing that assessment to reflect conditions in different states and regions. AR, ACF 000067 (ECF No. 27-6 at 6). HHS thereby reconsidered the need for a nationwide ceiling in light of local economic conditions and competing demands on state funding. An agency may reconsider the weight assigned to competing concerns "even on precisely the same record." *Kake*, 795 F.3d at 968.

Plaintiffs' equal access argument likewise provides no basis for requiring a seven percent ceiling. The provision governs provider payment rates and remains in force. 42 U.S.C. § 9858c(c)(4)(A); AR, ACF 000069 (ECF No. 27-6 at 8). The disproportionate burden of child care expenses on low-income families is relevant to whether copayments prevent families from receiving assistance. It does not establish that the equal access provision requires a nationwide seven percent cap.

The seven percent figure originated in the nonbinding benchmark announced in the 2016 preamble, which the 2024 Rule converted into a mandatory ceiling. AR, ACF 000022-23 (ECF No. 27-3 at 22-23). That benchmark relied on 2011 Census data that the 2024 Rule also cited. AR, ACF 000003 & n.21 (ECF No. 27-3 at 3). HHS explained in 2026 that those data were outdated and could not support a new national recommendation. AR, ACF 000067 (ECF No. 27-6 at 6). The broader evidence that child care costs can impede access reinforces the continuing prohibition on barriers to assistance. That evidence does not itself establish that HHS had to retain seven percent as a uniform national threshold when reconsidering the policy in light of competing funding needs.

**C. HHS adequately explained the rescission of the payment requirements.**

Plaintiffs principally contend that HHS ignored its earlier findings concerning private market practices and providers' fixed costs. Pls.' Mot. Summ. J. 25-29 (ECF No. 31 at 29-33). HHS acknowledged comments explaining the consistency of prospective and enrollment-based payments with private pay practices and their benefits for provider stability. HHS concluded that implementation difficulties, funding tradeoffs, and program integrity concerns favored allowing alternative methods. AR, ACF 000063-64, 000068-69 (ECF No. 27-6 at 2-3, 7-8). Those reasons address whether the practices should remain mandatory nationwide while recognizing their benefits. An agency may assign different weight to competing considerations even on the same record. *Kake*, 795 F.3d at 968. The 2026 Rule also retained the requirements concerning generally accepted payment practices and support for fixed costs during occasional absences to the extent practicable. AR, ACF 000073 (ECF No. 27-6 at 12).

First, HHS considered private market payment practices. Plaintiffs rely on the 2024 Rule's findings that private paying families generally pay in advance and based on enrollment. Pls.' Mot. Summ. J. 25-26 (ECF No. 31 at 29–30). The 2026 Rule considered comments explaining that advance payments help providers meet payroll and other operating expenses and that enrollment-based payments provide predictable revenue. AR, ACF 000068-69 (ECF No. 27-6 at 7-8). The 2026 Rule allows states to continue paying providers in advance and based on enrollment. It also requires states' payment practices to reflect generally accepted practices used by providers serving children without CCDF subsidies. States must satisfy that requirement when choosing their payment methods. AR, ACF 000073 (ECF No. 27-6 at 12).

Regarding payment timing, HHS restored the option to reimburse providers within 21 calendar days after receipt of a complete invoice. AR, ACF 000073 (ECF No. 27-6 at 12). HHS considered commenters' recommendations for shorter reimbursement periods but restored the prior



U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, D.C. 20005
(202) 598-0860

21-day deadline. AR, ACF 000068 (ECF No. 27-6 at 7). HHS explained that states should be able to select schedules suited to their programs while balancing provider and family needs with program integrity and accountability. It recognized that payment delays can discourage provider participation and stated that it intends to strengthen monitoring and oversight of the deadline. *Id.*

Second, HHS considered providers' fixed costs. Plaintiffs contend that retrospective and attendance-based payments inadequately support those costs, particularly during children's absences. Pls.' Mot. Summ. J. 26-29 (ECF No. 31 at 30–33). In the 2026 Rule, HHS considered comments explaining that providers must still pay rent, wages, and other expenses when children are absent and that reduced payments can make those expenses difficult to cover. HHS retained the requirement to support fixed costs by delinking payments from occasional absences to the extent practicable. AR, ACF 000068-69, 000073 (ECF No. 27-6 at 7-8, 12). The Act's qualification that delinking occur "to the extent practicable" supports considering the funding and administrative demands HHS identified in determining how states may satisfy that obligation. 42 U.S.C. § 9858c(c)(2)(S)(ii); AR, ACF 000063-64, 000068-69 (ECF No. 27-6 at 2-3, 7-8).

