**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*,<br><br>*Defendants*. | Case No. 2:26-cv-02282-TL<br><br>**Plaintiffs' Response to Defendants' Cross-Motion for Summary Judgment and Reply in Support of Plaintiffs' Motion**<br><br>ORAL ARGUMENT REQUESTED |



18 WEST MERCER ST., STE. 400
SEATTLE, WASHINGTON 98119
TEL 800.238.4231 | FAX 206.378.4132
BARNARD IGLITZIN & LAVITT LLP

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... ii

INTRODUCTION .......... 1

ARGUMENT .......... 3

I. Plaintiffs have standing to challenge the copay cap. .......... 3

II. The 2026 Rule was arbitrary and capricious. .......... 7

A. Rescission of the Copayment Cap .......... 10

B. Rescission of the Payment Practice Requirements .......... 16

C. Rescission of the Grants and Contracts Requirement .......... 23

III. The 2026 Rule is contrary to law. .......... 25

IV. The Court should vacate the rule. .......... 29



18 WEST MERCER ST., STE. 400
SEATTLE, WASHINGTON 98119
TEL 800.238.4231 | FAX 206.378.4132
BARNARD IGLITZIN & LAVITT LLP

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*All. for the Wild Rockies v. U.S. Forest Serv.*,
907 F.3d 1105 (9th Cir. 2018) .......... 29

*City & Cnty. of San Francisco v. USCIS*,
981 F.3d 742 (9th Cir. 2020) .......... 14, 16, 17, 18, 19, 25

*Coal. to Protect Puget Sound Habitat v. U.S. Army Corps of Eng'rs*,
466 F. Supp. 3d 1217 (W.D. Wash. 2020),
*aff'd*, 843 F. App'x 77 (9th Cir. 2021) .......... 30

*DHS v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020) .......... 13

*Diamond Alternative Energy, LLC v. EPA*,
606 U.S. 100 (2025) .......... 3, 5, 7

*Drip More LLC v. FDA*,
186 F.4th 677 (9th Cir. 2026) .......... 15

*Epic Sys. Corp. v. Lewis*,
584 U.S. 497 (2018) .......... 29

*First Choice Women's Res. Ctrs., Inc. v. Davenport*,
608 U.S. 174 (2026) .......... 3

*Hall v. U.S. Dep't of Agric.*,
984 F.3d 825 (9th Cir. 2020) .......... 5, 7

*Imperial Sovereign Ct. of Mont. v. Knudsen*,
170 F.4th 820 (9th Cir. 2026) .......... 3, 6, 7

*Michigan v. EPA*,
576 U.S. 743 (2015) .......... 10



18 WEST MERCER ST., STE. 400
SEATTLE, WASHINGTON 98119
TEL 800.238.4231 | FAX 206.378.4132
BARNARD IGLITZIN & LAVITT LLP

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .......... 8, 9, 11, 16, 19, 23, 25

*Nat. Grocers v. Rollins*,
157 F.4th 1143 (9th Cir. 2025) .......... 29, 31

*Nat. Res. Def. Council, Inc. v. Pritzker*,
828 F.3d 1125 (9th Cir. 2016) .......... 8, 12

*Nat'l Council of La Raza v. Cegavske*,
800 F.3d 1032 (9th Cir. 2015) .......... 7

*Nat'l Parks Conservation Ass'n v. EPA*,
788 F.3d 1134 (9th Cir. 2015) .......... 8, 10, 16, 21

*Ohio v. EPA*,
603 U.S. 279 (2024) .......... 9, 17, 19, 21, 23, 24

*Organized Vill. of Kake v. U.S. Dep't of Agric.*,
795 F.3d 956 (9th Cir. 2015) (en banc) .......... 8, 10, 17

*Pharm. Rsch. & Mfrs. of Am. v. Stolfi*,
153 F.4th 795 (9th Cir. 2025) .......... 3

*Pit River Tribe v. U.S. Forest Serv.*,
615 F.3d 1069 (9th Cir. 2010) .......... 32

*Pollinator Stewardship Council v. EPA*,
806 F.3d 520 (9th Cir. 2015) .......... 29, 30, 33

*Protect Our Cmtys. Found. v. LaCounte*,
939 F.3d 1029 (9th Cir. 2019) .......... 25, 26, 27

*Whitman v. Am. Trucking Ass'ns*,
531 U.S. 457 (2001) .......... 26

**Statutes**

5 U.S.C. § 706 .......... 25, 29



18 WEST MERCER ST., STE. 400
SEATTLE, WASHINGTON 98119
TEL 800.238.4231 | FAX 206.378.4132
BARNARD IGLITZIN & LAVITT LLP

42 U.S.C. § 9858c(c)(2)(A)(i) .......... 28, 30

42 U.S.C. § 9858c(c)(2)(S)(i) .......... 17, 27

42 U.S.C. § 9858c(c)(4)(A) .......... 12, 13

42 U.S.C. § 9858c(c)(5) .......... 12, 26

**Regulations**

45 C.F.R. § 98.68 .......... 22

*Improving Child Care Access, Affordability, and Stability in the Child Care and Development Fund (CCDF)*, 89 Fed. Reg. 15366 (Mar. 1, 2024) .......... *passim*

*Restoring Flexibility in the Child Care and Development Fund (CCDF)*, 91 Fed. Reg. 25796 (May 12, 2026) .......... *passim*

**Other Authorities**

ACF, *FY 2021 Final Data Table 17—Average Monthly Mean Family Co-payment as a Percent of Family Income* (Sept. 1, 2026), https://perma.cc/Q2ZF-CY8V .......... 6

S. Rep. No. 113-138 (2014) .......... 24, 28



18 WEST MERCER ST., STE. 400
SEATTLE, WASHINGTON 98119
TEL 800.238.4231 | FAX 206.378.4132
BARNARD IGLITZIN & LAVITT LLP

## INTRODUCTION

The Child Care and Development Block Grant Act (the "Act") prescribes the framework for a program that manages over $12 billion in federal dollars to ensure low-income families have equal access to high-quality child care options. Because the program funds care in every state and territory, Congress gave states a certain degree of flexibility to tailor their programs to local needs. But it set parameters to ensure that federal moneys are spent on the program Congress designed. States may ask families to contribute to the cost, but not so much that it becomes unaffordable and defeats the purpose of the subsidy. States may set their own payment rates, but payment practices must align with the market. And states may allocate the funds among vouchers and grant- or contract-funded child care slots, but they must use at least some of each approach to build supply and ensure parents have options.

The 2024 Rule imposed the requirements at issue because it found that many states and territories were violating those statutory limits—they set copays so high that parents could not afford the program, paid providers less favorably than the market, and did not use any grants or contracts. Those practices contributed to a "broken" child care system in which providers strained to cover their costs and care was scarce and unaffordable for families even when they used federal subsidies. *Improving Child Care Access,*



18 WEST MERCER ST., STE. 400
SEATTLE, WASHINGTON 98119
TEL 800.238.4231 | FAX 206.378.4132
BARNARD IGLITZIN & LAVITT LLP

*Affordability, and Stability in the Child Care and Development Fund (CCDF)*, 89 Fed. Reg. 15366, 15367 (Mar. 1, 2024) ("2024 Rule").