The 2026 Rule restores the payment alternatives described above and allows states to adopt more generous paid absence policies. AR, ACF 000069, 000073 (ECF No. 27-6 at 8, 12). HHS also declined commenters' requests to eliminate payment for absences altogether and thereby retained the requirement to account for occasional absences to the extent practicable. AR, ACF 000068-69, 000073 (ECF No. 27-6 at 7-8, 12). HHS considered the need for stable provider funding and retained protections for fixed costs while giving states flexibility to select payment methods.

HHS also considered concerns about improper and fraudulent payments. States expressed concern that the 2024 requirements could increase fraud risks. HHS noted the growth in CCDF funding, a 2020 Government Accountability Office report identifying the need to assess fraud risks more thoroughly, and recurring audit findings identifying weaknesses in financial controls. AR, ACF



U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, D.C. 20005
(202) 598-0860

000063 (ECF No. 27-6 at 2). HHS emphasized that states must maintain safeguards for program funds and encouraged reviews of attendance and billing records. AR, ACF 000068-69 (ECF No. 27-6 at 7-8). These concerns supported allowing states to choose payment methods suited to managing risks in their programs.

Third, HHS considered whether the changes could cause providers to stop serving families receiving CCDF assistance. Plaintiffs incorrectly argue that HHS did not assess that risk. Pls.' Mot. Summ. J. 29-30 (ECF No. 31 at 33–34). HHS recognized that payment delays can discourage provider participation and reduce parents' child care options, discussed research demonstrating that payment for absences can stabilize provider revenue, and considered warnings that attendance-based payments could cause providers to leave CCDF or charge families more. HHS's economic analysis also acknowledged that rescission could reduce payments to providers. AR, ACF 000056-57 (ECF No. 27-5 at 4-5); AR, ACF 000068-69, 000072 (ECF No. 27-6 at 7-8, 11). HHS retained payment protections and the 21-day reimbursement deadline and stated that it intends to strengthen monitoring and oversight. States may also continue prospective and enrollment-based payments. AR, ACF 000068-69, 000073 (ECF No. 27-6 at 7-8, 12).

**D. HHS adequately explained rescission of the grants or contracts requirement.**

HHS explained that requiring grants or contracts for specified populations was expensive and complicated and constrained states' choice of how to deliver assistance. AR, ACF 000066 (ECF No. 27-6 at 5). The 2026 Rule restores that choice while continuing to require states to identify and address shortages affecting underserved populations. AR, ACF 000065-66, 000073 (ECF No. 27-6 at 4-5, 12).

HHS supported its explanation with information about implementation of the 2024 requirement. As of March 2026, only seven states and one territory had implemented grants or contracts for children with disabilities, only 11 states and one territory had implemented them for infants and toddlers, and only 10 states had implemented them for children in underserved geographic



U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, D.C. 20005
(202) 598-0860

areas. AR, ACF 000066 (ECF No. 27-6 at 5). HHS cited those figures in responding to comments describing the requirement as overly prescriptive and difficult to implement. It also explained that establishing the required arrangements involved an expensive and complicated process that constrained state administration. AR, ACF 000066 (ECF No. 27-6 at 5).

The 2024 Rule identified grants or contracts as tools for stabilizing providers and expanding care in areas with shortages. AR, ACF 000017 (ECF No. 27-3 at 17). HHS considered comments emphasizing those benefits, particularly for children with disabilities and families in rural areas. AR, ACF 000066 (ECF No. 27-6 at 5). It preserved states' ability to use grants or contracts and explained why the expense and complexity of implementation favored allowing other approaches. AR, ACF 000066 (ECF No. 27-6 at 5). And states remain responsible for addressing shortages and explaining how their chosen methods will meet identified needs. AR, ACF 000073 (ECF No. 27-6 at 12).

HHS also addressed concerns about the limits of child care certificates. The 2024 Rule already preserved certificates as an option for parents. AR, ACF 000010 (ECF No. 27-3 at 10). HHS explained that certificates promote parental choice by allowing families to select any provider that accepts them, whether or not the provider has a direct service grant or contract. AR, ACF 000066 (ECF No. 27-6 at 5). It also considered comments warning that families lack meaningful choice when suitable care is unavailable. AR, ACF 000066 (ECF No. 27-6 at 5). HHS's response explained the burdens of requiring grants or contracts, preserved their availability, and retained states' responsibility to develop strategies addressing shortages. AR, ACF 000065-66, 000073 (ECF No. 27-6 at 4-5, 12). Those requirements make states accountable for explaining how their selected approaches will expand the availability of care. AR, ACF 000073 (ECF No. 27-6 at 12).

In *Ohio v. EPA*, the Supreme Court concluded that the applicants were likely to succeed because the Environmental Protection Agency had not adequately explained whether its analysis remained valid when its plan covered fewer states than originally contemplated. 603 U.S. 279, 293-95

(2024). Here, HHS responded to concerns about shortages by explaining why mandatory grants or contracts imposed expenses and complexity that constrained states' delivery of assistance. AR, ACF 000066 (ECF No. 27-6 at 5). HHS coupled that explanation with continuing requirements to identify shortages, select strategies to address them, and track progress. AR, ACF 000073 (ECF No. 27-6 at 12).