Under basic rules of reasoned decision-making, ACF could not toss out those requirements without confronting the findings that motivated them or the statutory mandates they address. But that is exactly what it did. Contrary to the government's contention, ACF cannot justify that evasion with vague gestures to "implementation burdens, funding tradeoffs, and program integrity concerns," Defs.' Opp'n to Pls.' Mot. Summ. J. & Cross-Mot. Summ. J. 2, Dkt. 32 ("Opp'n"), that the agency made no attempt to measure or analyze. And it certainly could not simply defer to state conventions it had condemned just two years earlier. As the steward of a multi-billion-dollar program, ACF was required to explain why the practices the 2026 Rule authorized followed the congressional directions it had previously found they violated.

Because the 2026 Rule reflects no such reasoned analysis, it violates the APA. In so doing, the rule will inflict all the harms the 2024 Rule aimed to avoid: It will put child care out of reach for many families who cannot pay their copays, even though they qualify for subsidies; it will strain provider budgets and shrink the pool of providers who can afford to participate in the CCDF program; and it will limit child care supply for underserved populations. The Court should vacate the 2026 Rule and restore the 2024 Rule's requirements.



18 WEST MERCER ST., STE. 400 BARNARD
SEATTLE, WASHINGTON 98119 IGLITZIN &
TEL 800.238.4231 | FAX 206.378.4132 LAVITT LLP

## ARGUMENT

### I. Plaintiffs have standing to challenge the copay cap.

Of the four provisions at issue, the government meaningfully contests standing only as to the repeal of the copay cap.[1] To show standing, plaintiffs need only show that "at least one of [their] members" faces a "substantial risk" of financial harm, *Pharm. Rsch. & Mfrs. of Am. v. Stolfi*, 153 F.4th 795, 830 (9th Cir. 2025), and that restoring the cap will "reduce the risk of harm . . . 'to some extent.'" *Imperial Sovereign Ct. of Mont. v. Knudsen*, 170 F.4th 820, 841 (9th Cir. 2026) (citation omitted). In answering that question, the Court may make "'commonsense inferences,'" "including inferences about 'third party behavior,'" *First Choice Women's Res. Ctrs., Inc. v. Davenport*, 608 U.S. 174, 190 (2026) (quoting *Diamond Alternative Energy, LLC v. EPA*, 606 U.S. 100, 116 (2025)). Plaintiffs easily meet that standard.

As SEIU's Illinois provider-members told ACF in the comments to the 2026 Rule, high copays harm them because when parents cannot afford their copays, the providers must either accept less money or lose the clients. Ex. 3,

[1] In a halfhearted footnote, the government notes that "[t]he other rescissions likewise leave states free to retain prospective payments, enrollment-based payments, and grants or contracts," but it does not actually contend that Plaintiffs lack standing to challenge those provisions. Opp'n 8 n.2. Nor could it, because AFSCME's and SEIU's provider members work in states that have not adopted those requirements, and those members are harmed as a result. Pls.' Mot. Summ. J. 17–18, Dkt. 31 ("Pls.' Mot.").


18 WEST MERCER ST., STE. 400 SEATTLE, WASHINGTON 98119 TEL 800.238.4231 | FAX 206.378.4132
BARNARD IGLITZIN & LAVITT LLP

SEIU Healthcare Illinois Indiana Missouri Kansas' Child Care and Early Learning Division Comment at 3 (ACF_005509), Dkt. 31-3 ("If parent[s] can't afford their copays, I don't get paid the full amount."); *id.* ("I either have to bite the bullet and allow them not to pay or ask them to find another provider."). One recounted how a parent had registered for her daycare, but "once [the parent] got approved, she saw her copay was over $200 and she knew she couldn't afford that," so she did not enroll "at all." *Id.* Because copays in Illinois can be "more than 7% of family income," Ex. 7, ACF State Compliance Summary at 3 (ACF_001127), Dkt. 31-7, a cap would make these provider-members less likely to lose money.

Declarations confirm this. One of SEIU's Illinois providers quoted in the comment testifies that she regularly loses money—and often cannot cover her expenses—because parents cannot pay their CCDF copays. Ex. 26, Wilson Decl. ¶¶ 6–7. "Some parents have gone months without paying me the full copay amount," she writes, but "[i]f I do not give these families a break on their copayments, they could not afford to stay in my program, and I would lose more income." *Id.* ¶ 6. "Capping copays at 7% would significantly improve [her] business" because it would mean that "more parents would be able to afford the full copay," making it more likely she could "cover the bills and [her] staff." *Id.* ¶ 8. Another Illinois member has both accepted partial payments and lost clients due to high copays. Ex. 27, Williams Decl. ¶¶ 7–9.



18 WEST MERCER ST., STE. 400
SEATTLE, WASHINGTON 98119
TEL 800.238.4231 | FAX 206.378.4132
BARNARD IGLITZIN & LAVITT LLP

Tarrezz Thompson, an AFSCME member in Ohio, where copays also exceed the cap, attests to the same problem. "Every single family [she] currently serve[s] receives a subsidy for the cost of their child care through" Ohio's CCDF-funded program. Ex. 8, Thompson Decl. ¶ 5, Dkt. 31-8. This May, she explains, "a child who was receiving CCDF subsidies withdrew from my program because her mother could not afford the weekly copay that she was required to contribute." Ex. 28, Thompson Supp. Decl. ¶ 3. Because many Ohio families pay copays higher than 7%—Thompson knows many who pay 12% or more—a copay cap would help her make ends meet. Ex. 8, Thompson Decl. ¶ 21, Dkt. 31-8. "[M]ore families would be able to enroll in [her] program, helping [her] to stay afloat and provide better services." *Id.*[2]

The government claims that this evidence does not establish "that reinstating the ceiling would lead families to enroll in Thompson's program." Opp'n 10. But "[r]edressability does not require certainty"—only a "significant increase in the likelihood" that the plaintiffs will suffer less harm. *Hall v. U.S. Dep't of Agric.*, 984 F.3d 825, 834 (9th Cir. 2020). "[I]f a court decision can provide a 'small incremental step' to reduce the risk of harm to the plaintiffs

---

[2] Members from other states corroborate this point, explaining that they must accept less money or lose clients when parents cannot afford copays. *See* Ex. 4, Vasquez Decl. ¶ 14, Dkt. 31-4; Ex. 5, Horton Decl. ¶ 27, Dkt. 31-5; Ex. 6, Godbolt Decl. ¶ 9, Dkt. 31-6. Although their states have capped copays at 7%, these declarations reinforce the "predictable" effects of unaffordable copays on providers. *Diamond*, 606 U.S. at 112.


18 WEST MERCER ST., STE. 400 SEATTLE, WASHINGTON 98119 TEL 800.238.4231 | FAX 206.378.4132
BARNARD IGLITZIN & LAVITT LLP

'to some extent,' that is enough to show causation as well as redressability." *Imperial Sovereign Ct. of Mont.*, 170 F.4th at 841 (citation omitted).

SEIU and AFSCME easily clear that low bar. They have tens of thousands of provider members who serve clients with CCDF subsidies, including around 20 in Ohio, 10,000 in New York, and 3,500 in Massachusetts, states that have not implemented the 2024 Rule's cap on family copayments. Ex. 9, Sforza Decl. ¶¶ 3, 8(b), 8(f), Dkt. 31-9; Ex. 29, Tejeda Decl. ¶ 5; Ex. 10, Peterson Decl. ¶ 14, Dkt. 31-10. Maximum copays in all three states exceed 7% of income. *See* Ex. 7, ACF State Compliance Summary at 3 (ACF_001127), Dkt. 31-7 (listing 27% for Ohio, 11.9% for Massachusetts, and noting that copays in New York exceed 7% for the lowest-income families). Indeed, even five years ago—when child care prices were lower than today—Ohio's *average* copay was 7% of income, meaning many families paid well over the 2024 Rule's cap. ACF, *FY 2021 Final Data Table 17—Average Monthly Mean Family Co-payment as a Percent of Family Income* (Sept. 1, 2026), https://perma.cc/Q2ZF-CY8V.