**IV. Any Relief Should Be Limited.**

If the Court finds that HHS acted arbitrarily and capriciously in rescinding a 2024 Rule requirement, it should return the matter to HHS for further consideration while leaving that rescission in effect. Although vacatur is the default APA remedy, courts retain equitable discretion in limited circumstances to remand without vacatur while the agency corrects its errors. *Nat. Grocers v. Rollins*, 157 F.4th 1143, 1170 (9th Cir. 2025). The decision turns on the seriousness of the agency's errors and the disruption vacatur would cause. An error's seriousness depends in part on whether the agency could correct its explanation and lawfully adopt the same policy on remand. *Solar Energy Indus. Ass'n v. FERC*, 80 F.4th 956, 997–98 (9th Cir. 2023). Both factors favor leaving the challenged rescission in effect during remand.

First, the explanatory deficiencies Plaintiffs allege can be addressed on remand. Plaintiffs principally contend that HHS failed to address earlier factual findings, adequately consider the consequences of rescission, and respond to significant comments. Pls.' Mot. Summ. J. 20-33 (ECF No. 31 at 24-37). If the Court agrees, HHS can reconsider the relevant evidence, respond to the identified concerns, and explain whether and why the affected rescission remains warranted. A ruling that HHS's explanation was inadequate would not establish that Congress prohibited the revised policy. In *Natural Grocers*, the agency could not readopt the same provisions because the district court had found that they violated the statute, and those rulings were not challenged on appeal. 157 F.4th at 1170-71. Here, an inadequate explanation could be corrected on remand.



U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, D.C. 20005
(202) 598-0860

Second, vacatur would be disruptive. It would restore requirements that many states had yet to implement, requiring substantial spending and changes to administrative systems. HHS's February and March 2026 reviews classified the CCDF plans of 47 lead agencies as noncompliant with prospective payment requirements, 49 with grants or contracts requirements, 27 with enrollment based payment requirements, and 19 with the seven percent copayment ceiling. AR, ACF 001126, 001130, 001133, 001135 (ECF No. 28 at 183, 187, 190, 192). State submissions describe the work needed to comply. Pennsylvania reported that paying providers in advance required significant systems changes and funding for two additional months of payments during the transition. AR, ACF 001482-83 (ECF No. 28-5 at 260-61). Washington required more time to change its administrative and payment systems even though its legislature had appropriated funding. AR, ACF 001498-99 (ECF No. 28-5 at 276-77). To establish grants or contracts, Ohio needed legislative funding approval, systems changes, and competitive procurement lasting six months to a year. Pennsylvania required budget and legislative approval, systems updates, and an application process to select providers for contracted slots. AR, ACF 000647, 000674-75 (ECF No. 27-12 at 553, 580-81).

Leaving the rescissions in effect during remand would avoid requiring states to undertake those changes while HHS reconsiders the regulations. States could spend money changing their systems to comply with the reinstated 2024 requirements, only for HHS to remove those requirements again after adequately explaining its decision. Avoiding that disruption supports remand without vacatur. *See Solar Energy*, 80 F.4th at 998.

If the Court nevertheless orders vacatur, it should vacate only the provisions it finds unlawful and any necessary conforming amendments. Severance is appropriate when the remaining provisions can function independently and the agency would have adopted them separately. *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 294 (1988). HHS expressly stated that the 2026 Rule's provisions are severable and that none depends on another's validity. AR, ACF 000064 (ECF No. 27-6 at 3). The four rescissions

separately govern copayments, payment timing, payment for absences, and grants or contracts for underserved populations. AR, ACF 000066-69, 000073 (ECF No. 27-6 at 5-8, 12). A defect in one rescission therefore provides no basis to vacate the others.

Finally, Defendants preserve the argument that the APA does not authorize universal vacatur and request that any relief extend no further than necessary to remedy injuries established by Plaintiffs or their members with standing. *See United States v. Texas*, 599 U.S. 670, 693-703 (2023) (Gorsuch, J., concurring in the judgment). The APA expressly preserves courts' authority to deny relief on equitable grounds. 5 U.S.C. § 702(1).

## CONCLUSION

The Court should deny Plaintiffs' motion and grant Defendants' cross motion.

I certify that this memorandum contains 8,333 words, excluding the caption, table of contents, table of authorities, signature block, and certificate of service, in compliance with Local Civil Rule 7(e)(6).

October 22, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

MICHELLE R. BENNETT
Assistant Branch Director

*s/ Kian K. Azimpoor*
KIAN K. AZIMPOOR
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, D.C. 20005
Tel: (202) 598-0860; Fax: (202) 616-8470
Email: kian.k.azimpoor@usdoj.gov

*Counsel for Defendants*