If no client had to pay a copay over 7% in these states, then more families could pay for child care from professional providers like Plaintiffs' members. *See* 2024 Rule, 89 Fed. Reg. at 15403 (estimating copay cap would help "sixty thousand" families afford child care). That would significantly reduce the likelihood that Plaintiffs' members would lose clients or need to accept less money; and it would "significant[ly] . . . increase the likelihood" that they could



18 WEST MERCER ST., STE. 400 SEATTLE, WASHINGTON 98119 TEL 800.238.4231 | FAX 206.378.4132
BARNARD IGLITZIN & LAVITT LLP

fill their programs because more clients could afford to enroll. *Hall*, 984 F.3d at 834; *see* Ex. 8, Thompson Decl. ¶ 21, Dkt. 31-8 (noting that Thompson's program is not at capacity); *see also Diamond*, 606 U.S. at 116–17 (holding that plaintiffs had standing because rule would likely shrink the market for their product and vacatur would expand that market). Thus, restoring the 7% cap would certainly "reduce the risk" of financial harm "to some extent." *Imperial Sovereign Ct. of Mont.*, 170 F.4th at 841. Article III requires no more.[3]

## II. The 2026 Rule was arbitrary and capricious.

As the government does not dispute, the 2024 Rule's requirements rested on several evidence-backed factual findings and conclusions: (1) copays over 7% of income created a "barrier" to child care and undermined equal access; (2) retroactive and attendance-based payments are not "generally accepted" in the private market, do not cover the fixed costs of care, and drive providers out of CCDF; and (3) grants and contracts are required by statute and indispensable tools to build supply for underserved populations.

[3] Plaintiffs would have standing even if they had not identified members who suffer financial losses from unaffordable copays. When it is "relatively clear, rather than merely speculative, that one or more members" of the plaintiff association "have been or will be adversely affected by a defendant's action, and where the defendant need not know the identity of a particular member to understand and respond to an organization's claim of injury," the plaintiff need not "identify by name the member or members injured." *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1041 (9th Cir. 2015).



18 WEST MERCER ST., STE. 400 SEATTLE, WASHINGTON 98119 TEL 800.238.4231 | FAX 206.378.4132
BARNARD IGLITZIN & LAVITT LLP

"[E]ven when reversing a policy after an election, an agency may not simply discard" such "prior factual findings without a reasoned explanation," *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 968 (9th Cir. 2015) (en banc), an explanation that "examine[s] the relevant data" and draws a reasonable bridge from the "facts found" to the "choice made," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted). Such an explanation was especially necessary here. Many of ACF's prior findings amounted to determinations that the alternatives—copays over 7% of income, attendance-based reimbursements, and a lack of grants or contracts—violated the Act. Pls.' Mot. 22–23, 25–26, 30–31. ACF certainly could not authorize these divergent practices "without a reasoned explanation" that addressed those previous findings and the statutory mandates the findings concerned. *Kake*, 795 F.3d at 968; *see*, *e.g.*, *Nat. Res. Def. Council, Inc. v. Pritzker*, 828 F.3d 1125, 1138 (9th Cir. 2016) (holding that agency acted arbitrarily when it chose a course of action without evaluating whether its choice satisfied the applicable statutory standard).

Yet, although commenters raised those same issues in response to the proposed 2026 rule, ACF failed to provide any "reasoned response" to them. *Ohio v. EPA*, 603 U.S. 279, 293 (2024). That failure is fatal to the 2026 Rule. *See Nat'l Parks Conservation Ass'n v. EPA*, 788 F.3d 1134, 1146 (9th Cir. 2015)


18 WEST MERCER ST., STE. 400 SEATTLE, WASHINGTON 98119 TEL 800.238.4231 | FAX 206.378.4132
BARNARD IGLITZIN & LAVITT LLP

(rule is arbitrary and capricious when the agency's "response does not meaningfully address" a significant "comment, as it must").

Throughout its brief, the government argues that ACF "considered" its earlier findings because it "summarized comments warning that rescission could increase family costs, discourage provider participation, and depart from private pay practices." Opp'n 18. But a summary of a comment is not a response to it. *See Ohio*, 603 U.S. at 296–97. And the scant responses ACF offered echoed the same refrain: the 2026 Rule did not "prohibit" states from voluntarily adopting the 2024 Rule's requirements. *Restoring Flexibility in the Child Care and Development Fund (CCDF)*, 91 Fed. Reg. 25796, 25799 (May 12, 2026) ("2026 Rule"). That answer "did not address" the 2024 Rule's factual findings "so much as sidestep" them, *Ohio*, 603 U.S. at 295: The 2024 Rule imposed its requirements precisely because states and territories would not voluntarily adopt them. *See* 89 Fed. Reg. at 15368–69, 15381. Just as the agency in *State Farm* could not simply "defer to the industry's failure" to adopt safety equipment the agency once found necessary to satisfy the statute, 463 U.S. at 49, ACF could not simply defer to state practices it found to violate the Act.

The government also generally suggests that ACF rescinded the challenged policies because "States reported greater implementation costs and difficulties than HHS anticipated." Opp'n 18. But the agency's economic impact analysis disagreed with these reports. In fact, ACF estimated that the 2026


18 WEST MERCER ST., STE. 400 SEATTLE, WASHINGTON 98119 TEL 800.238.4231 | FAX 206.378.4132
BARNARD IGLITZIN & LAVITT LLP

Rule's transfers and costs would mirror the 2024 Rule's impacts, minus costs for the year 2025. 2026 Rule, 91 Fed. Reg. at 25806 & n.9 (regulatory impact analysis "replicate[d]" the numbers in the 2024 Rule but inverted the figures).

In any event, an agency must analyze both the "advantages and the disadvantages" of its decision. *Michigan v. EPA*, 576 U.S. 743, 753 (2015). The 2024 Rule's costs alone cannot justify discarding its requirements without adequate consideration of its benefits or the "previous factual findings" and data that underpinned it. *Kake*, 795 F.3d at 969; *see Nat'l Parks Conservation Ass'n*, 788 F.3d at 1145 (agency action was arbitrary because it failed to explain why the "cost" of rejected controls was "not justified" by their benefits).

Yet ACF failed to consider the advantages that led it to adopt the rescinded requirements just two years earlier. At every turn, the 2026 Rule failed to provide a reasoned answer to the key rationales behind the 2024 Rule's requirements; disregarded the findings underpinning them; and failed to examine the evidence that overwhelmingly supported those earlier findings. Those failures doom each provision of the 2026 Rule.

### A. Rescission of the Copayment Cap

1. As the government agrees, the 2024 Rule imposed the 7% copay cap because ACF found that "copayments above seven percent of family income [are] a barrier to receiving child care assistance." Opp'n 19. To rescind the cap, the 2026 Rule had to address that finding. *Kake*, 795 F.3d at 969. A reasonable


18 WEST MERCER ST., STE. 400
SEATTLE, WASHINGTON 98119
TEL 800.238.4231 | FAX 206.378.4132
BARNARD IGLITZIN & LAVITT LLP

agency might have done so in several ways. It could have considered the evidence and explained that its prior finding was wrong, and that copays above 7% are affordable for the average family. It could have determined that copays over 7% are affordable in some states, such that a higher cap or a state-by-state inquiry was most appropriate. Or it could have determined that the evidence was too unclear to support a nationwide benchmark.

To reach these conclusions, the agency would have had to consider the "relevant data" and identify substantial evidence to support the new finding. *State Farm*, 463 U.S. at 43. If insufficient evidence existed, it would have had to "explain the evidence which is available" and provide a "justification for rescinding the regulation before engaging in a search for further evidence." *Id.* at 52. And in all events, it would have had to draw "a rational connection between the facts found and the choice made." *Id.* at 43; *accord City & Cnty. of San Francisco v. USCIS*, 981 F.3d 742, 759 (9th Cir. 2020).

The 2026 Rule does none of those things. It does not even mention the agency's prior "barrier" finding, much less grapple with it. Indeed, the government admits that "[t]he 2026 Rule makes no finding that families can afford copayments above seven percent of income." Opp'n 20. Instead, the government claims that ACF "weighed the benefits of lower copayments against the opportunity to serve more families" while providing less assistance to each. Opp'n 19. But Congress placed a limit on that trade-off: states may not



18 WEST MERCER ST., STE. 400 BARNARD
SEATTLE, WASHINGTON 98119 IGLITZIN &
TEL 800.238.4231 | FAX 206.378.4132 LAVITT LLP

use high copays to stretch their funds so thin the subsidies do not serve their purpose—to make child care affordable for the families who receive them. *See* 42 U.S.C. § 9858c(c)(5). The 2024 Rule concluded that copays over 7% exceed that limit. "[T]he record does not show" that ACF "critiqued" that analysis or concluded it was "unsound." *Nat. Res. Def. Council*, 828 F.3d at 1139–40.

No harm, no foul, says the government, because the agency retained the general requirement that states ensure copays are not a "barrier." Opp'n 20. But it does not dispute that without the cap, states will continue to charge copays above 7%, and ACF staff will continue to approve them, just as they routinely did before ACF issued the 2024 Rule. *See* 2024 Rule, 89 Fed. Reg. at 15368 (noting that 20 state policies allowed copays over 7% of family income, citing the approved FY2022–2024 state plans). Indeed, if ACF did not intend to approve copays over 7%, it would not have repealed the cap.

2. Further, the agency did not consider the other rationale for the copay cap—that copays over 7% placed a "disproportionate" burden on the low-income families who receive CCDF subsidies relative to the average "higher-income[]" family. 2024 Rule, 89 Fed. Reg. at 15388.

Instead of disputing that ACF failed to consider the equal-access issue, the government suggests it poses no problem because a statutory provision regarding payment rates, 42 U.S.C. § 9858c(c)(4)(A), remains in force. That provision requires states to set rates at a level "sufficient to ensure equal


18 WEST MERCER ST., STE. 400 SEATTLE, WASHINGTON 98119 TEL 800.238.4231 | FAX 206.378.4132
BARNARD IGLITZIN & LAVITT LLP

access" to child care comparable to care provided to children in the same area who do not receive subsidies. *Id.* The government points out that this provision does not "require[] a nationwide seven percent cap" on copays. Opp'n 20.

That response cannot sustain the agency's decision. The provision the government cites governs the total rates states pay providers, not the portion of those rates (the copay) a family bears. The payment-rate provision ensures that states pay providers enough to give families access to high-quality care. 42 U.S.C. § 9858c(c)(4)(A). The copay provision ensures that states do not force families to shoulder too much of that cost. As ACF found in 2024, even if the state sets the total rate high enough to buy comparable care, a low-income family's copay may be so high that the family still pays more for that care than the average higher-income family. *See* 2024 Rule, 89 Fed. Reg. at 15388. The payment-rate provision does nothing to solve that problem. And the 2026 Rule does not suggest that it does. So even if the payment-rate provision mattered, the agency cannot rely on it to defend the rule. *See DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 23 (2020) ("[J]udicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.'").

3. Even putting these issues aside, the government's defense—that the agency "weighed the benefits of lower copayments" against their costs, Opp'n 19—fails on its own terms. The record reveals no such balancing. True, ACF alluded to the general "trade-offs between reducing child care costs for families


18 WEST MERCER ST., STE. 400
SEATTLE, WASHINGTON 98119
TEL 800.238.4231 | FAX 206.378.4132
BARNARD IGLITZIN & LAVITT LLP

participating in CCDF and serving additional families with higher co-payments." 91 Fed. Reg. at 25798. But to name the problem is not to analyze it. ACF made no attempt to measure or even estimate how many more families could or would be served if ACF removed the copay cap—or even determine if that number was substantial. Without any sense of how many more children the program could reach, ACF could not possibly weigh that purported benefit against the costs the rescission will inflict on families who cannot afford copays over 7%. *See San Francisco*, 981 F.3d at 759 (holding that rule was arbitrary because it failed to "quantify the financial costs," including the number of people who would disenroll from state programs).

That omission is significant because, as ACF pointed out in 2024, higher copays do not necessarily translate to more children served. If copays are too high, they can put the CCDF program out of reach for parents who cannot afford to pay the copay, depressing participation. *See*, *e.g.*, Ex. 26, Wilson Decl. ¶¶ 6–8; Ex. 28, Thompson Supp. Decl. ¶ 3; *supra* pp. 4–5 & n.2. By making copays more affordable, the 2024 Rule helped more families participate: "some children who might not have received subsidized care" without the 2024 Rule, "e.g., those whose parents could not pay the co-pay," would "receive subsidized care" under the 2024 Rule. 2024 Rule, 89 Fed. Reg. at 15409. The 2026 Rule did not consider how this would affect the number of families who could afford CCDF, or the added benefit those families would derive from the program.


18 WEST MERCER ST., STE. 400 SEATTLE, WASHINGTON 98119 TEL 800.238.4231 | FAX 206.378.4132
BARNARD IGLITZIN & LAVITT LLP

Indeed, the only evidence the government can muster to support the purported unexpected costs of the copay cap is a local Colorado news article that ACF did not cite in the 2026 Rule and that is inconsistent with ACF's own economic analysis. Opp'n 19. The article quotes a state official's estimate that the copay cap would cost Colorado over $9.8 million per year and would mean the state could not serve as many families. Dkt. 29-1 at 3 (ACF_001646). But that is irreconcilable with ACF's own estimates in the 2026 Rule itself, which projected that the copay cap would result in annual transfers of only $8.4 million from 2025 through 2026 and $16.7 million for the next three years nationwide. 91 Fed. Reg. at 25806. The agency cannot now rely on unsubstantiated secondhand statements that contradict its own findings. *See Drip More LLC v. FDA*, 186 F.4th 677, 684 (9th Cir. 2026) ("[W]e must judge the agency's action 'solely by the grounds invoked by the agency' when it took the action[.]" (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947))).

4. Finally, the government notes that in addition to removing the cap, ACF decided to remove even the 7% advisory benchmark because it was based on data from a 2011 Census Bureau report, which found that the average family pays 7% of their income for child care. 91 Fed. Reg. at 25801. But the record confirms that "[c]hild care expenses have only risen since the 2024 CCDF Final Rule" and now average approximately 10% of median income for a married couple with children. Ex. 30, Zero to Three Comment at 4


18 WEST MERCER ST., STE. 400 SEATTLE, WASHINGTON 98119 TEL 800.238.4231 | FAX 206.378.4132
BARNARD IGLITZIN & LAVITT LLP

(ACF_006289). The agency did not explain why it nonetheless decided that the 2011 census data provided an unreasonable floor. Even if the 2011 census data was truly insufficient, ACF had to provide a "justification for rescinding the regulation before engaging in a search for further evidence" or simply using the data that commenters supplied the agency. *State Farm*, 463 U.S. at 52. Instead, ACF simply dismissed the Census Bureau report and called it a day. That falls well short of the reasoned analysis the APA requires. *See San Francisco*, 981 F.3d at 759 ("[A]n agency may not, without analysis, cite even 'substantial uncertainty' as a justification for its actions." (cleaned up)).

**B. Rescission of the Payment Practice Requirements**

The rescission of the payment practice provisions—requiring prospective and enrollment-based payments—also failed the APA's standards. In repealing those requirements, ACF disregarded its prior findings that attendance-based reimbursements violate the Act's requirement to use payment practices "generally accepted" in the private market, are insufficient to support providers' fixed costs, and depress provider participation in the program. And it failed to "meaningfully address" the comments that raised those concerns, *Nat'l Parks Conservation Ass'n*, 788 F.3d at 1146, or "examine the relevant data" behind them, *State Farm*, 463 U.S. at 43; *see* Pls.' Mot. 25–30.

1. As the government agrees, the Act requires state payment practices to "'reflect generally accepted payment practices' of providers in the



18 WEST MERCER ST., STE. 400
SEATTLE, WASHINGTON 98119
TEL 800.238.4231 | FAX 206.378.4132
BARNARD IGLITZIN & LAVITT LLP

state serving children who do not receive [CCDF] assistance, with the goal of providing stable funding and encouraging provider participation in CCDF." Opp'n 13 (quoting 42 U.S.C. § 9858c(c)(2)(S)(i)). The 2024 Rule required states to pay providers prospectively and based on enrollment because ACF found that the alternatives—retroactive payments and payments based on attendance—did not "reflect generally accepted payment practices," in violation of the statute. 42 U.S.C. § 9858c(c)(2)(S)(i).

To rescind the requirement, ACF had to address that finding. *See Kake*, 795 F.3d at 968. But ACF did not even mention it, let alone reconsider it. Though the government claims ACF "considered private market payment practices," it does not cite any part of the 2026 Rule that analyzed them. Opp'n 21. That is because the agency never did so. To be sure, ACF acknowledged that commenters flagged the issue: comments "argued" that (1) "prospective payment is more in line with the private pay child care market" and (2) enrollment-based payment is "a generally accepted practice among families paying for child care privately." 91 Fed. Reg. at 25800–03. But it is not enough to simply acknowledge comments that raise important issues; ACF had to provide a "reasoned response," *Ohio*, 603 U.S. at 293, that "grapple[d] with [the] evidence," *San Francisco*, 981 F.3d at 759 (citation omitted).

ACF offered no such response. It answered both points with the same refrain: under the new rule, states could adopt the prospective or enrollment-


18 WEST MERCER ST., STE. 400 SEATTLE, WASHINGTON 98119 TEL 800.238.4231 | FAX 206.378.4132
BARNARD IGLITZIN & LAVITT LLP

based payments if they chose to do so. *See* 91 Fed. Reg. at 25802 (responding that the rule "does not prohibit" prospective payments, and states and territories would still have the "flexibility to pay providers prospectively"); *id.* at 25803 (responding that rule "does not prohibit" enrollment-based payments). But the 2024 Rule required states to use those market practices because many states chose the alternatives—retroactive and attendance-based payments—that deviated from the market in violation of the Act. *See* 2024 Rule, 89 Fed. Reg. at 15368–70 (only 8 states and territories paid providers prospectively and only 36 paid providers based on enrollment). And as ACF acknowledged, many states continued to use those problematic practices in 2026. 2026 Rule, 91 Fed. Reg. at 25802 (only 9 paid prospectively and 29 based on enrollment). The 2026 Rule offered no answer to that problem.

Nor did the agency address the "estimates and credible data explained in the comments," *San Francisco*, 981 F.3d at 759, which here confirmed that private-pay clients generally pay prospectively and based on enrollment. *See, e.g.*, Ex. 18, Nat'l Ass'n for Educ. of Young Children Comment at 4–5 (ACF_006553–54), Dkt. 31-18 (survey: 77% of program directors require prospective payments and 80% charge private pay families based on enrollment); Dkt. 29-6 at 1859–61 (ACF_006543–45), 2306–08 (ACF_006990–92) (comments citing same study and noting that enrollment-based pay is "by far the most commonly accepted payment practice for providers only operating


18 WEST MERCER ST., STE. 400 SEATTLE, WASHINGTON 98119 TEL 800.238.4231 | FAX 206.378.4132
BARNARD IGLITZIN & LAVITT LLP

in the private market”). ACF was “required to ‘reasonably reflect upon’ and ‘grapple with’ such evidence.” *San Francisco*, 981 F.3d at 759 (citation omitted). Nothing in the 2026 Rule indicates that the agency did so.

2. The 2026 Rule also ignored ACF’s prior finding that retroactive and attendance-based payments are insufficient to support the fixed costs of child care services. 2024 Rule, 89 Fed. Reg. at 15369, 15392.

The government argues that ACF adequately “considered providers’ fixed costs,” Opp’n 22, because it generally noted that commenters “described enrollment-based payment as the best approach to ensure providers’ financial stability and ability to meet the expenses of their fixed operational costs.” 91 Fed. Reg. at 25803. That argument fails on its own terms: again, a summary of concerns raised in the comments is not a “reasoned response” to them, *Ohio*, 603 U.S. at 293, and the only response ACF provided—that states that “currently pay providers based on enrollment may continue to do so”—did not address states that pay based on attendance. 91 Fed. Reg. at 25803. Nor did ACF give any indication that it “examine[d] the relevant data” the commenters provided. *State Farm*, 463 U.S. at 43; *see* Pls.’ Mot. 28–29. In any event, the government’s reference to ACF’s comment summary misses the point: whether or not ACF generally “considered” fixed costs, it entirely failed to address ACF’s prior finding that attendance-based payment methods were insufficient to support those costs. *See* 2024 Rule, 89 Fed. Reg. at 15392.



18 WEST MERCER ST., STE. 400 BARNARD
SEATTLE, WASHINGTON 98119 IGLITZIN &
TEL 800.238.4231 | FAX 206.378.4132 LAVITT LLP

The government also points out that ACF retained the general regulation parroting the statute's mandate to "support the fixed costs of providing child care services by delinking provider payments from a child's occasional absences." 91 Fed. Reg. at 25807. But the 2026 Rule expressly allowed states to use market-divergent, attendance-based "alternatives" as a way to satisfy that requirement. Opp'n 22. True enough, those alternatives would not dock providers' pay every day a child is absent: they would reduce payments only when absences exceed certain thresholds. *See* 91 Fed. Reg. at 25802 (providing that states could make full payment when "a child attended at least 85 percent of authorized time" or was "absent for five or fewer days in a four week period"). But as explained in Plaintiffs' opening brief, the 2024 Rule considered those specific alternatives and found that "[n]either of the two . . . options supported a provider's fixed operational costs, continuity of care for children, or reflect the norm for families paying privately." 89 Fed. Reg. at 15392. Nothing in the preamble to the 2026 Rule discusses this finding, analyzes the data behind it, or explains whether or why ACF disagrees with it.

3. ACF also disregarded its prior conclusions that retroactive and attendance-based payments discourage providers from serving children in the program, and that prospective and enrollment-based payments would increase provider participation. 2024 Rule, 89 Fed. Reg. at 15369, 15392.



18 WEST MERCER ST., STE. 400 SEATTLE, WASHINGTON 98119
TEL 800.238.4231 | FAX 206.378.4132
BARNARD IGLITZIN & LAVITT LLP

The government claims that ACF "recognized that payment delays can discourage provider participation and reduce parents' child care options" and "considered warnings that attendance-based payments could cause providers to leave CCDF or charge families more." Opp'n 23. Although the government cites nothing, it again appears to refer to a summary of comments. *See* 2026 Rule, 91 Fed. Reg. at 25799 (noting that commenters "argued" that alternative payment practices could "lead providers to stop participating in the CCDF program"); *id.* at 25803 ("Commenters maintained that providers opt out of participating in CCDF when they are not paid based on enrollment.").

Again, such summaries certainly highlight that ACF "was aware of the [commenters'] concern." *Ohio*, 603 U.S. at 295. "But awareness is not itself an explanation." *Id.* And ACF did not "meaningfully address" commenters' concerns that attendance-based reimbursements depress provider participation, "as it must." *Nat'l Parks Conservation Ass'n*, 788 F.3d at 1146. ACF did not indicate whether it agreed or disagreed with those concerns or how ACF weighed them in its analysis, if at all. It did not grapple with—or even mention—ACF's prior findings that attendance-based reimbursements depressed provider participation. And it did not analyze the evidence the 2024 Rule cited to support that finding or that the 2026 commenters marshaled to back it up. *See* 2024 Rule, 89 Fed. Reg. at 15392; Pls.' Mot. 30 & n.6.


18 WEST MERCER ST., STE. 400 SEATTLE, WASHINGTON 98119 TEL 800.238.4231 | FAX 206.378.4132
BARNARD IGLITZIN & LAVITT LLP

4. Unable to meaningfully dispute that ACF ignored the findings and evidence that supported the payment practice requirements, the government suggests that rescinding prospective and enrollment-based payment requirements could help mitigate "concerns" about "fraud." Opp'n 22. But although ACF vaguely referenced unspecified "concerns" raised by some states, it never found that the 2024 Rule's payment practice requirements increased fraud risks or that retroactive or attendance-based regimes could help mitigate that risk. 2026 Rule, 91 Fed. Reg. at 25797, 25803. It did not even describe the concerns commenters raised or how they related to the payment practice requirements, if at all. *See id.* And the GAO study the rule cites did not associate any fraud risks with prospective or enrollment-based payment models. *See* GAO Report (ACF_001574–1611), Dkt. 28-9.

As the 2026 Rule noted, the regulations already require states and territories to implement fraud controls and "take actions when a provider has been suspected of fraud." 2026 Rule, 91 Fed. Reg. at 25803; *see* GAO Report at 6 (ACF_001581), Dkt. 28-9 (states are "required to describe in their State Plans the processes that are in place to identify fraud or other program violations, and to investigate and recover fraudulent payments and to impose sanctions in response to fraud"); 45 C.F.R. § 98.68 (requiring fraud controls). The 2026 Rule did not claim these processes would be insufficient to detect and respond to any fraud under a prospective or enrollment-based payment regime.


18 WEST MERCER ST., STE. 400 SEATTLE, WASHINGTON 98119 TEL 800.238.4231 | FAX 206.378.4132
BARNARD IGLITZIN & LAVITT LLP

The government also gestures to other factors it says ACF considered, including "implementation difficulties" and "funding tradeoffs." Opp'n 21. As explained above, however, ACF did not meaningfully assess or weigh those factors. And even if it had, that would not make up for its failure to analyze the other "important aspect[s] of the problem" that ACF identified in the 2024 Rule and that Congress identified in the statute. *State Farm*, 463 U.S. at 43.

**C. Rescission of the Grants and Contracts Requirement**

Finally, ACF failed to address the 2024 Rule's rationale for the grants and contracts requirement: they "are required by the Act" and would "build" needed child care "supply in underserved geographic areas and for underserved populations." 2024 Rule, 89 Fed. Reg. at 15381.

1. Sounding a now-familiar theme, the government argues that ACF "considered" that rationale because it summarized comments that made a similar point. Opp'n 24. The rule acknowledged that "[c]ommenters noted that grants or contracts for direct services can be a useful tool in addressing . . . supply gaps" for underserved populations, and they raised "concerns that the recission of the requirement would limit parental choice to locate and enroll their child in a child care provider of their choosing due to child care supply constraints." 2026 Rule, 91 Fed. Reg. at 25800. Again, though, a recap of commenters' concerns is not a "reasoned response." *Ohio*, 603 U.S. at 293.



18 WEST MERCER ST., STE. 400
SEATTLE, WASHINGTON 98119
TEL 800.238.4231 | FAX 206.378.4132
BARNARD IGLITZIN & LAVITT LLP

The response ACF did give simply "sidestep[s]" the point. *Ohio*, 603 U.S. at 295. Echoing its other responses, ACF answered commenters' concerns about child care supply with the truism that the 2026 Rule "does not prohibit a State or Territory's [sic] from providing direct child care services through grants or contracts if the Lead Agency finds this funding mechanism a useful tool to address supply gaps." 2026 Rule, 91 Fed. Reg. at 25800. But ACF already found that grants and contracts "are an important tool for building child care supply." 2024 Rule, 89 Fed. Reg. at 15370. So did Congress. *See* S. Rep. No. 113-138, at 12 (2014) (grants and contracts are "particularly helpful in meeting the needs of specific populations of children and are well-suited to provide services in specific geographical areas"). Yet most states and territories do not use them. 2026 Rule, 91 Fed. Reg. at 25800. That the new rule does not "prohibit" grants and contracts, *id.*, does not explain why it authorizes states and territories to continue to forgo those critical tools.

2. The government next claims ACF repealed the grants and contracts requirement because of the "expense and complexity of implementation," Opp'n 24, presumably referring to ACF's remark that grants and contracts are an "expensive and complicated process," 2026 Rule, 91 Fed. Reg. at 25800. But ACF's economic analysis estimated that the requirement would have cost only $3.3 million annually across all states and territories for the first two years and $6.5 million annually for the next three years. *Id.* at 25806. ACF could not



18 WEST MERCER ST., STE. 400
SEATTLE, WASHINGTON 98119
TEL 800.238.4231 | FAX 206.378.4132
BARNARD IGLITZIN & LAVITT LLP

possibly have determined that those relatively modest costs outweighed the rule's benefits for child care supply because it made no attempt to assess those benefits. In claiming to have rescinded the requirement based on its purported costs without measuring the benefits (or explaining why they could not be measured), ACF acted arbitrarily. *See San Francisco*, 981 F.3d at 759 (agency acted arbitrarily because it did not "quantify the financial costs" of rule or explain why those costs could not be quantified).

3. Indeed, ACF wholly failed to "examine the relevant data" concerning the benefits of grants and contracts for child care supply. *State Farm*, 463 U.S. at 43. Both the 2024 Rule and the 2026 comments cited ample evidence that grants and contracts increase investment in child care and grow supply, especially for infants and toddlers, children with disabilities, and children in child care deserts. *See*, *e.g.*, Ex. 18, Nat'l Ass'n for Educ. of Young Children Comment at 6 (ACF_006555), Dkt. 31-18 (73% of providers would be more willing to accept families with subsidies if they could receive grants and contracts to serve infants and toddlers and children with disabilities). But ACF did not discuss any of this evidence. Indeed, it made no attempt to assess the effects of the grants and contracts requirement on the supply of child care.

## III. The 2026 Rule is contrary to law.

The 2026 Rule is also contrary to law. Under Section 706 of the APA, an agency rule may not "sanction[] unlawful conduct by third parties." *Protect Our*



18 WEST MERCER ST., STE. 400 SEATTLE, WASHINGTON 98119 TEL 800.238.4231 | FAX 206.378.4132
BARNARD IGLITZIN & LAVITT LLP

*Cmtys. Found. v. LaCounte*, 939 F.3d 1029, 1043 (9th Cir. 2019). Based on ACF's 2024 findings—unconsidered and undisturbed by the 2026 Rule—the 2026 Rule authorizes practices that violate the Act. Pls.' Mot. 33–34.

1. First, as the government agrees, the Act prohibits states and territories from setting copays at a level that creates a "barrier" to accessing child care with subsidies. 42 U.S.C. § 9858c(c)(5); *see* Opp'n 12 ("Congress required family contributions not to be a barrier to accessing CCDF subsidies"). In 2024, ACF found that copays over 7% of a family's income created such a barrier. 2024 Rule, 89 Fed. Reg. at 15387. The agency never revised that factual finding. *See* Opp'n 20 ("The 2026 Rule makes no finding that families can afford copayments above seven percent of income."). And the government does not even dispute the finding now, let alone cite any evidence to the contrary. *See id.* Nor could it: the evidence in the record overwhelmingly supports the "barrier" finding. *See* Pls.' Mot. 22–23.

The government is of course correct that the Act itself does not prescribe a precise "numerical ceiling," Opp'n 12, but that is beside the point. Congress routinely sets general standards without specifying every practice that violates them; statutes often leave the agency to determine more precise thresholds based on the facts and data. *See, e.g.*, *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 465 (2001) (Clean Air Act delegated agency power to set air quality standards "requisite to protect the public health"). And here, the agency found



18 WEST MERCER ST., STE. 400 SEATTLE, WASHINGTON 98119 TEL 800.238.4231 | FAX 206.378.4132
BARNARD IGLITZIN & LAVITT LLP

based on unrebutted evidence that copays over 7% of income created an impermissible barrier to child care access, in violation of the Act. By authorizing copays that erect that barrier, the 2026 Rule "sanction[s]" violations of the Act. *Protect Our Cmtys. Found.*, 939 F.3d at 1043.

2. Similarly, the Act requires state payment practices to be "generally accepted" in the private market. 42 U.S.C. § 9858c(c)(2)(S)(i). Although the statute does not explicitly proscribe retroactive and attendance-based payments, ACF found that those practices are not "generally accepted" in the private market. 2024 Rule, 89 Fed. Reg. at 15369 ("Generally accepted payment practices for parents who do not receive subsidies (which are most parents) require a set fee, are based on a child's enrollment, and are paid in advance of when services are provided."). Again, ACF never revised those findings; the record here confirms them, *see*, *e.g*., Ex. 18, Nat'l Ass'n for Educ. of Young Children Comment at 4–5 (ACF_006553–54), Dkt. 31-18; and the government cites no evidence that undermines them. ACF's undisputed factual findings thus establish that retroactive and attendance-based payments are not "generally accepted" and violate the Act. 42 U.S.C. § 9858c(c)(2)(S)(i).

3. Finally, the rescission of the grants and contracts requirement violated the statutory mandate to "provide assurances" that parents in the program "are given the option either . . . to enroll [their] child with a child care provider that has a grant or contract for the provision of [child care] services"


18 WEST MERCER ST., STE. 400 SEATTLE, WASHINGTON 98119 TEL 800.238.4231 | FAX 206.378.4132
BARNARD IGLITZIN & LAVITT LLP

or "to receive a child care certificate." 42 U.S.C. § 9858c(c)(2)(A)(i). States cannot assure that parents are "given the option" to enroll their child with a provider "that has a grant or contract" if no provider has such a grant or contract. *Id.* Thus, as the 2024 Rule concluded, grants and contracts "are required by the Act." 2024 Rule, 89 Fed. Reg. at 15381.

The government reinterprets this provision to require states to give parents the grant-or-contract option only when a state decides to offer grants or contracts. Opp'n 15. But the statute contains no such qualification. Indeed, in the 2026 Rule, ACF recognized that the same language in Section 9858c(c)(2)(A)(i) requires states to offer child care certificates: "If a Lead Agency chooses to utilize grants or contracts for some direct child care services, the Lead Agency must continue to offer all families the option to receive a child care certificate for all CCDF-eligible children." 2026 Rule, 91 Fed. Reg. at 25800. If the requirement to assure parents "are given the option" to choose a certificate or a provider with a grant or contract requires states to "offer all families the option to receive a child care certificate," *id.*, it must also require states to offer the option to enroll with a provider who has a grant or contract.

Finding no foothold in the text, the government retreats to the legislative history, quoting the 2014 Senate Report's statement that "[g]rants and contracts will continue to remain an option for States to provide direct services to children." S. Rep. No. 113-138, at 12. But the passage from which the


18 WEST MERCER ST., STE. 400 BARNARD
SEATTLE, WASHINGTON 98119 IGLITZIN &
TEL 800.238.4231 | FAX 206.378.4132 LAVITT LLP

government plucks that line was discussing why the amendment "reasserts that a primary goal of CCDBG is 'to promote parental choice to empower working parents to make their own decisions regarding the child care that best suits their family's needs.'" *Id.* at 11–12. It was not focused on the question here—whether states must offer at least some grants or contracts to satisfy the statute. In context, the phrase "remain an option" does not suggest the grants and contracts are optional so much as it reinforces their importance. *See id.* In any event, "legislative history is not the law," and it certainly may not be used to "divine messages from congressional commentary directed to different questions altogether." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 523 (2018).

## IV. The Court should vacate the rule.

When an agency rule violates the APA, the statute directs the Court to "hold unlawful and set aside" the rule. 5 U.S.C. § 706. Thus, "vacatur and remand is the default remedy" under the APA. *Nat. Grocers v. Rollins*, 157 F.4th 1143, 1170 (9th Cir. 2025); *accord All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1121 (9th Cir. 2018) ("[V]acatur of an unlawful agency action normally accompanies a remand."). The Court may "order remand without vacatur only in 'limited circumstances'"—and only "when equity demands" that rare result. *Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015) (citation omitted).


18 WEST MERCER ST., STE. 400 BARNARD
SEATTLE, WASHINGTON 98119 IGLITZIN &
TEL 800.238.4231 | FAX 206.378.4132 LAVITT LLP

As the party "opposing invalidation of unlawful agency action," the government has the burden "to rebut the APA's 'presumption of vacatur' by showing that the equities demand remand without vacatur." *Coal. to Protect Puget Sound Habitat v. U.S. Army Corps of Eng'rs*, 466 F. Supp. 3d 1217, 1226 (W.D. Wash. 2020), *aff'd*, 843 F. App'x 77 (9th Cir. 2021). It has not done so.

First, the errors are "serious[,]" not just technical or harmless. *Pollinator*, 806 F.3d at 532. The agency failed to meaningfully respond to any of the key rationales behind the requirements it rescinded or its prior factual findings, which found that the practices the 2026 Rule permits violate central requirements of the Act. And the unrebutted qualitative and quantitative data overwhelmingly supports those prior factual findings, including that copays over 7% create a "barrier" to child care access and that attendance-based and retroactive payments are not "generally accepted" in the market. *See* Pls.' Mot. 22–23 (copays); *id.* at 25–26 & n.4 (payment practices); *supra* pp. 18–19, 26–27. The government does not cite any evidence that could warrant a different finding on those key statutory questions. *See* Opp'n 25–26. Thus, the government has not shown it is likely that the agency will be able to justify the 2026 Rule under the CCDF Act's requirements on remand.

Second, as explained above, the statute requires states to offer at least some grants and contracts so that parents "are given the option" to enroll their children with a provider who has one. 42 U.S.C. § 9858c(c)(2)(A)(i); *see supra*



18 WEST MERCER ST., STE. 400 SEATTLE, WASHINGTON 98119 TEL 800.238.4231 | FAX 206.378.4132
BARNARD IGLITZIN & LAVITT LLP

pp. 27–28. Because the 2026 Rule permits states and territories *not* to provide the grant or contract option to *any* parent, the agency cannot maintain that provision on remand. *See Nat. Grocers*, 157 F.4th at 1170–71.

Third, the government cannot show that vacating the 2026 Rule would cause more harm than leaving it in place. The unrebutted evidence shows that the practices authorized by the 2026 Rule place heavy financial burdens on child care providers and families. Copayments higher than 7% force families to sacrifice necessities like food and rent to afford child care, and they force providers to accept less money and lose clients, making it harder to pay their bills and their staff. *See* Pls.' Mot. 22–23 & n.3; *supra* Part I; *see also* 2024 Rule, 89 Fed. Reg. at 15403 (estimating copay cap would lower child care costs for "sixty thousand" families who pay over 7% of their income as a copay). Both attendance-based and retroactive payment practices place heavy financial burdens on providers, threatening to force some out of business entirely. *See* Pls.' Mot. 27–29.[4] And without grants and contracts, parents of underserved

---

[4] *See* Ex. 18, Nat'l Ass'n for Educ. of Young Children Comment at 7 (ACF_006556), Dkt. 31-18 ("During cold and flu season, if childcare providers were only paid based on attendance rather than enrollment, many of us simply would not survive the winter."); *id.* (collecting similar statements); Ex. 8, Thompson Decl. ¶ 18, Dkt. 31-8 ("[M]any of the providers closed their doors because they did not think they could stay afloat in Ohio's current system, without the changes promised in the 2024 rule."); Ex. 11, Rodriguez Decl. ¶¶ 10–11, 14–16, Dkt. 31-11 (describing financial burdens of retroactive and attendance-based payments); Ex. 12, Good Decl. ¶¶ 11–13, Dkt. 31-12 (same).



18 WEST MERCER ST., STE. 400 SEATTLE, WASHINGTON 98119 TEL 800.238.4231 | FAX 206.378.4132
BARNARD IGLITZIN & LAVITT LLP

children will have a harder time finding care. *See id.* at 31–32 & n.7.[5]

Any "disruption" the vacatur causes, Opp'n 25, would not outweigh those harms. First, the government's claim that vacatur would cause "disruption" assumes that ACF would adopt the same rule on remand. But the Court must assume that the agency will reconsider the matter afresh on remand and follow the law when it does so. *See Pit River Tribe v. U.S. Forest Serv.*, 615 F.3d 1069, 1082 (9th Cir. 2010) ("While bureaucratic inertia may be a risk, we presume that agencies will follow the law."). As explained above, the unrebutted record evidence supports the uncontested findings in the 2024 Rule, the government has not explained how ACF could reverse those findings, and the 2026 Rule will not comport with the statute if they remain in place. Because the agency is unlikely to keep the same rule on remand, retaining the 2026 Rule and the burdens it imposes would be the more disruptive option.

Second, before ACF rescinded the 2024 Rule this May, noncompliant states had already been in the process of changing their policies and processes to meet its requirements for about two years. The government has not shown that restoring the rule would require states to incur substantial additional costs beyond those they already incurred. It cites requests from Pennsylvania,

---

[5] *See* Ex. 23, Liminality Consulting Comment at 3 (ACF_005225), Dkt. 31-23 (32% of children in rural areas do not have child care because of lack of supply, and removing the grants and contracts requirement would "remove a reliable source of funding for these providers" and thereby depress supply).



18 WEST MERCER ST., STE. 400 BARNARD
SEATTLE, WASHINGTON 98119 IGLITZIN &
TEL 800.238.4231 | FAX 206.378.4132 LAVITT LLP

Ohio, and Washington for extensions of time to comply with the 2024 Rule. *See* Opp'n 26. But two of those requests were filed more than a year-and-a-half before the 2026 Rule took effect, and none of them estimate the costs those states would need to incur to comply today. *See* Dkt. 28-5 at 124 (ACF_001346) (Ohio); Dkt. 28-5 at 260 (ACF_001482) (Pennsylvania); Dkt. 28-5 at 276–79 (ACF_001498–1501) (Washington). Indeed, the 2024 Rule estimated that states would incur all the costs necessary to update their IT systems, and two-thirds of the total costs of the rule, in the first two years. 89 Fed. Reg. at 15401. And as explained, ACF's economic analysis did not identify any costs that states would incur in implementing the 2024 Rule that ACF did not already project in 2024. *See* 2026 Rule, 91 Fed. Reg. at 25806.

In short, the government cannot show that "equity demands" the Court sustain an invalid rule so bereft of analysis and so harmful to the small businesses and families who rely on CCDF. *Pollinator*, 806 F.3d at 532.

## CONCLUSION

The Court should grant Plaintiffs' motion for summary judgment, deny Defendants' motion, and vacate the 2026 Rule.


18 WEST MERCER ST., STE. 400 BARNARD
SEATTLE, WASHINGTON 98119 IGLITZIN &
TEL 800.238.4231 | FAX 206.378.4132 LAVITT LLP

Dated: November 12, 2026

Respectfully submitted,

*/s/ Sean Ouellette*
Sean Ouellette*
Briana M. Clark*
Joel McElvain*
Robin F. Thurston*
**DEMOCRACY FORWARD FOUNDATION**
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
souellette@democracyforward.org
bclark@democracyforward.org
jmcelvain@democracyforward.org
rthurston@democracyforward.org

Robert H. Lavitt, WSBA No. 27758
Sarah E. Derry, WSBA No. 47189
**BARNARD IGLITZIN & LAVITT LLP**
18 W Mercer St, Suite 400
Seattle, WA 98119
(206) 257-6004
lavitt@workerlaw.com
derry@workerlaw.com

*Counsel for Plaintiffs*
**Admitted pro hac vice*

**WORD COUNT CERTIFICATION**

Per Local Rule 7(e)(6), I certify that this memorandum contains 8,367 words excluding the caption, table of contents, table of authorities, and signature block, in compliance with the Local Civil Rules.

*/s/ Sean Ouellette*
Sean Ouellette



18 WEST MERCER ST., STE. 400 BARNARD
SEATTLE, WASHINGTON 98119 IGLITZIN &
TEL 800.238.4231 | FAX 206.378.4132 LAVITT LLP